David D. Garner, 020459
Travis C. Hunt, 035491
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
dgarner@omlaw.com
thunt@omlaw.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Mohamed Sabra; and Council on American-Islamic Relations of Arizona,

Plaintiffs,

vs.

Maricopa County Community College District; and Nicholas Damask, in his official and individual capacity,

Defendants.

No. 2:20-cv-01080-PHX-SMB

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**(Oral Argument Requested)**

OSBORN MALEDON
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

## INTRODUCTION

"[S]chools are not required to delete from the curriculum all materials that may offend any religious sensibility."[1] Moreover, "there has never been any reported case holding that a teacher violate[s] the Establishment Clause by making statements in the classroom that were allegedly hostile to religion."[2] This case is no different. Preliminary injunctive relief should be denied, and Plaintiffs' claims dismissed.

* * * *

Plaintiffs' Complaint fails on the merits—as a matter of law—for two, separate but equally compelling reasons: (a) Plaintiffs' claims are moot and they lack standing; (b) Plaintiffs' claims are not supported under the Establishment and Free Exercise clauses, and undermine First Amendment protections reserved for academic freedom.[3]

In addition to (1) having no chance of success on the merits, Plaintiffs' request for preliminary injunctive relief similarly fails every other prerequisite for such extraordinary relief: (2) offense based on university course instruction is not recognized as harm for purpose of "irreparable harm," and in any case, is moot; (3) the balance of equities disfavor a preliminary injunction because it would undermine Defendants' academic freedom; and (4) for those same reasons, a preliminary injunction is not in the public interest. Accordingly, Plaintiffs' Motion must be denied.

## BACKGROUND

Plaintiff Mohamed Sabra is a former student of an online World Politics course at Scottsdale Community College ("SCC") taught by Dr. Nicholas Damask. Dr. Damask

---

1 *Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1318 (8th Cir. 1980).

2 *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 986 (9th Cir. 2011).

3 Properly viewed, Plaintiffs' claim is not that the World Politics course generally disapproves of *Islam*, but rather that Dr. Damask erred in failing to distinguish clearly enough between *different views of Islam*—specifically, between alleged "radical" and alleged "mainstream" views of Islam. These are essentially allegations of "educational negligence or malpractice"—a claim that is not recognized and has been repeatedly rejected by the courts. *See Ross v. Creighton Univ.*, 957 F.2d 410, 414-415 (7th Cir. 1992) (collecting case).

received his PhD in Political Science from the University of Cincinnati, where his studies concentrated on Contemporary Political Violence and his doctoral dissertation specifically addressed contemporary terrorism.[4]

**The World Politics Course.** The World Politics course focuses on "the principles and issues relating to the study of international relations," and is broken down into six modules, each consisting of: a PowerPoint lecture, supplemental reading materials, and an online quiz. (Ex. D. to Comp., Course Syllabus.)

As explained in the syllabus, the goals of the course included (1) evaluating "the political, economic, national, and transnational rationale for international interactions," (2) "[a]nalyz[ing] the role of scientific inquiry in the field of international relations, (3) "[d]elineat[ing] the historical development of interstate relations," and (4) "[d]escrib[ing] the issue of change in the international environment and those forces that may initiate their change." *Id.* at 1-2. The syllabus further states that "[s]tudents can expect a response time of a few hours for the instructor to respond to messages sent via the Canvas Learning Management System or email." *Id.* at 5.

**The Islamic Terrorism Module.** One of the topics addressed in the course is international terrorism. Although the materials in this module discussed a broad variety of terrorist groups throughout history, the unit focused on "Islamic Terrorism," given that the vast majority of groups currently designated as foreign terrorist organizations claim a religious foundation in Islam.[5]

The PowerPoint lecture associated with the terrorism topic provided: (1) a general definition of what terrorism is and how it is distinguished from other forms of political violence, along with a brief history of terrorism ("Defining Terrorism"); (2)

---

[4] *See* SCC Website, Biography of Nicholas Damask, *available at* https://contact.scottsdalecc.edu/faculty/faculty_member/damask-nicholas.

[5] *See* Department of State, Foreign Terrorist Organization, *available at* https://www.state.gov/foreign-terrorist-organizations/. The few non-Islamic organizations on the list are generally either functionally defunct or not international in nature.

theories relating to the rise of, and justification for, terrorism within Islam specifically ("Islamic Terrorism: Definition"); and (3) an analysis of how different political schools of thought approach solving the problem of terrorism by those professing a belief in Islam ("Islamic Terrorism: Analysis"). (Ex. A, Full PowerPoint, at Slide 1.)

In the Defining Terrorism section, the PowerPoint presentation first explains theoretical motivations behind terrorist acts by several groups—not just groups associated with Islam. *Id.* at Slides 2-21. For example, the presentation first discusses the professed religious motivations for terrorist acts by the early religious Zealots (Jewish), Assassins (Islamic), and Thuggees (Hindu). The presentation then proceeds to discuss "nationalist/right-wing terrorism" (e.g., Nazis in Germany, KKK in the U.S., hakki ichiu in Japan) and "communist/left-wing terrorism" (e.g., People's Will in Russia; Red Army in Germany, Provisional Irish Republican Army in Northern Ireland, Weather Underground in the U.S., Sendero Luminoso in Peru, and the Khmer Rouge in Cambodia) in the nineteenth and mid-twentieth centuries. *Id.*

The "Islamic Terrorism: Definition" section of the PowerPoint lecture discusses what it describes as Islamic terrorism in some detail. *Id.* at Slides 2-26. When read in context of the topic being analyzed—*Islamic terrorism*, as distinct from *Islam in general*—it becomes clear that none of the references to Islam seek to endorse or inhibit belief in the religion in any way. *Id.* For example,

- Slide 25 explains that "[*a*]*ll Islamic terrorists* sanctify their actions through pious references to the Quran and the traditions of the Prophet Muhammad." *Id.* at 25 (emphasis added).
- Slide 23 discusses the "theological mandate for jihad" but clearly does so from the perspective of terrorists seeking justification for their actions. *Id.* at 23.
- In describing the "efforts" required in jihad, Slide 22 states that they are "physical, not simply prayer or introspection." *Id.* Notably, the statement does not preclude prayer and introspection. Moreover, there are many forms of physical action that do not involve terrorism, including potentially self-defense

or actual warfare. Thus, when Slide 22 goes on to state that "jihad is a religiously-justified, communal mobilization of the resources and capabilities of the Muslim population for war against unbelievers," it is decidedly not stating that the Muslim population generally condones terrorism. ***Id.*** It is simply explaining the justifications offered by those in Islam who do support terrorism.

Contrary to Plaintiffs' repeated refrain throughout its brief and in the Complaint, nowhere in any of the course materials is it ***ever*** stated that: "Muslims have a 'theological mandate' to kill Non-Muslims"[6] or that "Islam is terrorism." ***See id.*** at 1-42.

Other statements in the slides that Plaintiffs claim to be offensive are statements with citations to sourced facts and statistics regarding terrorism by some who profess to believe in Islam, including those on Slides 21, 25, 33.[7]

**Mr. Sabra is offended.** After taking the quiz associated with this topic, Mr. Sabra emailed Dr. Damask to let him know that he was offended by some of the questions, which he considered to be "in distaste of Islam" and caused him to "feel disgust." (Ex. E to Comp., April 29-30 email exchange.)

**Dr. Damask's efforts to clarify.** Dr. Damask promptly responded to Mr. Sabra, explaining that: no offense was intended; "the course isn't 'for' or 'against' anything"; and the materials and quiz questions focused on views of Islam expressed by terrorist groups—which "may be quite wrong" or may be "twisted … from a kernel of truth into something horribly misguided." Moreover, consistent with the course's goals, the content related to this topic "aim[ed] to explain international politics," including the

---

[6] (Comp. ¶¶ 48, 68; Mot. at 4, 6, 16, 18.)

[7] Although Defendants disagree that Dr. Damask should be required to provide source citations for all of the cited facts in the slides, much of the information in these slides can be found in the following locations. ***See*** INSTITUTE FOR ECONOMICS AND PEACE, GLOBAL TERRORISM INDEX (2017), ***available at*** http://visionofhumanity.org/app/uploads/2017/11/Global-Terrorism-Index-2017.pdf; UNIVERSITY OF MARYLAND, GLOBAL TERRORISM DATABASE, ***available at*** https://www.start.umd.edu/gtd/; HANNAH, HASSELL, ET. AL., TERRORISM, Published online at OurWorldInData.org (2013), ***available at*** https://ourworldindata.org/terrorism#all-charts-preview.

"phenomenon of terrorism in international politics" as well as the use of terrorism by some "in a way that amounts to carrying out their own foreign policy according to their deeply held religious beliefs." (*Id.* at 2-3.).

Mr. Sabra replied that "[t]he course may outline these beliefs but that doesn't make it acceptable to teach this misinformation to other student[s] who aren't fully educated." *Id.* at 5. Mr. Sabra then asked Dr. Damask to review the three questions Mr. Sabra found offensive and explain them further:

9. Where is terrorism encouraged in Islamic doctrine and law?

Answer: the Medina verses.

12. Who do Islamic terrorists strive to emulate?

Answer: the Prophet Muhammad.

20. Terrorism is ___ in Islam.

Answer: justified within the context of jihad.

(Ex. B, Quiz, at 9, 12, 20.)

Dr. Damask promptly responded, providing context on the questions, much of which had already been provided in his PowerPoint lecture, and reiterated that "interpretations [of the Quran and other religious writings] by the terrorists may be quite wrong-headed. But try not to think about whether the terrorists' beliefs are 'right' or 'wrong' or 'true' -- you should approach the discussion thinking simply, 'what beliefs motivate them no matter how wrong they may be.'" (Ex. E to Comp. at 6-7.)

**Mr. Sabra's appeal to social media.** In the meantime, before receiving Dr. Damask's reply, and instead of engaging with Dr. Damask further or discussing with SCC administration, Mr. Sabra posted the quiz questions on social media—without any of the context provided in the PowerPoint lecture or from Dr. Damask's emails.

**Response to social media backlash.** The decontextualized response from social media was swift, including death threats to Dr. Damask. For its part, SCC responded to the social media furor by initially issuing a hasty apology. (*See* Ex. F to Comp.) Upon a more careful review of the matter in context, however, MCCCD subsequently issued a

public statement, explaining that the three quiz questions "were taken out of context from a unit examining violent political and social movements, and the subject they addressed – the reliance of certain violent groups on religious texts as a justification for their actions – was within the scope of the course." (Ex. C., MCCCD Statement.) Consistent with upholding requirements of academic freedom, the statement further affirmed: "[W]e expect our students and faculty to engage fully with the ideas and perspectives of others, even when they disagree with each other." (*Id.*)

**Mr. Sabra completes the course and files suit.** After completing the course (and passing with an 85.67%), (Ex. D, Grade Sheet.) Mr. Sabra filed this lawsuit with Co-Plaintiff Council on American-Islamic Relations of Arizona ("CAIR"), claiming that Defendants violated the Establishment and Free Exercise Clauses of the First Amendment, not only because of the three quiz questions but because, in their view, "the entire module disapproved of Islam." (*See* Comp. ¶ 48)

## ARGUMENT

"The Supreme Court has emphasized that preliminary injunctions are an 'extraordinary remedy . . . ,'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted), and require Plaintiffs to "make 'a clear showing"' as to each of the four, required elements of preliminary injunctive relief. *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 876 (D. Ariz. 2012) (citation omitted) (confirming that this high "burden of persuasion" is on the movant).

Here, Plaintiffs cannot make the required clear showing with respect to the four prerequisites: (a) likely success on the merits, (b) irreparable harm, (c) that the balance of equities favors an injunction, and (d) that the requested relief is in the public interest. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013).[8] Moreover, because

---

[8] In light of Defendants' academic freedom rights and for the reasons discussed below, Plaintiffs' claims also fails under the "alternate formulation of the *Winter* test" discussed in *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012), because the "balance of hardships" tips toward Defendants, not Plaintiffs, and there are no "serious questions going to the merits."

Plaintiffs are essentially asking MCCCD to monitor a professor's course to ensure that it does not offend them or others, Plaintiffs' request constitutes a "mandatory injunction" and is "particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319-20 (9th Cir. 1994) (citations omitted).

**I. Plaintiffs Are Unlikely to Succeed on the Merits.**

**A. Plaintiffs' Constitutional Claims Became Moot Upon Mr. Sabra's Completion of the World Politics Course.**

As an initial matter, Mr. Sabra's alleged constitutional injuries ceased when he successfully completed the World Politics course. Because there is simply no continuing harm to Mr. Sabra that the Court can redress, his claims fail to meet the requirement of a live controversy and should be dismissed as moot. *See Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (finding moot former student's claims challenging the constitutionality of school rules regulating the student newspaper); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999) (en banc) (finding moot former student's First Amendment claim based on prayers at graduation ceremony); *See DeFunis v. Odegaard*, 416 U.S. 312, 319-20 (1974) (holding current law student's claim moot, because he was in final semester).

Because Mr. Sabra completed the World Politics course, he will not be subject to the same lectures that caused his alleged injuries. The possibility that another student might be exposed to the allegedly offending course content is insufficient to avoid dismissal for mootnes. *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123-24 (9th Cir. 1997), *as amended* (Sept. 16, 1997) (discussing the very narrow mootness exceptions, inapplicable here).

**B. Plaintiffs Also Lack Standing.**

Plaintiffs' claims have no likelihood of success for the additional reason that Plaintiff's lack standing to bring the asserted claims. Article III standing requires a plaintiff to establish (1) that he or she has "suffered an 'injury in fact'"; (2) that the injury is "'fairly . . . trace[able] to the challenged action of the defendant'"; and, (3) that

it is "'likely' " that "the injury will be 'redressed by a favorable decision.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The Supreme Court requires in Establishment Clause cases alleging non-economic injury that the injury must be "'directly affected by the laws and practices against which their complaints are directed.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n. 22 (1982) (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n. 9 (1963)). This requires a plaintiff to allege an injury that is more concrete than the mere assertion that he has observed conduct violating the Constitution. *Valley Forge*, 454 U.S. at 485 ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing" under Article III); *see also Catholic League for Religious & Civil Rights v. City & Cty. of S.F.*, 624 F.3d 1043, 1052 (9th Cir. 2010 ("[T]he psychological consequence [must be] exclusion or denigration on a religious basis within the political community.").

Dr. Damask's online course materials and quiz did not and could not affect the political community in which Mr. Sabra and CAIR associate. As soon as Mr. Sabra finished the course, neither he nor CAIR had any connection with Dr. Damask or his World Politics course. *See e.g.*, *Mincone v. Nassau Cty. Cmty. Coll.*, 923 F. Supp. 398, 404-05 (E.D.N.Y. 1996) (finding that the plaintiffs who were not enrolled in the challenged course at the college did not have standing based on their status as county taxpayers to assert free exercise of religion claims). Further, the injunctive relief Plaintiffs seek cannot remedy a past alleged injury from a course that Mr. Sabra is not currently enrolled in. *See Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 815 (9th Cir. 1995) ("Mootness, like standing, limits judicial power to cases where the wrong can be redressed by the lawsuit.").

**C. Plaintiffs' Establishment Clause Claim Fails.**

Even if Plaintiffs' claims were not fatally deficient for mootness and lack of standing, they must fail on the merits of its Establishment Clause and Free Exercise claims, as well. Government action satisfies the Establishment Clause if it: (1) has a secular purpose; (2) does not have the principle or primary effect of advancing or inhibiting religion; and (3) does not foster excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971); *Catholic League*, 624 F.3d at 1054-55.

Plaintiffs do not contest—and thereby concede—that the first and third prongs of the *Lemon* test are satisfied here. Plaintiffs' sole contention is that the course content fails the second prong of the *Lemon* test because it allegedly "disapproves" of Islam. (Mot. at 5.) But, Ninth Circuit precedent is clear: "[T]here has never been any reported case holding that a teacher violate[s] the Establishment Clause by making statements in the classroom that were allegedly hostile to religion." *C.F.*, 654 F.3d at986. Indeed, the cases on which Plaintiffs rely *reject* the claim Plaintiffs are attempting to advance here. The same result should occur here, and in any event, Plaintiffs do not remotely meet the demanding standard for preliminary injunctive relief.

**1. The primary effect standard requires an informed and objective observer and does not categorically prohibit all disapproval of religion.**

"[P]ublic schools are not required to delete from the curriculum all materials that may offend any religious sensibility." *Florey*, 619 F.2d at 1318; *id.* at 1317 ("It would be literally impossible to develop a public school curriculum that did not in some way affect the religious … sensibilities of some of the students or their parents."). Consistent with this practical recognition, *Lemon*'s second prong affirms that governmental action is constitutional where the "*principal or primary* effect" "neither advances nor inhibits religion." *Lemon*, 403 U.S. at 612 (emphasis added).

Moreover, the primary effect of a challenged practice is not a subjective analysis, but is considered under a "reasonable observer standard," where the hypothetical observer is both "informed" and "reasonable," and "we assume that he or she is familiar with the

history of the government practice at issue." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir. 1994) (citation omitted); *id.* at 1379 ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself."). In addition, "when determining the purpose or primary effect of challenged religious content, courts … consistently have examined the entire context of surrounding the challenged practice, rather than only reviewing the contested portion." *Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir. 2019) (noting that "context is crucial" and also dictated by "common sense"); *Cal. Parents for Equalization of Educ. Mat. v. Torlakson*, 370 F. Supp. 3d 1057, 1081 (N.D. Cal. 2019) ("context . . . [is] essential in assessing the primary effect").

Under this substantive standard, even where the government practice reflects "some disapproval" of religion, this alone is not enough to run afoul of the Establishment Clause. *Id.* at 1079 ("[E]ven if there is some evidence by which a reasonable person could infer disapproval of Hindu religious beliefs . . . , that is not enough to conclude that the primary message . . . is disparagement."); *id.* at 1081 (affirming that Plaintiff's interpretation of *Lemon*'s second prong "would read the word 'primary' out of the primary effect test and render any conceivable disapproval a constitutional violation. That is not the law.").

**2. A reasonable and informed objective observer would see the challenged content as reflecting terrorists' motivations.**

The PowerPoint lecture provides the specific context for its discussion of Islam at Slide 25: "*All* Islamic terrorists sanctify their actions through pious reference to the Quran and the traditions of the Prophet Muhammad, and by extensive use of longstanding Islamic legal doctrines." (Ex. A, Full PowerPoint.)

A reasonable and informed objective observer, who in the context of a world politics class studying terrorism motivated by Islamic ideologies, would view the

challenged materials as having the primary effect of explaining exactly that: an analysis of the Islamic texts, traditions, and legal doctrines by which terrorist organizations justify their actions.

Rather than viewing the materials from the perspective of a reasonable and informed objective observer, Plaintiffs instead resort to "making up" and attributing to Dr. Damask comments that he never said and conclusions that he has never drawn, including Plaintiffs' oft-repeated and falsely attributed assertions that: "Muslims have a 'theological mandate' to kill Non-Muslims," (Mot. at 4.);[9] "Islam is terrorism," (Comp. ¶ 48); and "[all] Muslims are dangerous and a threat to society," (Mot. at 6.).

Contrary to these "straw-man" arguments, what the materials actually say is that: Islamic doctrine contains a "theological mandate *for jihad*," (Ex. A, Full PowerPoint at Slide 23 (emphasis added)); that jihad does "not simply [encompass] prayer and introspection," but also requires "physical 'efforts,'" (*Id.* at Slide 22); that such physical efforts may be read to include justifying acts of "violent struggle" such as defensive war (e.g., to protect from invaders), or offensive war, or based on interpretations of some Quranic verses and historical precedent, "the use of terror," (*Id*. at 24).[10] While the materials explain how terrorism may be justified through reference to Islamic texts, traditions, and doctrine, nowhere does the material state that Muslims are prohibited from living peacefully with their non-Muslim neighbors, much less that "Islam is terrorism" or that all Muslims are "dangerous" or that "1.8 billion Muslims in the world have a 'mandate' to kill the rest of the population." (Mot. at 16.) While these fanciful statements may serve as decontextualized sound bites to stir up social media fervor, they are not justified from an objective, reasonable, and informed review of the course content, in context, and do not reflect its primary effect.

---

[9] (*See also* Mot. at 6, 16, 18, and Complaint ¶ 67 (repeating the same).

[10] Plaintiffs acknowledge that Islamic texts and doctrine are in fact "accepted" and "espoused" by within Islam as justifying terrorism. (Mot. at 12; Complaint ¶ 68.)

**3. References to unpopular or unflattering religious views does not trigger the primary effect prong.**

The inclusion in public school curricula of statements that are negative or unflattering about a particular religion, or that do not mesh with the preferred narrative of the religious "mainstream" do not run afoul of the primary effect prong.

In *Torlakson*, for example, plaintiffs claimed that the State Board of Education's sixth-grade world history curriculum painted Hinduism in a derogatory and negative light in violation of the Establishment Clause. Among other things, the plaintiffs objected that the curriculum's "spotlight on caste [system] gives students an unfairly negative view of Hinduism" and is "derogatory." 370 F.Supp.3d at 1071-72. The court rejected the suggestion that curricular references to unpopular historical practices is sufficient to establish a primary effect of religious disapproval. The court went onto mention several other such "unpopular" statements in the challenged curriculum that reflect "some disapproval" of religion but fail to satisfy *Lemon*'s primary effect prong:

- "Muslim leaders conquered new land and forced some non-Muslims to convert."
- "Christians and Muslims enslaved captives who did not belong to their own religions."
- Noting "'extensive' criticism of the Catholic Church over the selling of indulgences and corruption by the clergy."

*Id.* at 1076. The objections Plaintiffs raised here are likewise insufficient to clear the primary effect bar.

**4. Plaintiffs' cases fail to support their analysis.**

Plaintiffs rely primarily on five cases to "support" their Establishment Clause argument. (Mot. at 14-18.) However, *none* of these cases holds that the challenged government practice unconstitutionally "disapproved" of religion in violation of the Establishment Clause. Indeed, these cases—all of which resulted in dismissal of the Establishment Clause claims as a matter of law—affirmatively support Defendants' position and illustrate why Plaintiffs claims fail on merits:

*California Parents for Equalization of Educational Materials v. Torlakson*, 370 F. Supp. 3d 1057 (N.D. Cal. 2019) (discussed *supra*; even if there was some disapproval of Hinduism, it was not primary effect; summary judgment granted).

*Grove v. Mead School District No. 354*, 753 F.2d 1528 (9th Cir. 1985) (rejecting Establishment and Free Exercise Claus claims that high school's refusal to remove book from curriculum, based on its being offensive to plaintiff's fundamentalist Christian beliefs; summary judgment affirmed).

*C.F. ex rel Farnan v. Capistrano Unified School District*, 654 F.3d 975 (9th Cir. 2011) (rejecting claim that A.P. History teacher's comments questioning religious beliefs violated Establishment clause; summary judgment on qualified immunity affirmed).

*American Family Association, Inc. v. City and County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) (rejecting claim that Board of Supervisor violated the Establishment and Free Exercises clauses when it issued resolutions in response to plaintiff's religiously-based "anti-gay" media campaign; dismissal affirmed).

*Vernon v. City of Los Angeles*, 27 F.3d 1385 (9th Cir. 1994) (rejecting Establishment and Free Exercise claims, based on City's investigation of assistant police chief for alleged improper influence of personal religious beliefs on department operations and policies; while evidence suggested some disapproval of plaintiff's religion (at 1398), "its *primary* message" was not disapproval of religion (at 1399); summary judgment affirmed).

**5. No formal "disclaimer" is required—or needed.**

Plaintiffs suggest that the course content would have been just fine, if the syllabus had included a disclaimer that the views expressed in the course are not universally shared. (Mot. at 18.) While it is true that some of Plaintiffs' cases referenced a disclaimer as part of the context for analyzing the primary-effect prong, none of the case made such a disclaimer mandatory. Nor was one required here. As noted above, the context of the material—a discussion of how "Islamic terrorists sanctify their actions through pious reference[s]"—provides any necessary, clarifying context. In any event, the existence of

other viewpoints is often self-evident in the materials themselves, which acknowledge (though reject) competing points of view. (Ex. B. to Comp., *Future of Jihad* at 18 (indicating how jihad is treated "[i]n most literature … related to Middle East politics," and disagreeing with that viewpoint).) Plaintiffs' Establishment Clause claim fails.[11]

**D. Plaintiffs' Free Exercise Clause Claim Fails.**

Plaintiffs' Free Exercise claim also lacks any likelihood of success. To state a viable Free Exercise Clause claim, Mr. Sabra would need to allege a government action that "substantially burdens a religious practice and either is not justified by a substantial state interest or is not narrowly tailored to achieve that interest." *Am. Family*, 277 F.3d at 1123; *see also Parker*, 514 F.3d 87; *Cal. Parents for Equalization of Educ. Mats. v. Torlakson*, 267 F. Supp. 3d 1218, 1226 (N.D. Cal. 2017).

Mr. Sabra trips on the very first step: he has identified no substantial burden to his ability to practice his religion that was violated when he reviewed the Islamic terrorism material and took the associated quiz. The fact that this material was apparently offensive to Mr. Sabra does not provide the basis for a Free Exercise challenge.[12] *See e.g.*, *Torlakson*, 267 F. Supp. 3d at 1226 ("At its core, Plaintiffs' Free

---

[11] Alternatively, Plaintiffs' ubiquitous allegations that the course content is "blatantly false" (Mot. at 11), "inaccurate" (*Id.* at 9), "factually incorrect" (*Id.* at 12), a "gross misconstruction[]" (*Id.* at 8), "only accepted by radicals" (*Id.* at 12), "intentionally distort[s] the context of specific Quranic verses" (at 8), and is outside "the actual mainstream belief of Muslims" (*Id.* at 8)—affirmatively invites the Court to impermissibly entangle itself in resolving religious questions about what the "correct" interpretation of Islamic doctrine is, which itself would violate the Establishment Clause. *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (noting that courts are "categorically prohibit[ed]" from resolving religious questions).

[12] *See e.g., Parker*, 514 F.3d 87; *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002) (student may be required to write a paper from a particular viewpoint, even if the student disagrees with that viewpoint); *see also Lee v. Weisman*, 505 U.S. 577, 597 (1992) (noting that it is an inevitable fact that "[p]eople may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation."); *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1379 (9th Cir. 1994) ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school

Exercise argument seems to be that the public school curriculum conflicts with their religious beliefs. The Ninth Circuit has held that this alone does not violate the Free Exercise Clause."); *cf. Wood v. Arnold*, 915 F.3d 308, 313 (4th Cir. 2019) (affirming summary judgment in favor of the school on student's First Amendment claim that he was academically punished for refusing to complete a fill-in-the-blank quiz on Islam indicating that "There is no god but ____ [Allah] and Muhammad is the ___ [messenger]," in contravention of his Christian religious beliefs; concluding that the quiz did not require the student to "profess or accept the tenets of Islam," but rather "to demonstrate her understanding of the world history curriculum") *id*. at 319. Further, the school's substantial interest in academic freedom outweighs Plaintiffs' interests in being shielded from material they find offensive to their religious beliefs.[13]

## II. Plaintiffs Will Not Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

Plaintiffs' alleged harm is entirely speculative, especially with Mr. Sabra no longer enrolled in the World Politics course. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

But even if Plaintiffs had pled such a claim (and they have not), raising a First Amendment claim is not enough, by itself, "to tip the hardship scales." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted). To hold otherwise

---

curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself.").

[13] *Grove*, 753 F.2d at 1543 (Canby, J., concurring) ( "[D]istinctions must be drawn between those governmental actions that actually interfere with the exercise of religion, and those that merely require or result in exposure to attitudes and outlooks at odds with perspectives prompted by religion.").

would collapse the other preliminary injunction elements into a finding on the merits.

### III. Academic Freedom in Colleges and Universities—not Excessive Religious-Centric Censorship—is in the Public's Best Interest.

Regarding the public interests, Plaintiffs' personal offense is not sufficient to override the Court's constitutionally imposed "responsibility to safeguard [schools'] academic freedom, 'a special concern of the First Amendment.'" *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) (quoting *Keyishian*, 385 U.S. at 603 (noting further judicial "reluctance to trench on the prerogatives of state and local educational institutions").

"To afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010). As one court noted, "If it were unconstitutional to require students to read books in which concepts coinciding with their religious beliefs came under question, then thousands of college courses throughout the country would be invalidated, including courses on philosophy, history, religion, literature, and biology." *Gheta v. Nassau Cty. Cmty. Coll.*, 33 F. Supp. 2d 179, 185 (E.D.N.Y. 1999); *accord Grove*, 753 F.2d at 1533-34 (finding no Establishment Clause violation and noting that "[i]f we are to eliminate everything that is objectionable to any of [the religious bodies existing in the United States] or inconsistent with any of their doctrines, we will leave public education in shreds").

In *C.F.*, the Ninth Circuit recently rejected a claim that a high school Advanced Placement history course teacher violated the Establishment Clause by promoting hostility to religion. The Court noted that "[t]he Supreme Court has long recognized the importance of protecting the 'robust exchange of ideas' in education, 'which discovers truth out of a multitude of tongues.'" *C.F.*, 654 F.3d at 988 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). As the Court noted, "teachers must . . . be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities. . . . [W]e must be careful not to curb intellectual freedom by imposing dogmatic

restrictions that chill teachers from adopting the pedagogical methods they believe are most effective." *C.F.*, 654 F.3d at 988

Such academic freedom is even more important at the college level: "If colleges are forced to act as the hall monitors of academia, subject to constant threats of litigation both from professors who wish to speak and listeners who wish to have them silenced," many would steer away from any controversial topics or professors to avoid litigation. *Rodriguez*, 605 F.3d at 708-09 (relying in part on academic freedom grounds to reject First Amendment claim); *see also*, *e.g.*, *C.F.*, 654 F.3d at 988 (listing cases that involve Establishment Clause claims in an educational context, reflecting that such cases typically focuses on elementary or high school students). College students are not only more mature than high school students, but they have voluntarily decided to continue to pursue their education, selecting their course of study and the classes they wish to take. *Gheta*, 33 F. Supp. 2d at 186 (Establishment Clause claims are different for community college students than elementary school students). Plaintiffs' offense over the materials in the World Politics course is not a reason to override constitutional protections relating to academic freedom, or justify the extraordinary remedy of a preliminary injunction.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion should be denied.

DATED this 19th day of June, 2020.

OSBORN MALEDON, P.A.

By s/ David D. Garner
David D. Garner
Travis C. Hunt
2929 N. Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793

Attorneys for Defendants

TORRES LAW GROUP, PLLC

By s/James E. Barton II
James E. Barton II
Jacqueline Mendez Soto
2239 West Baseline Road
Tempe, Arizona 85283

Co-counsel for Defendant Nicholas Damask