**PRICE LAW GROUP**
David Chami, Esq. (AZ Bar # 027585)
8245 N. 85th Way, Suite 4349
Scottsdale, Arizona 85258
Email: David@pricelawgroup.com
Phone: (818) 600-5515
Fax:     (818) 600-5415

**RM WARNER, PLC**
Raeesabbas Mohamed, Esq. (AZ Bar # 027418)
8283 N. Hayden Road, Suite 229
Scottsdale, Arizona 85258
Email: Raees@RMWarnerlaw.com
Phone: (480) 331-9397
Fax:    (866) 961-4984

**COUNCIL ON AMERICAN-ISLAMIC RELATIONS OF ARIZONA**
Ahmed Soussi. Esq. (AZ Bar # 035741)
1819 S. Dobson Road, Suite 214
Mesa, Arizona 85202
Email: Asoussi@cair.com
Phone: (480) 704-3786

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mohamed Sabra; and Council on American-Islamic Relations of Arizona,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>Maricopa County Community College District; and Nicholas Damask, in his official and individual capacity<br><br>　　　　　Defendants. | **Case No.  CV-20-01080-PHX-SMB**<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hearing Set: June 29, 2020.<br>Time: 9 a.m. |

1

1

**Introduction.**

2    Defendants' Response misses the mark substantively, and mischaracterizes

3 Plaintiff's argument and Defendants' own words. The primary message of the Islamic

4 Terrorism Module is that Islam mandates terrorism – a position that an informed and

5 reasonable observer would find hostile to Islam.  Defendants ask this Court to replace

6 express constitutional rights within the First Amendment's Establishment Clause with their

7 vague "academic freedom" request. But academic freedom does not permit Damask to

8 abuse his position of authority and cross the line into hostility – an instruction from the

9 Ninth Circuit that was clearly omitted in Defendants' citation to the *Farnan* case.[1]

10    Defendants also reduce their gross Establishment Clause violations to mere

11 "educational negligence", "offensive" and "unpopular" content. The issue is not about

12 differing views, religious debate, teaching methodology, curriculum, or other legitimate

13 artifacts of education. Nor is the injunction about Sabra reading "objectionable" material in

14 Damask's class. The issue is Defendants are teaching demonstrable *hostility* towards a

15 religion and that no alternative view exists.

16    Plaintiff CAIR-AZ is entitled to an injunction, based on the facts.  If this Court finds

17 that components within Module 6 are likely unconstitutional, then a preliminary injunction

18 is certainly warranted. A continuing Establishment Clause violation is sufficient to show

19 irreparable harm.[2]  Notably, Defendants utterly failed to identify an iota of harm or hardship

20 that could possibly result from enjoining the limited inflammatory components within

21 Module 6.  The Defendants would not be deprived of any academic benefit nor would their

22 students.  Furthermore, upholding  the Establishment Clause and enjoining Defendants'

23 continuing violations is in the public's best interest.

24    Contrary to Defendants' Response, Plaintiffs have a significant likelihood of success

25 based on the facts at bench, which are largely <u>uncontested</u> and demonstrate a clear and

26
[1] *See Farnan v. Capistrano Unified Sch. Dist*., 654 F.3d 975, 988 (9th Cir. 2011) ("At some
27 point a teacher's comments on religion might cross the line and rise to the level of
unconstitutional hostility.").
28 [2] *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 973 (9th Cir. 2002).

brazen violation of the Establishment Clause.

Defendants also argue that because a case with the same facts has not been decided under the Establishment Clause, that perhaps the Establishment Clause does not exist.  As diagramed below, the facts of this case are distinguishable from existing case law, and demonstrate Establishment Clause and Free Exercise claims that are more colorable than any published case in the Ninth Circuit.

A reasonable observer would not, as Defendants argue, simply see a terrorist's motivations or "an analysis of the Islamic texts, traditions, and legal doctrines by which terrorist organizations justify their actions."  The inflammatory materials do not reflect mere "motivations" and do not present *any analysis at all*, despite Damask's email to Sabra stating the contrary. *See* Damask Email in Doc. 6-6 ("The analysis of their beliefs would come later, once the motivations of the terrorists are understood.").

Thus, the true question for this Court is whether it is likely that Damask's Islamic Terrorism module has the primary effect of disapproving of Islam.[3]

## I.   The Primary Effect of Teaching "ISLAM MANDATES TERRORISM" Is a Clear Disapproval of Islam.

Defendants' are mistaken in their argument that the primary effect is not disapproval, and if it is, that academic freedom allows it . "Statements such as '[a]ll Muslims are terrorists' would be perceived by any reasonable Muslim as 'disapproval of their individual religious choices.'"[4] This is the *same* message Damask spreads through Module 6. He literally says that the Quran and the Hadith, the two primary sources of Islam, "mandates"[5] the "physical"[6] act of "terrorism"[7] to support a "war against unbelievers,"[8] and that this terrorism mandate "can be traced back"[9] to Prophet Muhammad who committed

---

[3] *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 20 (2008).
[4] *Isakhanova v. Muniz,* 2016 WL 1640649, at *6 (N.D. Cal. Apr. 26, 2016).
[5] *See* Decl. of M. Sabra, ¶ 8, Ex. A, p. 23-27.
[6] *Id.* at 22.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 20.

acts that "*unambiguously would be regarded as terrorism today.*"[10] (emphasis in the original). These are uncontested facts. Thus, Damask's hostility is the issue, not the "censoring" of an academic debate or differing views, as Defendants argue.

Ironically, Damask forecloses the possibility of a true academic debate. Further, Damask's own email to Sabra, stating that the materials are simply teaching a view relied upon by terrorists, is contradicted by Damask's own classroom materials by teaching that: "**[c]ontentions that Islam does not promote warfare or violence cannot be supported on either theological or historical grounds – indeed, such contentions would flatly contradict hundreds of Quranic passages and *hadiths* ("traditions") of Muhammad, as well as longstanding Islamic jurisprudence**."[11]  Shockingly, he goes on to say that the "legitimacy of terrorism is supported by nearly every Islamic authority of any significance"[12] who are also "unanimous in their approval of suicide attacks."[13]  As if that was not brazen enough, Damask teaches that "Muslim popular opinion has some **sympathy** for terrorism generally, and the ultimate goals of terror group[s] particularly."[14]  This is NOT a discussion of what *motivates* terrorism – it's calling Islam terrorism; the latter is a violation of the Establishment Clause.

Damask's assigned readings, which appear to reflect his personal views, also conclude that no other interpretation of Islamic doctrine exists.  Specifically, that any other interpretation is because of "forces [that] were mobilizing to insert a new meaning."[15]  A meaning that is "terribly ironic," an attempt to "confuse minds," and "blur the meaning."[16]

Finally, Damask gives his students a quiz reinforcing the modules objective: the disapproval of, and hostility towards, Islam. The quiz questions require students to conclude that any other interpretation of the terrorism mandate is for "'gullible' Westerners" because

---

[10] *Id.* at 27.
[11] *Id.* at 25. (emphasis added).
[12] *Id.* at 28.
[13] *Id.* at 33.
[14] *Id.* at 40. (emphasis in the original).
[15] *See* Decl. of M. Sabra, ¶ 9, Ex. B, p. 19.
[16] *Id.* at 18.

4

the "overwhelmingly obvious meaning is" "combat / war."[17] Furthermore, the quiz answers support that "terrorism [is] *encouraged*" in Islam,[18] and that there is an "official, religiously justified type of warfare waged by the Islamic community on non-believe[rs]".[19] (emphasis in the original). None of the material is qualified with what Defendants call: "motivations".

An informed and objective observer would conclude that the primary effect of Damask's instruction is hostility towards Islam.  This is because his materials create no conclusion other than that: (1) Islam is dangerous because it mandates the killing of non-believers and (2) no other plausible interpretation exists because the primary sources of Islam, the Prophet Muhammed, Islamic Jurisprudence, Contemporary scholars of Islam, and Muslims *all* agree that the terrorism/jihad mandate is the *only* interpretation of the excerpts he cites.  Perhaps Defendants missed it, but teaching that a religion mandates to kill you, is disapproving of that religion. The module resembles the blatant unconstitutional approval of religion that occurs when public schools demand students to pray in class.[20]   Plaintiff does not seek to enjoin Damask from teaching Islam-based terrorism. Plaintiffs simply insist that Defendants must comply with the First Amendment of United States Constitution.

Damask's condemnation of Islam is similar to the defendants conduct in *Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Comm'n.,* where they attacked the plaintiff's religious beliefs as "one of the most despicable pieces of rhetoric."[21] Additionally, defendants there compared the plaintiff's religious objections to those who used religion to  "defen[ed] slavery and the Holocaust."[22] The Supreme Court stated that these statements were "inappropriate."[23] Similarly, Damask stating Islam "unanimous[ly]"

---

[17] *See* Decl. of M. Sabra, ¶ 10, Ex. C, p. 11.
[18] *Id.* at 6.
[19] *Id.* at 7.
[20] *Sch. Dist. Of Abington Twp. v. Schempp,* 374 U.S. 203, 223-25 (1963) (holding that state laws requiring the reading of Bible verses and recitation of the Lord's Prayer in public schools violated the Establishment Clause).
[21] 138 S.Ct. 1729, 201 L. Ed. 2d 35 (2018).
[22] *Id.*
[23] *Id.*

mandates the killing of Non-Muslims is "inappropriate" for a professor who "in broaching controversial issues like religion, …must be sensitive to students' personal beliefs and take care not to abuse their positions of authority."[24]

Defendants' point to slide 25, which states, "*All* Islamic terrorist sanctify their actions through pious reference to Quran and the traditions of the Prophet Muhammad, and by extensive use of longstanding Islamic doctrine."[25] They argue that a reasonable observer would understand it as "an analysis of the Islamic texts traditions, and legal doctrines by which terrorist organizations justify their actions."[26] However, on the same slide students learn in this introductory[27] course that "[c]ontentions that Islam does not promote warfare or violence cannot be supported on either theological or historical grounds – indeed, such contentions would flatly contradict hundreds of Quranic passages and hadith ("traditions of Muhammad), as well as longstanding Islamic jurisprudence."[28] A reasonable observer, exposed to all of the content at issue, would conclude that the primary message is that Islam "promote[s] warfare [and] violence." Damask closes the door on other interpretations, thus, disapproving of Islam.

Defendants' argument that a reasonable observer would view the materials as an analysis of Islamic doctrine is further contradicted by Damask's slides. Defendants state that "what the materials actually say is that: Islamic doctrine contains a 'theological mandate *for jihad*; that jihad does not simply [encompass] prayer and introspection', **but also** requires 'physical efforts.'"[29] Thereafter, on slide 22, Damask argues that jihad is to be understood as "physical, **not** simply prayer or introspection."[30] The next line on the slides makes light of those who think jihad is "prayer and introspection," by stating to think that

---

[24] *Farnan,* 654 F.3d at 988.
[25] Defendants' Response Brief at p. 10.
[26] *Id.*
[27] *See* Decl. of I. Siddiqi, ¶ 5. (Damask states in an interview that POS120 is an introductory course).
[28] *See* Decl. of M. Sabra, ¶ 8, Ex. A, p. 25.
[29] Defendants' Response Brief at p. 11. (bold emphasis added).
[30] *See* Decl. of M. Sabra, ¶ 8, Ex. A, p. 22. (emphasis added).

it is to "'equate jihad with yoga.'"[31] Lastly, his own definition of jihad is "*a religiously-justified, communal mobilization of the resources and capabilities of the Muslim population for war against unbelievers.*"[32]

To Damask, there is no room for other interpretations of jihad. When a reasonable observer is told that Islam's "theological mandate for jihad" means "*war against unbelievers.*" and that prayer or introspection is "not" what it means, there is no other reasonable conclusion other than a disapproval of Islam. Plaintiff's argument gains traction and Defendants' contradiction becomes clearer when the Court looks at the entire module. It's not the other way around. The assigned readings' thesis is that any other interpretation of jihad is the West trying to "confuse" and "blur" minds.[33] This *is* teaching hostility.

Plaintiff's position is further reinforced by a simple reading of quiz question 19 that states that a reasonable observer would be "gullible" to think jihad means anything other than the "overwhelmingly obvious meaning " of "combat / war."[34] Damask's entire module is equating jihad to war, and Defendants' attempt to spin it differently is not believable.

In a last ditch attempt to revise their hostile materials, Defendants now argue that, "nowhere does the material state that Muslims are prohibited from living peacefully with their non-Muslim neighbors."[35] Defendants confuse the standard for hostility. The idea that Islam does not mandate terrorism is nowhere to be found because Damask's materials refute the notion of a peaceful religion.  The aforementioned materials within Module 6 all support Plaintiff's request for preliminary relief, because they demonstrate hostility towards Islam.

Defendants are also incorrect – Plaintiffs did not waive the secular prong of the *Lemon* test, and actually distinguished secular context cases from the facts in this case. *See Pl's Memo,* 17:11-19; 18-1:18.

## II.     Academic Freedom Is Not A Defense To Unconstitutional Instruction.

---

[31] *Id.*
[32] *Id.* (emphasis in the original).
[33] *See* Decl. of M. Sabra, ¶ 9, Ex. B, p. 18.
[34] *See* Decl. of M. Sabra, ¶ 10, Ex. C, p. 11.
[35] Defendants' Response Brief at p. 11.

7

1     Defendants argue that "personal offense," is not enough to override "academic

2  freedom."[36] If Damask decided to segregate his class on the basis of race in the name of

3  academic freedom, undoubtedly this Court would enjoin him because his actions would

4  violate the Constitution. Even if MCCCD decided not to stop him in the name of academic

5  freedom, this Court cannot "'defer to [their] decision to err on the side of academic

6  freedom.'"[37]

7     Ninth Circuit authority states clearly that academic freedom cannot be used to

8  justify unconstitutional speech. Defendants have cited to no authority that has held

9  otherwise.  The case Defendants rely on to support their claim that this Court must "defer"

10  to the college's decisions also agrees that unconstitutional speech is not protected speech.[38]

11  The *Rodriguez* court stated that unconstitutional speech would not be protected under

12  academic freedom.[39]

13     Damask does not even attempt to veil his disapproval of Islam. He has refused to

14  temper his rhetoric through the use of "prominent disclaimers." Disapproval of religion is

15  not protected speech and thus, the *Rodriguez* case Defendants cite to (which they were the

16  defendant in) *supports* Plaintiff's argument that academic freedom is not applicable here.

17     Other Circuits also agree that academic freedom does not justify unconstitutional

18  speech. For example, the Third Circuit dealt with an academic freedom defense relating to

19  a school avoiding an Establishment Clause violation.[40] A teacher challenged a district policy

20  prohibiting his participation in a student-initiated prayer stating that it violated his right to

21  academic freedom.[41] The court held that the policy did not violate his right to academic

22  freedom, and instead, that he would violate the Establishment Clause by partaking in the

23  prayer.[42] Similarly, academic freedom is inapplicable here.

24  [36] Defendants' Response Brief at p. 16

25  [37] *Id.*

     [38] *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010).

26  [39] *Id.*

27  [40] *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 174 (3d Cir. 2008),

     [41] *Id.* at 168.

28  [42] *Id.* at 153.

### III.   Damask's Hostility and Disapproval of Islam is More Brazen Than The Facts of Any Other Published Case in the Ninth Circuit.

The facts of this case are both distinguishable and more brazen than any precedential Establishment Clause case. Damask's Islamic Terrorism module is grossly transparent. For ease of the Court's reference, Plaintiff have compiled a diagram of relevant facts from authoritative Establishment Clause Cases. *See* **Exhibit A**, attached hereto.

In both *Vernon v. City of Los Angeles*[43] and *American Family Association, Inc. v. City & Cty. of San Francisco*[44] the Ninth Circuit explained how conduct far less hostile than the materials at issue in this case qualified as disapproval of religion. However, in those cases, the "prominent disclaimers" and the entire context showed that the disapproval was not the primary effect. For example, in *American Family,* the defedant was "hostile towards the religious view that homosexuality is sinful or immoral."[45]   Damask isn't hostile to a particular viewpoint within Islam. He is hostile and disapproving of the entire religion and those who follow it.

Regarding educators, *Torlakson* said "truly derogatory language…would…qualify as…government action that…'disapprove[d] of, religion.'"[46] The court further stated that "[c]ertainly courts cannot ignore…'government action that… disapprove of religion.'"[47] The Defendants cite to *Farnan* for the proposition that "teacher[s] must…be given leeway."[48] However, *Farnan* provides critical guidance, that "[i]n broaching controversial issues like religion, teachers must be sensitive to students' personal beliefs and take care not to abuse their positions of authority."[49] That "[a]t some point a teacher's comments on

---

[43] 27 F.3d 1385 (9th Cir. 1994).
[44] 277 F.3d 1114  (9th Cir. 2002).
[45] *Id.* at 1122.
[46] 370 F. Supp. 3d at 1082.
[47] *Id.* at 1081.
[48] Defendants' Response Brief at p. 16
[49] 654 F.3d 975, 988 (9th Cir. 2011)

religion might cross the line and rise to the level of unconstitutional hostility."[50] Damask is so far passed the hostility line that he can no longer see it.

Defendants anecdotally comment that a preliminary injunction would require the Court to interpret religious doctrine. Plaintiffs are not asking the Court to adjudicate religious doctrine. Plaintiffs are asking the Court to apply the standard of an informed, reasonable observer to deem the Module 6 components at issue as showing hostility towards Islam.

## IV.   Plaintiff CAIR-AZ Has Article III Organizational Standing.

Plaintiff, CAIR-AZ has standing on their own behalf under the organizational theory. "[O]rganizations are entitled to sue on their own behalf for injuries they have sustained."[51] "[A]n organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [problem] in question."[52] Plaintiff, CAIR-AZ is an Arizona-based 501(c)(3) non-profit organization committed to education, advocacy, and protecting the civil rights of American Muslims while promoting justice.[53]

Just like Fair Housing non-profits in the cited cases, Plaintiff's mission is currently frustrated when Damask spreads his dangerous Islamophobic rhetoric to the public in his Islamic Terrorism module.[54] Plaintiff is "expend[ing] time and resources" engaging in a campaign to correct this specific injury caused by Defendants.[55] CAIR-AZ has suffered actual damages by way of a contract it entered into with a religious scholar to create content for the public to  debunk the dangerous information in Damask's module.[56] Plaintiff is

---

[50] *Id.*
[51] *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).
[52] *Smith v. Pac. Props. & Dev. Corp.,* 358 F.3d 1097, 1105 (9th Cir. 2004).
[53] Complaint at ¶ 2.
[54] *See We Are Am./ Somos Am., Coal. Of Arizona v. Maricopa Cty. Bd. Of Supervisors,* 809 F. Supp. 2d 1084, 1095 (D. Ariz. 2011) ([T]he Ninth Circuit has invoked *[Havens]* two prong test outside the context of [Fair Housing Act] discrimination).
[55] *Comm. For Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma,* 644 F. Supp. 2d 1177, 1195 (N.D. Cal. 2009).
[56] Complaint at ¶ 63.

diverting precious funds as well as time during a global pandemic to counter-act this unconstitutional behavior. Thus, Plaintiff CAIR-AZ has organizational standing.

Plaintiff seeks to enjoin the Islamic Terrorism module that Damask is currently teaching in this Summer semester and will teach again in the Fall semester.[57] Damask publicly stated that: "I'll **never** apologize for teaching **the content that I am**, or the manner in which I'm teaching it."[58]  Thus, the violations are continuing, and Plaintiff's injunction is for prospective relief and thereby not moot.

## Conclusion.

Defendants may teach how terrorists use Islam to justify their actions, in context. But Defendants cannot teach hostility towards Islam, which is precisely what the components within Module 6 at issue do. Therefore, Plaintiffs request a preliminary injunction.

DATED this 25th day of June, 2020.

By s/ Raees Mohamed
**RM WARNER, PLC**
Raees Mohamed, Esq.
8283 N. Hayden Road, Suite 229
Scottsdale, Arizona 85258
Phone: (480) 331-9397
Fax: (866) 961-4984

By s/ David A. Chami
**PRICE LAW GROUP**
David A. Chami, Esq.
8245 N. 85th Way, Suite 4349
Scottsdale, Arizona 85258

By s/ Ahmed Soussi
**CAIR-AZ**
Ahmed Soussi, Esq.
1819 S. Dobson Road, Suite 214
Mesa, Arizona 85202
Phone: (480) 704-3706

*Attorneys for Plaintiffs*

---

[57] *See* Decl. of M. Sabra, ¶ 14, Ex. G.
[58] *See* Decl. of I. Siddiqi, ¶ 5. (emphasis added).

11