David D. Garner, 020459
Travis C. Hunt, 035491
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
dgarner@omlaw.com
thunt@omlaw.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mohamed Sabra; and Council on American-Islamic Relations of Arizona,<br><br>Plaintiffs,<br><br>vs.<br><br>Maricopa County Community College District; and Nicholas Damask, in his official and individual capacity,<br><br>Defendants. | No. 2:20-cv-01080-PHX-SMB<br><br>**DEFENDANTS' MOTION TO DISMISS**<br><br>**(Oral Argument Requested)** |

Plaintiffs' Complaint seeks to "judicially censor" the content of a college-level World Politics class because Plaintiffs find a portion of its contents—discussing terrorism, premised on professed Islamic beliefs–offensive to Mr. Sabra's personal views and in conflict with CAIR-AZ's mission of "promot[ing] a positive image of Islam and Muslims in America."[1]  While it is understandable that Plaintiffs may be upset by discussion of views that they consider to be "radical" or outside the "mainstream" of Islam, censoring academic speech is dangerous, wrong, and antithetical to academic freedom—a "special concern" under the First Amendment.[2] Indeed, Plaintiffs' Motion for Preliminary Injunction failed to cite even a single case that has accepted their argument, making it—literally—unprecedented.

Plaintiffs' claims are fatally deficient as a matter of law and must be dismissed for several, independent reasons:

1. Plaintiffs are precluded from seeking any declaratory or injunctive relief (preliminary or otherwise) because their claims are moot—Mr. Sabra is no longer enrolled in the allegedly offending course.
2. Plaintiffs lack standing because they cannot allege an "official policy" of MCCCD causing their alleged constitutional injuries.
3. Plaintiffs fail to state Establishment and Free Exercise Clause claims as a matter of law.
4. Plaintiffs' claims against Dr. Damask in his individual capacity fail because he is entitled to qualified immunity.

## BACKGROUND

Plaintiff Mohamed Sabra is a former student of an online World Politics course at Scottsdale Community College ("SCC"). (Compl. ¶¶ 1, 7.)

**The World Politics Course.**  The World Politics course focuses on "the principles and issues relating to the study of international relations," and is broken down into six modules, each consisting of: a PowerPoint lecture, supplemental reading materials, and an online quiz.  (Compl. ¶¶ 7-9; Ex. D. to Compl., Course Syllabus.)

---

[1] CAIR-AZ, WHO WE ARE, *available at* https://cair-az.org/about-us/who-we-are/.
[2] *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985).

As explained in the syllabus, the goals of the course include evaluating "the political, economic, national, and transnational rationale for international interactions." *Id.* at 1-2. Direct communication between students and the course professor relating to course content is also encouraged. (Ex. D. to Compl. at 5.)

**The Terrorism Module.** One of the topics addressed in the course is international terrorism. Although the materials in this module discuss a broad variety of terrorist groups throughout history, the unit focuses on "Islamic Terrorism," given that the vast majority of groups currently designated as foreign terrorist organizations claim a religious foundation in Islam.[3]

The PowerPoint lecture associated with the terrorism topic provided: (1) a general definition of what terrorism is and how it is distinguished from other forms of political violence, along with a brief history of terrorism ("Defining Terrorism"); (2) theories relating to the rise of, and justification for, terrorism within Islam specifically ("Islamic Terrorism: Definition"); and (3) an analysis of how different political schools of thought approach solving the problem of terrorism by those professing a belief in Islam ("Islamic Terrorism: Analysis"). (Compl. ¶ 10; Ex. A to Compl.; Ex. A, Full PowerPoint, at Slide 1.)

In the Defining Terrorism section, the PowerPoint lecture first explains theoretical motivations behind terrorist acts by several groups, including the early religious Zealots (Jewish), Assassins (Islamic), and Thuggees (Hindu). (Ex. A at Slides 14-16.) The presentation also discusses "nationalist/right-wing terrorism" (e.g., Nazis (Germany), KKK (U.S.), hakki ichiu (Japan)) and "communist/left-wing terrorism" (e.g., People's Will (Russia); Red Army (Germany), Provisional Irish Republican Army (Northern Ireland), Weather Underground (U.S.), Sendero Luminoso (Peru), and the

---

[3] *See* Department of State, Foreign Terrorist Organization, *available at* https://www.state.gov/foreign-terrorist-organizations/. The few non-Islamic organizations on the list are generally either functionally defunct or not international in nature.

3

Khmer Rouge (Cambodia) in the nineteenth and mid-twentieth centuries. (Id. at Slides 17-19.)

The "Islamic Terrorism: Definition" section of the PowerPoint lecture discusses what it describes as Islamic terrorism in some detail. (*Id.* at Slides 22-36.) When read in context of the topic being analyzed—*Islamic terrorism*, as distinct from *Islam in general*—it becomes clear that none of the references to Islam seek to endorse or inhibit belief in the religion in any way. (*Id.*) For example,

- Slide 25 explains that "[*a*]*ll Islamic terrorists* sanctify their actions through pious references to the Quran and the traditions of the Prophet Muhammad." (*Id.* at 25) (emphasis added).
- Slide 23 discusses the "theological mandate for jihad" but clearly does so from the perspective of terrorists seeking justification for their actions. (*Id.* at 23.)
- In describing the "efforts" required in jihad, Slide 22 states that they are "physical, not simply prayer or introspection." (*Id.*) Notably, the statement does not preclude prayer and introspection. Moreover, there are many forms of physical action that do not involve terrorism, including potentially self-defense or actual warfare. Thus, when Slide 22 goes on to state that "jihad is a religiously-justified, communal mobilization of the resources and capabilities of the Muslim population for war against unbelievers," it is decidedly not stating that the Muslim population generally condones terrorism. (*Id.*) It is simply explaining the justifications offered by those in Islam who do support terrorism.

Contrary to Plaintiffs' repeated refrain throughout its brief and in the Complaint, nowhere in any of the course materials is it *ever* stated that: "Muslims have a 'theological mandate' to kill Non-Muslims"[4] or that "Islam is terrorism."

---

[4] (Comp. ¶¶ 48, 68.)

4

Other statements in the slides that Plaintiffs claim to be offensive are statements with citations to sourced facts and statistics regarding terrorism by some who profess to believe in Islam, including those on Slides 21, 25, 33.[5]

**Mr. Sabra is offended.** After taking the quiz associated with this topic, Mr. Sabra emailed Dr. Damask to let him know that he was offended by some of the questions, which he considered to be "in distaste of Islam" and caused him to "feel disgust." (Compl ¶ 53; Ex. E to Compl., April 29-30 email exchange.)

**Dr. Damask's efforts to clarify.** Dr. Damask promptly responded to Mr. Sabra, explaining that: no offense was intended; "the course isn't 'for' or 'against' anything"; and the materials and quiz questions focused on views of Islam expressed by terrorist groups—which "may be quite wrong" or may be "twisted … from a kernel of truth into something horribly misguided." (Ex. E to Compl. at 2-3.). Moreover, consistent with the course's goals, the content related to this topic "aim[ed] to explain international politics," including the "phenomenon of terrorism in international politics" as well as the use of terrorism by some "in a way that amounts to carrying out their own foreign policy according to their deeply held religious beliefs." (*Id.*).

Mr. Sabra then asked Dr. Damask to review the three questions Mr. Sabra found offensive and explain them further:

9. Where is terrorism encouraged in Islamic doctrine and law? -Medina verses.

12. Who do Islamic terrorists strive to emulate? -the Prophet Muhammad.

20. Terrorism is ___ in Islam. -justified within the context of jihad.

---

[5] Although Defendants disagree that Dr. Damask should be required to provide source citations for all of the cited facts in the slides, much of the information in these slides can be found in the following locations. *See* INSTITUTE FOR ECONOMICS AND PEACE, GLOBAL TERRORISM INDEX (2017), *available at* http://visionofhumanity.org/app/uploads/2017/11/Global-Terrorism-Index-2017.pdf; UNIVERSITY OF MARYLAND, GLOBAL TERRORISM DATABASE, *available at* https://www.start.umd.edu/gtd/; HANNAH, HASSELL, ET. AL., TERRORISM, Published online at OurWorldInData.org (2013), *available at* https://ourworldindata.org/terrorism#all-charts-preview.

(Compl. ¶¶ 38-53; Ex. B, Quiz, at 9, 12, 20.)

Dr. Damask promptly responded, providing context on the questions, much of which had already been provided in his PowerPoint lecture, and reiterated that "interpretations [of the Quran and other religious writings] by the terrorists may be quite wrong-headed. But try not to think about whether the terrorists' beliefs are 'right' or 'wrong' or 'true' -- you should approach the discussion thinking simply, 'what beliefs motivate them no matter how wrong they may be.'" (Ex. E to Compl. at 6-7.)

**Mr. Sabra's appeal to social media.** In the meantime, before receiving Dr. Damask's reply, and instead of engaging with Dr. Damask further or discussing with SCC administration, Mr. Sabra posted the quiz questions on social media—without any of the context provided in the lecture or from Dr. Damask's emails. (Compl. ¶ 54.)

**Response to social media backlash.** The decontextualized response from social media included death threats to Dr. Damask. SCC initially responded by issuing a hasty apology. (*See* Ex. F to Compl.) On May 11, 2020, upon a more careful review of the matter in context, however, MCCCD subsequently issued a public statement, explaining that the three quiz questions "were taken out of context from a unit examining violent political and social movements, and the subject they addressed – the reliance of certain violent groups on religious texts as a justification for their actions – was within the scope of the course." (Ex. C., MCCCD Statement.) Consistent with upholding requirements of academic freedom, the statement further affirmed: "[W]e expect our students and faculty to engage fully with the ideas and perspectives of others, even when they disagree with each other." (*Id.*)

**No other action by MCCCD or SCC**. Plaintiff asserts that SCC "knew or had constructive knowledge that this module was going to be taught in this class" but then cites an MCCCD administrative regulation providing only that "a copy of the course syllabus must be submitted to the division/department office at the college no later than the end of the first week of class." (Compl. ¶¶ 57, 70.) But, neither this nor any other MCCCD administrative regulation requires any approval by the division or department,

much less by SCC or MCCCD leadership. The Complaint alleges no curriculum review or substantive oversight by MCCCD or SCC, but instead simply concludes that Dr. "Damask as the division/department chair . . . [is] the final policymaker, [and] Damask's actions are attributable to SCC." (Compl. ¶ 71.)

**Mr. Sabra completes the course and files suit.** After completing the course, Mr. Sabra filed this lawsuit with CAIR, claiming that Defendants violated the Establishment and Free Exercise Clauses of the First Amendment, not only because of the three quiz questions but because, in their view, Dr. Damask's "primary message is the disapproval of Islam." (*See* Compl. ¶ 65.)

## ARGUMENT

### I. Plaintiffs lack standing.

By constitutional mandate, a federal court's jurisdiction is limited to live "cases" or "controversies." U.S. CONST. art. III, § 2. The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "A plaintiff must demonstrate constitutional standing separately for each form of relief requested." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir.), *cert. denied*, 139 S. Ct. 640, 202 L. Ed. 2d 492 (2018). Here, Plaintiffs lacks standing for two, independent reasons: (1) their claims are moot, thus precluding any declaratory or injunctive relief, and (2) they have alleged no "official action or policy" to provide standing to support a claim against MCCCD or Dr Damask in his official capacity.

### A. Plaintiffs' claims are moot and preclude prospective injunctive or declaratory relief.

Plaintiffs' claims seeking prospective or injunctive relief are now clearly moot and should be dismissed because Mr. Sabra has completed, and is no longer enrolled in, the World Politics course.

Mootness is "the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of litigation (standing) must continue

throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). A claim becomes moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. *E.g., Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 853-54 (9th Cir. 1985); *American Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1407 (9th Cir. 1995); *see also Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1389 (9th Cir. 1985) ("Generally, an action is mooted 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'") (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). "If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed." *American Rivers v. Nat'l Marine Fisheries Serv.,* 126 F.3d 1118, 1123 (9th Cir. 1997).

Here, there is simply no continuing harm to Mr. Sabra, or by association CAIR, that the Court can redress. Courts have consistently dismissed as moot claims brought by former students for injunctive relief. *See Board of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (dismissing as moot former student's claims challenging the constitutionality of school rules regulating the student newspaper); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999) (en banc) (dismissing as moot former student's First Amendment claim based on prayers at graduation ceremony); *Ahmed v. University of Toledo*, 822 F.2d 26, 28 (6th Cir. 1987) (dismissing as moot former student's claims challenging constitutionality of a university policy requiring students to carry health insurance).[6]

Likewise, Plaintiff CAIR lacks organizational standing. "An organization may sue only if it was forced to choose between suffering an injury and diverting resources to counteract the injury." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 n.4 (9th Cir. 2010); *see also Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994)

---

[6] No mootness exception is applicable because there is no "reasonable expectation that the plaintiff[] will be subjected to the same action again." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997), *as amended* (Sept. 16, 1997) (citation omitted).

(standing is not based solely on "diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs."). Any action that CAIR took *after* Mr. Sabra completed the World Politics course was, by definition, not something that CAIR was compelled to undertake because there was no longer an ongoing injury. *See Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) (finding parts of organization's claims moot because there was no longer an ongoing injury, and finding no organizational standing for other claims without diversion of resources related directly to the alleged injury).

Because Mr. Sabra's alleged constitutional injuries are not continuing, Plaintiffs' claims are moot and their request for injunctive and declaratory relief must be dismissed.

### B. Plaintiffs' failure to allege an "official policy" precludes standing to sue MCCCD or Dr. Damask in his official capacity.

Plaintiffs cannot establish Article III standing against MCCCD for the additional and independent reason that they allege no official action or policy leading to their alleged injuries.[7]

When asserting claims against a local government entity under 42 U.S.C. section 1983, plaintiffs must establish standing based an "official … policy" of the local government entity—not just the action of a single employee. *See e.g.*, *Miller v. City of St. Paul*, 823 F.3d 503, 507 (8th Cir. 2016) (quoting *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978)); *Nunez v. City of Los Angeles*, 147 F.3d 867, 874 n.10 (9th Cir. 1998) ("[T]o sustain a § 1983 action against a municipality, a plaintiff must demonstrate that a governmental policy or custom has caused him injury.") (citation omitted); *An v. City of New York*, 230 F. Supp. 3d 224, 229 (S.D.N.Y. 2017) ("The official policy requirement for a plaintiff to have standing is critical

---

[7] Plaintiffs' failure to allege an official policy also provides a basis to dismiss their claims under Rule 12(b)(6).

here."); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) ("There is no respondeat superior liability under section 1983.") (citations omitted).

Under *Monell* and its progeny, plaintiffs must allege that "the municipal custom, practice, or policy was the 'moving force' behind the employee's violation of the plaintiff's constitutional rights." *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1007 (D. Ariz. 2009).[8] Plaintiffs must also allege actions that were "sufficiently imbued with the state's authority to constitute state endorsement of religion." *Canell v. Lightner*, 143 F.3d 1210, 1214 (9th Cir. 1998); *see also C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 987 (9th Cir. 2011) (noting that cases finding Establishment Clause violations related to curriculum "challenge *systemic* actions such as state laws and school district policies rather than parsing individual teachers' classroom discussions") (emphasis in original).

Plaintiffs fail to allege any official action by MCCCD giving rise to their injuries. The sole allegations as to MCCCD are that (1) it has an administrative regulation requiring professors to submit "a copy of the course syllabus . . . to the division/department office at the [relevant] college" (not MCCCD) and (2) it "has publicly defended Damask, and stated that despite their intent to 'investigate', the investigation will not involve Damask and … he is not at risk of losing his job." (Compl. ¶¶ 57, 61.) Nothing in the first allegation suggests official action or policy by MCCCD approving any of Dr. Damask's World Politics materials, and the second

---

[8] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481-82. "The official must also be responsible for establishing final government policy respecting [the activity underlying the alleged injury] before the municipality can be held liable." *Id.* at 482-83.

10

occurred after Mr. Sabra had completed the course, and therefore could not have contributed to his alleged injuries. Further, the May 11, 2020 MCCCD statement to which Plaintiffs refer expressed no final conclusions on either "the student's concerns [or] the faculty member's rights," and announced an "independent investigation of the facts related to this situation." (Ex. C., MCCCD Statement.) Such actions do not support direct liability claims against local government entities like MCCCD.

Plaintiffs also fail to allege any official action by Dr. Damask in his official capacity, or by extension SCC, giving rise to their injuries. All of Plaintiffs' allegations related to Dr. Damask focus on his work as a professor or as chair of the Political Science Department, and under Arizona law,[9] a professor or department chair does not "speak with final policymaking authority for [MCCCD or SCC] concerning the action alleged to have caused the particular constitutional or statutory violation at issue"; he therefore had no authority to establish a policy or official "message" of "disapproval of Islam." (Compl. ¶¶ 68-69.) *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Canell v. Lightner*, 143 F.3d 1210, 1214 (9th Cir. 1998) (officer's actions "were not sufficiently imbued with the state's authority to constitute state endorsement of religion"); *Saif'ullah v. Albritton*, 15-CV-05600 LHK (PR), 2017 WL 6558719, at *12 (N.D. Cal. Dec. 21, 2017) (noting that "[c]ase law is clear that there must be evidence that the State endorsed or ratified defendants' actions" for Establishment Clause violations).[10]

---

[9] Whether Dr. Damask was a final policymaker as to the actions underlying Plaintiffs' alleged injuries is a purely legal question decided under Arizona law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 112 (1988) ("The identification of officials having 'final policymaking authority' is a question of state (including local) law, rather than a question of fact for the jury."). Nothing in Dr. Damask's course material suggests he created an official stance on Islam even for his course, and nothing in Arizona law suggests that a professor or department chair has the authority to create an official stance on a world religion for a community college or community college district.

[10] Notably, we have located no cases in which professors or department chairs have been held to be final policymakers on behalf of colleges.

Plaintiffs fail to establish standing against MCCCD or Dr. Damask in his official capacity because they allege no official policy or action giving rise to their claims.

### II. Plaintiffs' Establishment and Free Exercise Clause claims fail as a matter of law.

Even if Plaintiffs' claims were not fatally deficient for mootness and lack of standing, they fail to state either an Establishment Clause or Free Exercise claim under Rule 12(b)(6). Courts may properly dispose of such claims at the motion to dismiss stage. *E.g., Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008) (affirming dismissal of Establishment Clause and Free Exercise Clause claims); *Freedom fr. Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 15 (1st Cir. 2010) (same); *Bauchman v. W. High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997) (same). Indeed, the Ninth Circuit has held that "it is appropriate to test the viability of [a plaintiff's] claim under *Lemon*, even at th[e] early stage" of a Rule 12 (b)(6) motion. *See e.g.*, *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1255 (9th Cir. 2007); *Am. Family Ass'n.*, 277 F.3d at 1121-22. In doing so, courts are not "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

### A. Plaintiffs fail to state an Establishment Clause claim.

Government action satisfies the Establishment Clause if it: (1) has a secular purpose; (2) does not have the principle or primary effect of advancing or inhibiting religion; and (3) does not foster excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971); *Catholic League for Religious & Civil Rights v. City & County of San Francisco*, 624 F.3d 1043, 1054-55 (9th Cir. 2010) (holding that "*Lemon v. Kurtzman* remains controlling on Establishment Clause [alleged] violations, subject to subsequent emendations as the 'endorsement' and 'neutrality' principles have developed.").

Plaintiffs do not dispute the first and third elements. Plaintiffs instead assert that the course content fails the second prong of the *Lemon* test because it allegedly "disapproves" of Islam. (Compl. ¶ 69.) But, "[t]here has never been any reported case holding that a teacher violate[s] the Establishment Clause by making statements in the classroom that were allegedly hostile to religion." *C.F.*, 654 F.3d at 986. And, even accepting as true those allegations that are not contradicted by the documents referenced in or relied upon in Plaintiffs' Complaint, their claims cannot survive as a matter of law.

### 1. The primary effect standard requires an informed and objective observer and does not categorically prohibit all disapproval of religion.

As a fundamental matter, Plaintiffs cite no authority to suggest that teaching anything other than the purported "mainstream" views of a religion, or not specifically calling out every possible viewpoint on a religious practice or doctrine in a college class about politics, constitutes "disapproval" of a religion. As Dr. Damask explained: the course content "is not 'for' or 'against' anything, but aims to explain international politics." (Ex. E to Compl. at 2-3.) The fact that the content may not correspond with Plaintiffs' views of Islam does not mean that the course, Dr. Damask, or MCCCD "disapproves" of Islam.

Regardless, "public schools are not required to delete from the curriculum all materials that may offend any religious sensibility." *Florey v. Sioux Falls Sch. Dist.*, 619 F.2d 1311, 1318 (8th Cir. 1980); *id.* at 1317 ("It would literally be impossible to develop a public school curriculum that did not in some way affect the religious … sensibilities of some of the students or their parents."). Consistent with this practical recognition, *Lemon*'s second prong affirms that governmental action is constitutional unless it has the "*principal or primary* effect of advancing or inhibiting religion." *Lemon*, 403 U.S. at 612 (emphasis added).

Moreover, the primary effect of a challenged practice is not a subjective analysis, but is considered under a "reasonable observer standard," where the hypothetical observer is both "informed" and "reasonable," and "we assume that he or she is familiar with the

13

history of the government practice at issue." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir. 1994) (citation omitted); *id.* at 1379 ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself."). In addition, "when determining the purpose or primary effect of challenged religious content, courts … consistently have examined the entire context of surrounding the challenged practice, rather than only reviewing the contested portion." *Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir. 2019) (noting that "context is crucial" and also dictated by "common sense"); *California Parents for Equalization of Educ. Mat. v. Torlakson*, 370 F.Supp.3d 1057, 1081 (N.D. Cal. 2019) ("context … [is] essential in assessing the primary effect").

Under this objective standard, even where the government practice reflects "some disapproval" of religion, this alone is not enough to run afoul of the Establishment Clause. *California Parents for Equalization of Educ. Mat. v. Torlakson*, 370 F.Supp.3d 1057, 1079 (N.D. Cal. 2019) ("[E]ven if there is some evidence by which a reasonable person could infer some disapproval of Hindu religious beliefs …, that is not enough to conclude that the primary message … is disparagement."); *id.* at 1081 (affirming that Plaintiff's interpretation of *Lemon*'s second prong "would read the word 'primary' out of the primary effect test and render any conceivable disapproval a constitutional violation. That is not the law.").

**2. Plaintiffs fail to sufficiently allege Dr. Damask's course materials had the primary effect of advancing or inhibiting religion.**

The PowerPoint lecture, incorporated by reference into Plaintiffs' Complaint, provides the specific context for its discussion of Islam at Slide 25: "*All* Islamic terrorists sanctify their actions through pious reference to the Quran and the traditions of the Prophet Muhammad, and by extensive use of longstanding Islamic legal doctrines."

A reasonable and informed objective observer, in the context of a politics class studying terrorism motivated by Islamic ideologies, would view the materials as having the primary effect of providing an analysis of the Islamic texts, traditions, and legal doctrines by which terrorist organizations justify their actions.

Rather than relying on allegations that view the materials from the perspective of a reasonable and informed objective observer, Plaintiffs instead resort to "making up" and attributing to Dr. Damask comments that he never said and conclusions that he has never drawn, including Plaintiffs' oft-repeated and falsely attributed assertions that: "Islam 'mandates' terrorism and the killing of Non-Muslims," (Compl. ¶ 67); "Islam is terrorism," (Compl. ¶ 48); and Dr. Damask's "message is the disapproval of Islam." (Compl. ¶ 69.).

These stray allegations are contradicted by the documents referenced in Plaintiffs' Complaint, which actually say that: Islamic doctrine contains a "theological mandate *for jihad*," (Slide 23 (emphasis added)); that jihad does "not simply [encompass] prayer and introspection," but also requires "physical 'efforts,' (Slide 22); that such physical efforts may be read to include justifying acts of "violent struggle" such as defensive war (e.g., to protect from invaders), or offensive war, or based on interpretations of some Quranic verses and historical precedent, "the use of terror," (Slide 24).[11]  While the materials explain how terrorism may be justified through reference to Islamic texts, traditions, and doctrine, nowhere does the material state that Muslims are prohibited from living peacefully with their non-Muslim neighbors, much less that "Islam 'mandates' terrorism and the killing of Non-Muslims"; "Islam is terrorism"; or Dr. Damask's "message is the disapproval of Islam."

None of Plaintiffs' allegations, when considered in the context of the materials they reference, support a conclusion that the primary effect of Dr. Damask's World

---

[11] Plaintiffs acknowledge that Islamic texts and doctrine are in fact "accepted" and "espoused" by some within Islam as justifying terrorism. (P.I. Mot. at 12; Complaint ¶ 68.)

Politics course materials advanced or disapproved of religion, and their Establishment Clause claim must be dismissed. *See e.g.*, *Am. Family Ass'n.*, 277 F.3d at 1118-20 (upholding dismissal under Rule 12 (b)(6) of Establishment Clause claim brought against a resolution condemning a series of anti-gay advertisements religious groups had placed in newspapers because "read in context as a whole, [the resolution was] primarily geared toward promoting equality for gays and discouraging violence against them"); *Vasquez*, 487 F.3d at 1257 (upholding dismissal under Rule 12(b)(6) of Establishment Clause hostility claim).

### B. Plaintiffs fail to state a Free Exercise claim.

As with Plaintiffs' Establishment Clause claim, Plaintiffs fail to state a Free Exercise claim because they do not sufficiently allege that any of Defendants' actions "substantially burden[ed] a religious practice." *Am. Family*, 277 F.3d at 1123; *see also Parker*, 514 F.3d 87; *Cal. Parents for Equalization of Educ. Mats. v. Torlakson*, 267 F. Supp. 3d 1218, 1226 (N.D. Cal. 2017).

The fact that the material in the World Politics course was apparently offensive to Mr. Sabra does not provide the basis for a Free Exercise challenge.[12] *See e.g.*, *Torlakson*, 267 F. Supp. 3d at 1226 ("At its core, Plaintiffs' Free Exercise argument seems to be that the public school curriculum conflicts with their religious beliefs. The Ninth Circuit has held that this alone does not violate the Free Exercise Clause."); *Am. Family*, 277 F.3d at 1124 (upholding dismissal of Free Exercise claim where plaintiffs failed to sufficiently allege a substantial burden on practicing their religion).

---

[12] *See e.g., Parker*, 514 F.3d 87; *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002) (student may be required to write a paper from a particular viewpoint, even if the student disagrees with that viewpoint); *see also Lee v. Weisman*, 505 U.S. 577, 597 (1992) (noting that it is an inevitable fact that "[p]eople may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation."); *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1379 (9th Cir. 1994) ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself.").

Plaintiffs' Free Exercise claim should be dismissed because they fail to plead an essential element—a substantial burden on Mr. Sabra's ability to practice his religion.

### III. Plaintiffs' claims against Dr. Damask are barred by qualified immunity.

Regardless of mootness or standing, Plaintiffs' claims against Dr. Damask, personally, are precluded as a matter of law under principles of qualified immunity.

Governmental officials, such as Dr. Damask, "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S 800, 807 (1982)). Courts regularly determine the applicability of qualified immunity at the motion to dismiss stage. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (citation omitted); *Friedman v. South*, 92 F.3d 989, 989 (9th Cir. 1996) (upholding dismissal on qualified immunity grounds of free exercise claim "because the law was not clear"); *Smith v. Arizona*, CV 11-1437-PHX-JAT, 2012 WL 3108818, at *7 (D. Ariz. July 31, 2012) (finding qualified immunity at the motion to dismiss stage because the "[p]laintiff has not pointed to any specific actions by Defendants that obviously violated a clearly established right under the Establishment Clause or to any cases indicating that a college level Ethics course cannot be taught with reference to a specific religion and, thus, the Court cannot find that the Individual Defendants would have been aware that their conduct was in violation of a clearly established constitutional right").

### A. Dr. Damask's conduct is not prohibited by clearly established law.
#### i. No clear Establishment Clause violation.

As the Ninth Circuit has recognized, there are no cases holding that content critical of religion in a college course violates the Establishment Clause. *C.F.*, 654 F.3d at 987 (noting that existing caselaw finding violations of the Establishment Clause in the "educational context involve claims that school officials were *promoting* religion rather than expressing hostility toward it, and challenge *systemic* actions such as state laws and school district policies rather than parsing individual teachers' classroom

17

discussions"). In *C.F.*, the Ninth Circuit rejected a claim that a high school Advanced Placement history course teacher violated the Establishment Clause by promoting hostility to religion. *Id.* The Court noted that "[t]he Supreme Court has long recognized the importance of protecting the 'robust exchange of ideas' in education, 'which discovers truth out of a multitude of tongues.'" *Id.* at 988 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). As the Court noted, "teachers must . . . be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities. . . . [W]e must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective." *Id.*

Because there is no clearly established case law, statute or regulation that would have informed Dr. Damask that his PowerPoint presentation, course materials, and quiz on terrorism were in violation of the Establishment Clause, Dr. Damask is entitled to qualified immunity, and this claim must be dismissed. *See id.* (holding that "without any cases illuminating [the demarcation] between permissible and impermissible discussion of religion in a college level history class, we cannot conclude that a reasonable teacher  . . . would have been on notice that his actions might be unconstitutional"); *Smith v. Arizona*, CV 11-1437-PHX-JAT, 2012 WL 3108818, at *7 (dismissing Establishment Clause claim in part based on qualified immunity).

### i. No Clear Free Exercise Clause Violation.

As with Plaintiffs' Establishment Clause claim, there was no existing caselaw at the time that Mr. Sabra took the World Politics course that would put Dr. Damask on notice that his PowerPoint presentation, course materials, and quiz would violate the Free Exercise Clause. Based on existing caselaw, for Dr. Damask to have even approached a violation of the Free Exercise Clause, there would need to be caselaw suggesting that any of his actions "substantially burden[ed] a religious practice." *Am. Family*, 277 F.3d at 1123; *see also Parker*, 514 F.3d 87; *Torlakson*, 267 F. Supp. 3d at 1226. And there is no caselaw suggesting that it was a substantial burden to Mr. Sabra's

ability to practice his religion when he reviewed the Islamic terrorism material or took the associated quiz. Under these allegations, the Court must dismiss claims against Dr. Damask personally, because he is entitled to qualified immunity. *Friedman*, 92 F.3d at 989.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed.

DATED this 26th day of June, 2020.

                                                OSBORN MALEDON, P.A.

                                                By    s/ David D. Garner
                                                        David D. Garner
                                                        Travis C. Hunt
                                                         2929 N. Central Avenue, 21st Floor
                                                        Phoenix, Arizona  85012-2793

                                                Attorneys for Defendants

                                                TORRES LAW GROUP, PLLC

                                                By    s/James E. Barton II
                                                        James E. Barton II
                                                        Jacqueline Mendez Soto
                                                        2239 West Baseline Road
                                                        Tempe, Arizona  85283

                                                Co-counsel for Defendant Nicholas Damask