David D. Garner, 020459
Travis C. Hunt, 035491
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
dgarner@omlaw.com
thunt@omlaw.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mohamed Sabra; and Council on American-Islamic Relations of Arizona,<br><br>Plaintiffs,<br><br>vs.<br><br>Maricopa County Community College District; and Nicholas Damask, in his official and individual capacity,<br><br>Defendants. | No. 2:20-cv-01080-PHX-SMB<br><br>**DEFENDANTS' REPLY IN SUPORT OF THEIR MOTION TO DISMISS**<br><br>**(Oral Argument Scheduled: August 6, 2020 at 10:00 a.m.)** |

Plaintiffs' Response fails to rebut the jurisdictional defects requiring dismissal of the Complaint:

- **No organizational standing.** Plaintiffs concede that Mr. Sabra lacks standing to pursue injunctive relief, and CAIR-AZ's claim to organizational standing likewise fails as a matter of law because: (a) an organization's "abstract social interests" cannot provide the basis for organizational standing, (b) organizational standing is not available for injunctive relief claims, and (c) Plaintiffs have failed to allege diversion of resources specific to any non-abstract interest.

- **No official policy.** The Court also lacks jurisdiction to entertain relief under Section 1983 because the bare submission of a course syllabus to the Social and Behavioral Science Division—without any specific reference to, much less approval of, the allegedly offending course content—is insufficient as a matter of law to establish an "official policy" required for Section 1983 liability.

On the merits, Plaintiffs do not dispute that their claims are appropriately considered at the motion-to-dismiss stage. Rather, they ask the Court to focus exclusively on selective, decontextualized sound bites and improper extrapolations. But, even at the motion to dismiss stage, the Court is not required to ignore the context available in the pleadings and incorporated documents, nor is the Court required to accept "conclusory, unwarranted deductions" or "unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Properly considered, the course content refutes any viable Establishment Clause or Free Exercise claims as a matter of law. Moreover, at a minimum, the unprecedented nature of Plaintiffs' claims entitles Dr. Damask to qualified immunity.

## ARGUMENT

### I. Plaintiffs lack standing.

#### A. Plaintiff CAIR-AZ lacks organizational standing.

Plaintiffs rely exclusively on CAIR-AZ's alleged organizational standing in seeking to overcome the jurisdictional defects barring their claims. This argument fails because: (1) abstract social interests like those asserted by CAIR-AZ cannot provide the basis for organizational standing, (2) the seminal case finding organizational standing—*Havens Realty Corporation v. Coleman*—involved only a claim for damages, not

1

injunctive relief, and (3) even if the Court were able to discern a non-abstract interest, Plaintiffs have failed to sufficiently allege diversion of resources to such interest.

First, although courts sometimes recognize an organization's standing to bring a claim on its own right when it sufficiently alleges "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [injurious behavior] in question," courts reject this kind of "on-its-own-right" organizational standing when an organization suffers only "a setback to the organization's abstract social interests." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004)). Further, an organization cannot "manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*

Numerous courts, including this Court in a case cited by Plaintiffs, have held that abstract societal interests like CAIR-AZ's interests in "correcting [alleged] Islamophobic information" or "advocacy and protecting the civil rights of American Muslims while promoting justice" cannot provide the basis for organizational standing:

- *We Are Am./Somos Am., Coal. of Arizona v. Maricopa County Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1101 (D. Ariz. 2011) (no organizational standing for a plaintiff that "sweepingly allege[d] that 'its primary goals include promoting and protecting the legal, political, social, and cultural interests of Latinos in the United States' because … the complaint's allegations as to [the organization] amount to nothing more than 'simply a setback to [its] abstract societal interests'");
- *Project Sentinel v. Evergreen Ridge Apts.*, 40 F.Supp.2d 1136, 1139 (N.D. Cal. 1999) (no organizational standing; complaint "alleges nothing more than a setback to the organization's abstract social interest in gaining compliance with fair

housing laws" and did not allege, e.g., that "it provides any service or is engaged in any other enterprise independent of this action that might be frustrated by defendants' allegedly unlawful conduct");

- *Mecinas v. Hobbs*, CV-19-05547-PHX-DJH, 2020 WL 3472552, at *10 (D. Ariz. June 25, 2020) (no organizational standing, based on abstract social interests of "electing Democrats in Arizona");

- *Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 232 (E.D.N.Y. 2019) (collecting cases; "courts have been reluctant to extend this [organizational standing] doctrine to organizations engaged primarily in social advocacy").

Indeed, Plaintiffs have not cited, nor have we found, any cases holding that plaintiff organizations may bring Establishment Clause or Free Exercise claims under *Havens*, much less claims based on interests as broad and ephemeral as correcting alleged Islamophobia, protecting the civil rights of Muslims, and promoting justice.

Second, a "critical difference between *Havens* and this case is that, in *Havens*, [the plaintiff] sought only damages for past expenses." *Young Advocates*, 359 F. Supp. 3d at 231. "Therefore, this case raises a concern that was absent in *Havens*, namely, the prospect that a citizen with a generalized grievance might manufacture standing in order to enjoin conduct that they object to as a public policy matter." *Id.*; *see also Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014) (voter outreach organization lacked standing to challenge absentee ballot procedures; distinguishing *Havens* because, inter alia, the *Havens* plaintiff "sought [only] damages, not an injunction"). Because Plaintiff CAIR-AZ seeks injunctive relief, it cannot assert organizational standing under *Havens*.

Third, Plaintiff CAIR-AZ fails to "provide any specificity in describing (1) from what and (2) to what its resources have been reallocated." *Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1100-01 (N.D. Cal. 2018) (granting motion to dismiss claim for lack of organizational standing). The Complaint vaguely alleges that "[i]n an attempt to remedy the damage done by Damask, CAIR-AZ has had to divert their resources to create a campaign correcting the Islamophobic information. CAIR-AZ has

contracted with a religious scholar to create materials for this campaign." (Compl. ¶ 63). These general allegations fail to allege "diversion of resources" to something "more than a setback to [CAIR-AZ's] abstract social interest" and cannot support organizational standing. *See Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) (finding no diversion of resources and no organizational standing).

### B. Plaintiffs' prospective claims for injunctive relief are moot.

Even if CAIR-AZ had "organizational standing" (it does not), organizational standing would not cure the mootness of Plaintiffs' claims. The only non-abstract injuries alleged with any specificity are those that Mr. Sabra allegedly experienced in the World Politics course. With his completion of the course, the Court cannot redress those alleged injuries on a prospective basis, particularly given that course content is not static, but may change from term to term. *See e.g.*, *Doe v. Madison School Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999) (student's graduation mooted her declaratory and injunctive relief claims regarding school policy allowing selected students to give presentations, including prayers, during graduation ceremony); *T.A. v. McSwain Union Elementary Sch.*, 1:08-CV-01986, 2010 WL 2803620, at *6 (E.D. Cal. July 16, 2010) ("A student's graduation generally moots claims for declaratory and injunctive relief against a school.").

### C. Plaintiffs' failure to allege an "official policy" precludes standing to sue MCCCD or Dr. Damask in his official capacity.

In addition to asserting moot claims and failing to qualify for organizational standing, Plaintiffs cannot establish Article III standing for the independent reason that they allege no "official policy" or action leading to their alleged injuries.[1] *See e.g.*, *Miller v. City of St. Paul*, 823 F.3d 503, 507 (8th Cir. 2016) (alleged restrictions on plaintiff's free speech rights stemmed from police commander's security plan—not a "final government policy" of the city; motion to dismiss granted).

Plaintiffs assert that the following show some kind of official policy: (1)

---

[1] Plaintiffs' failure to allege an official policy also provides a basis to dismiss their claims under Rule 12(b)(6).

"MCCCD's receipt and acceptance of Dr. Damask's course syllabus" and (2) the allegation that "Dr. Damask has been teaching a form of the violative course module for nearly a quarter century." (Resp. at 5). These assertions are belied by the sources Plaintiffs incorporate into their Complaint, including (1) MCCCD Regulation 3.6 and (2) the World Politics course syllabus itself.

Contrary to Plaintiffs' assertion, nothing in Regulation 3.6 suggests that MCCCD reviews—much less approves—the content of specific slides or quiz questions within a module of a course. Regulation 3.6 provides in relevant part:

> The instructor must present a course syllabus to students during the first week of a class (before the end of drop/add). A copy of the course syllabus must be submitted to the division/department office at the college no later than the end of the first week of class.[2]

If a substantive review and approval were contemplated, such review/approval would happen before the course began, not at "the end of the first week of class." Moreover, the information provided in the syllabus is sparse at best:

> Module #6
> **Islamic Terrorism**
> Reading: "The Historical Roots of Jihad," by Walid Phares, from his *Future Jihad*
> Quiz #6

(Ex. D. to Compl. at 4.) Nothing in this brief syllabus description suggests any alleged inappropriate content, as Plaintiffs readily concede: "There is no question that Damask has a right to teach why terrorists use Islam to commit terrorism." (Mot. for Prelim. Inj. at 18.)[3] Thus, the absence of any substantive review or approval of the specific course content to which Plaintiffs object negates any claim that such content represented an "official policy" of MCCCD that could support a claim under Section 1983.

---

[2] MCCCD Regulation 3.6, *available at* https://district.maricopa.edu/regulations/admin-regs/section-3/3-6.

[3] Plaintiffs have not alleged that prior versions of the syllabus provided any more detail about the specific content of this module. Thus, the fact that Dr. Damask has taught the course for many years provides no support for Plaintiffs' conclusory assertion that MCCCD "approved" the specific course content to which Plaintiffs' object.

## II. Plaintiffs' Establishment Clause and Free Exercise claims fail as a matter of law.

Plaintiffs do not attempt to refute or contest the appropriateness of considering Establishment and Free Exercise claims for dismissal under Rule 12(b)(6). Instead, Plaintiffs suggest that the Court must turn a blind eye to what it claims are "factual arguments." (Resp. at 1.) But even at the motion-to-dismiss stage, courts are not "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall*, 629 F.3d at 998. Viewing Plaintiffs' claims within this permissible context requires dismissal.

### A. Plaintiffs fail to state an Establishment Clause claim.

Under the *Lemon* test, "when determining the purpose or primary effect of challenged religious content, courts … consistently have examined the entire context of surrounding the challenged practice, rather than only reviewing the contested portion." *Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir. 2019) (noting that "context is crucial" and also dictated by "common sense").

Plaintiffs refuse to acknowledge the course context—in which the discussion of Islam is limited to understanding why certain groups resort to terrorism as a means of effecting political change. Instead, Plaintiffs cobble together selected soundbites— stripped of context—in an effort to manufacture a claim that the materials "explicitly state that Islam is terrorism," "all Muslims are terrorists," "Islam is dangerous because it mandates the killing of non-believers" and "no other plausible interpretation exists." (Resp. at 8-9.) While Plaintiffs' tactics may stir up social media fervor, neither the course nor Dr. Damask says any of these things, and the Court should not accept such "conclusory, unwarranted deductions" or "unreasonable inferences."

Rather, the Court must view the claims in context and under the objective, reasonable observer standard, which would acknowledge and understand: (1) the module's focus is "Islamic Terrorism"—not "mainstream Islamic beliefs" or "Islam

6

generally"; (2) the course is a political science course, focused on international politics—not a religion course, focused on intra-faith disputes within Islam about various doctrinal interpretations; (3) the slides focus on analyzing Islamic texts, traditions, and legal doctrines by which terrorist organizations justify their actions, including the statement that "*All* Islamic terrorists sanctify their actions through pious reference to the Quran and the traditions of the Prophet Muhammad"; (4) the course discusses scholars' views that "radical terror groups such as al Qaeda that represent a 'twisted' variant of Islam as a whole"; (5) the course discusses scholars' views that "[t]errorism & jihad are being undertaken by forces of reaction within the Islamic world attempting to revive the Caliphate"; and (6) the module discusses several other examples of religious and non-religious groups engaging in terrorism as a means of achieving political objectives. (Ex. A to Mot. at Slides 25, 37, 41.) This context was further validated in Mr. Sabra's email exchanges with Dr. Damask, confirming that the focus is on "explain[ing] international politics" and "what beliefs motivate [terrorist organization] no matter how wrong they may be." (Ex. E to Compl. at 7.)

Plaintiffs' reliance on *Isakhanova v. Muniz*, 15-CV-03759-TEH, 2016 WL 1640649, at *1 (N.D. Cal. Apr. 26, 2016) is misplaced and, if anything, supports dismissal under the facts of the present case. In *Isakhanova*, the plaintiff went to visit her son in jail. During the visit, the plaintiff's son was removed after officers suspected she had given him chewing tobacco. *Id.* Officers then handcuffed plaintiff; detained her for seven to eight hours; strip searched her; searched her car and cell phone; denied her access to diabetes medication, food, and water; and "[t]hroughout the detention . . . made offensive and derogatory remarks about Plaintiff's religion (Islam) and foreign national origin …, including the statements 'All Muslims are terrorists' and 'America is no place for Muslims.'" *Id.* On these facts, the court in *Isakhanova* held that the plaintiff could survive a motion to dismiss.

The abuse suffered by the plaintiff in *Isakhanova* is not remotely "similar" to what Mr. Sabra alleges occurred in the context of the World Politics course. Dr. Damask never

said that "All Muslims are terrorists" or that "America is no place of Muslims." Further, unlike the wrongfully detained plaintiff in *Isakhanova*, Mr. Sabra was a student in a college course, who had every opportunity to ask Dr. Damask about any of the statements or quiz questions in the terrorism module. Indeed, when Mr. Sabra did reach out to Dr. Damask, Dr. Damask provided additional clarification, explaining: "the course isn't 'for' or 'against' anything"; and the materials and quiz questions focused on views of Islam expressed by terrorist groups—which "may be quite wrong" or may be "twisted … from a kernel of truth into something horribly misguided." (Ex. E to Compl. at 2-3.)

At a fundamental level, the Court should reject Plaintiffs' attempt to confuse their personal disapproval of terrorist interpretations of Islam with purported government disapproval of Islam generally. In his course, Dr. Damask is merely teaching—accurately—that some individuals who subscribe to Islamic beliefs cite to Islamic religious authorities as supporting terrorist actions as a means of effecting political goals. Plaintiffs do not share those views and wish that the course focused more on distinguishing such views from mainstream interpretations of Islam. But the fact that Plaintiffs are deeply offended by interpretations of Islam that support terrorism does not mean that teaching such interpretations in a secular, World Politics course constitutes "disapproval of Islam." As Dr. Damask expressly told Mr. Sabra, the course is not concerned with whether terrorists' interpretations of Islam as "'true' or 'right'"; nor is the course content "'for' or 'against'" any particular interpretation of Islam; rather, the course "aims to explain international politics." (Ex. E to Comp.) If courts were to start wading into which version or interpretations of Islam should be taught in college courses, as Plaintiffs seem to want, this could itself be a violation of the Establishment Clause and would certainly violate principles of academic freedom.[4] Considering the context of the course, dismissal of Plaintiffs' Establishment Clause claim is appropriate.

---

[4] *See e.g.*, *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1356-57 (D.C. Cir. 1990) ("[D]etermination of 'whose voice speaks for the church' is *per se* a religious matter. We cannot imagine an area of inquiry less suited to a temporal court for decision." (citation omitted)); *Rodriguez v. Maricopa Cty. Cmty.*

**B. Plaintiffs fail to state a Free Exercise claim.**

Plaintiffs' Free Exercise claim must likewise be dismissed because they fail to plead an essential element—a substantial burden on Mr. Sabra's ability to practice his religion. Plaintiffs assert that Mr. Sabra was forced to choose between denouncing his religion "by selecting the 'correct' multiple choice answers on the module quiz, or receiv[ing] a lower grade, potentially affecting Mr. Sabra's academic and professional future." (Resp. at 12-13.) But Mr. Sabra was not being asked to adopt the correct answer on a quiz about terrorism founded on Islamic beliefs as his own, personal religious view; Mr. Sabra was being tested to "demonstrate understanding" of the course material—something courts have held is not a violation of the Free Exercise Clause. *See Wood*, 915 F.3d at 313 (rejecting student's Free Exercise claim that he was academically punished for refusing to complete a fill-in-the-blank quiz on Islam indicating that "There is no god but ____ [Allah] and Muhammad is the ___ [messenger]," in contravention of his Christian religious beliefs; the quiz did not require the student to "profess or accept the tenets of Islam," but rather "to demonstrate her understanding of the world history curriculum"); *see also California Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1226 (N.D. Cal. 2017) (school curriculum, allegedly requiring students to learn a "derogatory depiction" of Hinduism, does not violate the Free Exercise Clause; motion to dismiss granted); *Parker v. Hurley*, 514 F.3d 87, 99 (1st Cir. 2008) (no burden on religious exercise when students read a book plaintiffs found religiously offensive; dismissal affirmed).

**III. Plaintiffs' claims against Dr. Damask are barred by qualified immunity.**

Plaintiffs acknowledge they must show "existing precedent" that places the "constitutional question beyond debate," (Resp. at 14) and further admit that "each of

---

*Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010) ("To afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom.").

9

the[] cases [they cite] ultimately denied the respective plaintiffs' Establishment Clause claims," (*Id.* at 10). Pointing instead to dicta and to a joint policy statement discussing religious and other discrimination, Plaintiffs ask the Court to be the first to find that statements made in a college course clearly violate the First Amendment religions clauses in a way that is "beyond debate." Plaintiffs cannot satisfy this high standard.

Plaintiffs' reliance on a Department of Justice guidance document does not remedy Plaintiffs' failure to allege violation of clearly established law.  The document neither references nor suggests that it is providing a standard for Establishment Clause violations. More important, the example it provides bears little relation to this case. In the example, a student is subjected to other students "call[ing] him a terrorist and tell[ing] him to go back to his country," after which his teacher "asks the student why Muslims have not denounced the terrorist attacks of 9/11." Mr. Sabra has not alleged that any of his fellow students or Dr. Damask personally called him a terrorist or asked him to explain why Muslims have not denounced particular terrorist attacks.

Plaintiffs fail to cite any caselaw or any other precedent suggesting that Mr. Sabra's participation in the World Politics course violated a "clearly established" constitutional right.[5] This alone provides an appropriate basis to dismiss Plaintiffs' claims against Dr. Damask in his individual capacity. *See Friedman v. South*, 92 F.3d 989, 989 (9th Cir. 1996) (upholding dismissal on qualified immunity grounds of free exercise claim "because the law was not clear").

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed.

---

[5] *Grove v. Mead School District*, cited by Plaintiffs (at 16), supports dismissal of their Free Exercise claim on qualified immunity grounds, and in any event involved a mandatory high school class—not a college-level elective course. 753 F.2d 1528, 1542-43 (9th Cir. 1985).

1  DATED this 17th day of July, 2020.

OSBORN MALEDON, P.A.

By  s/ David D. Garner
David D. Garner
Travis C. Hunt
2929 N. Central Avenue, 21st Floor
Phoenix, Arizona  85012-2793

Attorneys for Defendants

TORRES LAW GROUP, PLLC

By  James E. Barton II
Jacqueline Mendez Soto
2239 West Baseline Road
Tempe, Arizona  85283

Co-counsel for Defendant Nicholas Damask