FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MOHAMED SABRA; COUNCIL ON AMERICAN-ISLAMIC RELATIONS OF ARIZONA,<br><br>          *Plaintiffs-Appellants*,<br><br>v.<br><br>MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT; NICHOLAS DAMASK, in his official and individual capacity,<br><br>          *Defendants-Appellees.* | No 20-16774<br><br>D.C. No.<br>2:20-cv-01080-SMB<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Susan M. Brnovich, District Judge, Presiding

Argued and Submitted November 15, 2021
Phoenix, Arizona

Filed August 10, 2022

Before:  Richard R. Clifton, Daniel A. Bress, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Clifton;
Concurrence by Judge VanDyke;
Dissent by Judge Bress

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of an action brought pursuant to 42 U.S.C. § 1983 against Dr. Nicholas Damask and the Maricopa County Community College District alleging that a module on Islamic terrorism within a course in world politics taught by Damask at Scottsdale Community College violated plaintiff's constitutional rights under the Establishment Clause and Free Exercise Clause of the First Amendment, and that Damask's disparaging treatment of Islam was part of an official policy embraced by the College District.

The panel first concluded that the Council on American-Islamic Relations of Arizona, Inc. (CAIR-AZ) had organizational standing to bring this action alongside plaintiff Mohamed Sabra.  CAIR-AZ, a non-profit organization that advocates for the civil rights of American Muslims, alleged that Damask's actions frustrated its mission and caused it to divert resources in order to combat Damask's distorted portrayal of Islam.  At the motion-to-dismiss stage, these allegations were sufficient to establish organizational standing.

The panel next held that plaintiffs could not sustain a claim for municipal liability against the College District. First, plaintiffs abandoned their municipal liability claim on appeal by failing to address it in their Reply Brief even after the College District raised the argument in its Answering

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Brief on appeal.  But even on the merits, the claim could not survive dismissal under Fed. R. Civ. P. 12(b)(6).  Although plaintiffs alleged that Damask has taught his World Politics class for 24 years, they did not allege that the course in other years contained the same content that offended Sabra, or that Damask's views or teaching methods were so persistent and widespread as to constitute part of the College District's standard operating procedure.  Plaintiffs also failed to produce authority suggesting that a professor becomes a "final policymaker" for an entire community college district simply by assuming administrative responsibilities within his department, nor had the panel located any such authority.

The panel held that Damask was entitled to qualified immunity with respect to plaintiffs' Establishment Clause and Free Exercise claims.  Under the second prong of the qualified immunity analysis, the constitutional right allegedly violated in this case was not clearly established at the time of the events giving rise to this action.  This court has never held that actions like the ones challenged in this case constitute a violation of the Establishment Clause or Free Exercise Clause.  Nor was this the exceptional case where the alleged constitutional violation was so obvious as to obviate the need for a case on point.  Rather, the context of this case weighed heavily against any argument that the violation was obvious.  Because the "clearly established" prong was dispositive, the panel did not address whether, under the facts alleged in the complaint, Damask violated Sabra's constitutional rights.

Concurring, Judge VanDyke agreed with the majority but wrote to respond to Judge Bress's position that qualified immunity was inappropriate because Sabra's Free Exercise claim was clearly established.  In reality, Sabra's Free Exercise claim—whether it might ultimately succeed or

not—was fraught with difficulties, which is why no claim like it has ever, to Judge VanDyke's knowledge, been squarely addressed by any court. Judge VanDyke also wrote separately to briefly note this court's misguided approach to organizational standing. Here, the only resources CAIR-AZ diverted from its organization were those to further its stated purpose of "protecting the civil rights of American Muslims." An activity that falls exactly in line with an organization's stated purpose seriously undermines any sense of injury, and therefore runs afoul of the Supreme Court's threshold requirement that injury be "concrete and particularized" and "actual or imminent."

Dissenting, Judge Bress stated that the question here was not whether Sabra should prevail but merely whether he had stated a claim for relief at the motion to dismiss stage. Although Sabra suffered no First Amendment injury through his mere exposure to inflammatory course materials, he may have suffered such an injury when, in connection with those disturbing materials, he was forced to answer black and white multiple-choice questions that he plausibly alleged required him to violate his religious beliefs on pain of receiving a lower grade. Discovery was therefore needed to assess Damask's explanations for his facially problematic quiz questions. Judge Bress also disagreed with affirming the dismissal of the College District on the ground that Sabra had not pleaded a custom or practice for purposes of municipal liability. The district court never reached this issue, the College devoted minimal briefing to it, and Sabra had never been given an opportunity to amend his complaint. The majority then prevented Sabra from even having a standard opportunity to replead by holding that Sabra had abandoned this claim on appeal—an abandonment holding that was unsound, unprecedented, and unfair.

**COUNSEL**

Ahmed Soussi (argued), CAIR-AZ, Mesa, Arizona; David Chami, Price Law Group APC, Scottsdale, Arizona; Raeesabbas Mohamed, RM Warner PLC, Scottsdale, Arizona; for Plaintiffs-Appellants.

Kris Leonhardt (argued) and Pavneet Singh Uppal, Fisher & Phillips LLP, Phoenix, Arizona, for Defendant-Appellee Nicholas Damask.

David D. Garner (argued) and Travis C. Hunt, Osborn Maledon P.A., Phoenix, Arizona, for Defendant-Appellee. Maricopa County Community College District.

## OPINION

CLIFTON, Circuit Judge:

Mohamed Sabra ("Sabra") and the Council on American-Islamic Relations of Arizona, Inc. ("CAIR-AZ") brought this action against Dr. Nicholas Damask ("Damask") and the Maricopa County Community College District (the "College District"). Plaintiffs allege that a module on Islamic terrorism within a course in world politics taught by Damask at Scottsdale Community College (the "College") violated Sabra's constitutional rights under the Establishment Clause and Free Exercise Clause of the First Amendment. Plaintiffs also allege that Damask's disparaging treatment of Islam was part of an official policy embraced by the College District. The district court granted Defendants' motion to dismiss the Complaint, and the Plaintiffs appealed.

We conclude that CAIR-AZ has organizational standing to bring this action alongside Sabra. CAIR-AZ, a non-profit organization that advocates for the civil rights of American Muslims, alleged that Damask's actions frustrated its mission and caused it to divert resources in order to combat Damask's distorted portrayal of Islam. At the motion-to-dismiss stage, these allegations are sufficient to establish organizational standing.

We also conclude, however, that Plaintiffs cannot sustain a claim for municipal liability against the College District. Plaintiffs failed to allege that their injuries were caused by a municipal policy or custom and subsequently abandoned their municipal liability claim on appeal.

Finally, we conclude that Damask is entitled to qualified immunity with respect to Plaintiffs' Establishment Clause

and Free Exercise claims.  Under the second prong of the qualified immunity analysis, the constitutional right allegedly violated in this case was not clearly established at the time of the events giving rise to this action.  Because the "clearly established" prong is dispositive in this case, we do not address whether, under the facts alleged in the Complaint, Damask violated Sabra's constitutional rights. We affirm the district court's dismissal of the action.

## I.  Background

### A.  The World Politics Course at Scottsdale Community College

This case arises from an online course offered by the College during the spring 2020 semester.  The course, "World Politics," was described as an "[i]ntroduction to the principles and issues relating to the study of international relations," including "the political, economic, national, and transnational rationale for international interactions."  It was divided into six "modules," each designed to examine a different theme in the study of international affairs, specifically (1) "Realism," (2) "Idealism and International Law," (3) "Images of the World," (4) "Three World Wars," (5) "Globalization and the World Economy," and (6) "Islamic Terrorism."  Within each module, there were three components: first, students would review PowerPoint slides discussing the theme of the module; next, they would complete assigned readings to supplement the PowerPoint material; and finally, they would complete an online, multiple-choice quiz.  Students were to complete the course online at their own pace.

Sabra was a student in the course.  A practicing Muslim, Sabra alleges that the last module, Islamic Terrorism, presented a "biased" and "distort[ed]" portrayal of Islam.

8     SABRA V. MARICOPA CNTY. CMTY. COLL. DIST.

His First Amendment claims, discussed below, are based on allegedly false and inflammatory statements throughout the PowerPoint slides, assigned reading, and required quiz that comprised the Islamic Terrorism module.  Sabra attached portions of these materials to his Complaint and incorporated them by reference, and the district court considered these materials in evaluating and granting the motion to dismiss his claims.

> 1.  The Islamic Terrorism Module's PowerPoint Slides

The module's PowerPoint presentation, which students were required to review independently at their own pace, was divided into three sub-sections: (1) "Defining Terrorism," (2) "Islamic Terrorism: Definition," and (3) "Islamic Terrorism: Analysis."     Sabra focuses predominantly on the first two sub-sections.

The first sub-section provided a general overview of terrorism and distinguished it from other forms of war.  On one of the allegedly offending slides, Damask stated that, "effectively[,] there is no non-Islamic international terrorism in the contemporary world."  Another slide in this section gave a statistical accounting of Islamic terror attacks, comparing the scope of such attacks to other terror movements and conflicts throughout history.  The slide stated, for example, that "Islamic terrorists kill on average more people every 90 days than the number of blacks killed by the Ku Klux Klan in its entire 120+ year history."

The second sub-section purported to define Islamic terrorism and situate it within a larger historical, theological, and political context.  One slide, for example, stated that "Islamic terrorism should be understood within the broader history of Islamic warfare against unbelief," or "jihad."

"Politically-speaking," the slide explained, "jihad is a religiously-justified, communal mobilization of the resources and capabilities of the Muslim population for war against unbelievers."

Subsequent slides described the putative justification for terrorism in Islamic theology and law, as well as its supposed antecedents in early Islamic history and teaching. For example, under a heading labeled "[t]he theological mandate for jihad," one slide cited Quranic passages to support a statement that "jihad is a moral obligation of Muslims with limited exceptions such as for the blind." The next slide argued that the Prophet Muhammad plays a "central role" in the justification for Islamic terrorism. "*All* Islamic terrorists," it stated, "sanctify their actions through pious references to the Quran and the traditions of the Prophet Muhammad," whose "life, sayings, and circumstances" provide a basis for "[e]ngaging in jihad." Rejecting the argument that Islam does not promote "warfare or violence," the slide stated that such a notion "would flatly contradict hundreds of Quranic passages and *hadiths* ('traditions') of Muhammad, as well as longstanding Islamic jurisprudence." The presentation also stated that "Muhammad himself committed acts that . . . unambiguously would be regarded as terrorism today."

The final sub-section of the presentation discussed how different groups respond to Islamic terrorism. One slide, for example, stated that "Muslim popular opinion has some sympathy for terrorism generally, and the ultimate goals of terror group[s] (sharia) particularly." The same slide argued that "Islamic states have a decided preference to employ force over diplomacy, relative to other countries," citing comparative statistics regarding various countries' use of force.

2.  The Islamic Terrorism Module's Assigned Reading

The module's assigned reading was an excerpt from the book *Future Jihad: Terrorist Strategies against America*, by Walid Phares.  In the first chapter, entitled "The Historical Roots of Jihad," Phares criticized the "western establishment['s] . . . efforts to convince audiences and readers of the benign character of jihad."  Phares argued that although western academics, journalists, and political activists tried to "sanitize[]" and "camouflage[]" the meaning of "jihad" throughout the 1990s, its "comprehensive and widely understood" meaning for much of history was quite different.  "Jihad," Phares maintained in the assigned reading, was a "call for mobilization and action and ultimately war" in service of the early Islamic *umma*, or nation, "as it developed its military and strategic dimensions."  The aim of jihad was "to promote, propagate, and conquer *for* Islam."  Thus, Phares scoffed at westerners' efforts to "portray personal jihad as a 'spiritual experience on the inside,' almost like yoga."  Such efforts, he argued, "can only blur the public's vision and its grasp of the real dangers emanating from the modern use of jihad."

3.  The Islamic Terrorism Module's Required Quiz

Finally, after reviewing the PowerPoint slides and completing the assigned reading, students were required to complete a 25-question, multiple choice quiz testing their comprehension of the module's content.  As discussed below, Sabra maintains that several questions (and their correct answers) display a hostility to Islam and are factually inaccurate.  Sabra identifies five examples.

SABRA V. MARICOPA CNTY. CMTY. COLL. DIST.      11

Question 9 asked: "Where is terrorism *encouraged* in Islamic doctrine and law?"   The answer choices were as follows:

- the Medina verses

- the Muhammad verses

- the Mecca verses

- terrorism is not encouraged in Islamic doctrine and law

The correct answer was the first choice, "the Medina verses."  Sabra incorrectly selected the fourth choice.

Question 12 asked: "Who do Islamic terrorists strive to emulate?"  The answer choices were as follows:

- the Prophet Muhammad

- Saddam Hussein

- Osama bin Laden

- Ibn Tamiyyah

The correct answer was the first choice, "the Prophet Muhammad."  Sabra incorrectly selected the fourth choice.

Question 15 stated: "Contemporary terrorism is _____."  The answer choices were as follows:

- communist/left-wing

- Islamic

- Mormon

- fascist/right-wing

The correct answer was the second choice, "Islamic." Sabra incorrectly selected the first choice.

Question 19 stated: "Walid Phares notes that although 'gullible' Westerners are taught that jihad can have two meanings, people in the Arabic world understand that its overwhelmingly obvious meaning is _____." The answer choices were as follows:

- struggling against sin

- spiritual contemplation

- combat/war

- peace

The correct answer was the third choice, "combat/war." Sabra incorrectly selected the first choice.

Question 20 stated: "Terrorism is _____ in Islam." The answer choices were as follows:

- justified within the context of jihad

- always forbidden

- justified under international law

- always justified

The correct answer was the first choice, "justified within the context of jihad."   Sabra incorrectly selected the second choice.

When Sabra took the quiz on April 29, 2020, he was, as alleged in his Complaint, "shocked and offended" to see the potential answer choices for each of the questions above. These questions, Sabra alleged, forced him to make a decision: "either disavow his religion or be punished by getting the answers wrong on the quiz."   Sabra decided to answer the questions in accordance with his own personal practice of the Islamic faith and was penalized by losing points on the quiz for selecting incorrect answer choices.

After completing the quiz, Sabra emailed Damask to express his "disgust" at the questions above (and their correct answers), which, Sabra said, were "absolutely in distaste of Islam."   In response, Damask thanked Sabra for his "heartfelt response" and attempted to "allay" Sabra's concerns by noting "that the course content [wasn't] 'for' or 'against' anything, but aim[ed] to explain international politics."   Damask went on to explain that the "point" of the quiz and module was not to assert that what terrorists "believe is in fact a 'true' or 'right' or 'wrong' interpretation of a major religion," but rather to convey what terrorists believe.

In a video posted to Instagram one day after Sabra took the quiz, a comedian who had learned about the quiz criticized Damask's questions and challenged the College on its stance toward the quiz.   The College contacted Sabra and pledged to investigate the issue.   Shortly thereafter, the College posted a statement to Instagram apologizing to Sabra "and to anyone in the broader community who was offended by the [quiz questions]."   The College called the content of the quiz "inaccurate, inappropriate, and not

reflective to inclusive [sic] nature of college." The College also stated that Sabra would receive credit for three of the questions he had missed, and that the offending questions would be removed from future quizzes.

### B. Sabra and CAIR-AZ Challenge the Islamic Terrorism Module

Sabra brought this action under 42 U.S.C. § 1983 against Damask and the College District, of which the College is a part, alleging that the Islamic Terrorism module violated Sabra's constitutional rights under the Establishment Clause and Free Exercise Clause of the First Amendment. Joining Sabra as a Plaintiff in the action was CAIR-AZ, a non-profit organization that advocates on behalf of American Muslims. CAIR-AZ alleged that in an effort "to remedy the damage done by Damask," it contracted with a religious scholar to develop materials for a public-awareness campaign that would "correct[] . . . Islamophobic information," thus diverting resources from the organization's usual advocacy activities.

In their first cause of action, Plaintiffs allege that the Islamic Terrorism module violates the Establishment Clause because its "primary message is the disapproval of Islam." The crux of this claim is that Damask presented a "biased" and "one-sided" portrayal of Islam as though it were fact, without qualifying this interpretation or exposing students to alternative views.

The Complaint gathers several examples that allegedly illustrate this disparaging treatment of Islam. Plaintiffs argue, for example, that Damask defined the concept of "jihad" too narrowly, failing to inform students "that prayer, introspection, and spiritual struggle" are what mainstream Muslims refer to when discussing jihad. They allege that

Damask "intentionally distort[ed]" the meaning of various passages from the Quran and the Hadith[1] by failing to contextualize and discuss the cited source material, using incomplete or inaccurate quotations, and relying on poor English translations. They contend that the PowerPoint presentation mischaracterized the actions of the Prophet Muhammad and contained "blatantly false and inflammatory statements about Islam" (for example, that contemporary Islamic legal authorities unanimously sanction suicide attacks).  Moreover, they allege that the assigned reading was authored by a "known Islamophobe" who "represents . . . an extreme perspective."  Without this additional contextual information, they argue, the assigned passage suggested that Damask's "biased interpretations" of Islam were "academic facts."

In their second cause of action, Plaintiffs allege that the end-of-module quiz "forced Sabra to agree to [Damask's] radical interpretation of Islam" in violation of the Free Exercise Clause.  As noted, Plaintiffs maintain that certain questions on the module's mandatory quiz required Sabra either to "disavow his religion" by selecting the correct answer choice or be penalized by answering in accordance with his personal religious beliefs.

Plaintiffs sued Damask in both his official and individual capacities.  Plaintiffs also named the College District as a Defendant under a theory of municipal liability, alleging, among other things, that Damask acted as a "final policymaker" on behalf of the District, and that the District

---

[1] The "Hadith" refers to the sayings, teachings, and actions of the Prophet Muhammad.

"had constructive knowledge" that Damask would teach the Islamic Terrorism module in his World Politics class.

In addition to seeking nominal damages, Plaintiffs asked the district court to declare that Defendants' actions violated the Establishment Clause, and to enjoin Defendants temporarily and permanently from teaching the offending materials unless and until they are modified.

## C.  The District Court Dismisses Plaintiffs' Claims

Defendants moved to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The district court concluded, as a threshold matter, that although Sabra's completion of the World Politics course mooted his claim for declaratory and injunctive relief, he could still maintain an action for nominal monetary damages.  But CAIR-AZ, the court concluded, could not establish Article III standing under a theory of organizational injury.  In the court's view, CAIR-AZ had not explained how its remedial actions—developing a public-awareness campaign to combat Islamophobia—fell outside "the realm of [its] normal advocacy," nor had the organization identified the source from which it was forced to divert resources.  Thus, it failed to state an injury that would establish Article III standing.

The district court also concluded that Sabra failed to state an Establishment Clause or Free Exercise claim.  The allegedly offensive material, the court reasoned, made up just one part of a unit that was itself one of six modules in the entire course.  Moreover, the challenged content was conveyed in the context of analyzing terrorism, of which Islamic terrorism is a part.  Viewing the course "as a whole," the court concluded, a reasonable, objective observer would not conclude that the course's "primary purpose" was to

inhibit the practice of Islam, and thus, Sabra failed to state a claim under the Establishment Clause.  With respect to his Free Exercise claim, the court said Sabra was not put to the choice of either repudiating his religion or receiving a lower score on the quiz.  In the court's view, by selecting the correct answer Sabra was not being forced to adopt the views expressed by Damask or the authorities cited in the course; rather, he was merely "demonstrat[ing] an understanding of the material taught."  Because the course did not burden Sabra's personal worship, the court concluded, Sabra's Free Exercise claim failed as a matter of law.

Finally, the district court concluded that Damask was entitled to qualified immunity.  As the court observed, existing precedent governing Establishment Clause violations based on college teaching is "anything but clear," particularly when the challenged content involves religion.  Because it could not say that Damask would have been on notice that his conduct might be unconstitutional, the court concluded that Damask was shielded by qualified immunity.

This appeal followed.

## II. Discussion

We have jurisdiction under 28 U.S.C. § 1291.  We review de novo a district court's dismissal under Rule 12(b)(1) or Rule 12(b)(6).  *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1007 (9th Cir. 2021).  We also review de novo a district court's decision regarding qualified immunity.  *Vazquez v. County of Kern*, 949 F.3d 1153, 1159 (9th Cir. 2020).  Where, as here, a district court has considered documents attached to the complaint, we may likewise consider those documents when resolving the appeal.  *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 887 (9th Cir. 2018).

*A.  CAIR-AZ Has Organizational Standing*

"The Article III standing inquiry serves a single purpose: to maintain the limited role of courts by ensuring they protect against only concrete, non-speculative injuries." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 583 (1992)).  Whether a plaintiff has standing (and thus, whether the court has jurisdiction) is a "threshold question" that "is distinct from the merits of his claim." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).

An organization can assert Article III standing in its own right, provided it can "allege[] such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction[.]"  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (citation and internal quotation marks omitted).  In *Havens*, an organizational plaintiff alleged that the defendants' racial steering practices impaired the organization's efforts to achieve equal housing access through counseling and referral services. *Id.* at 379. The complaint further alleged that the plaintiff had to "devote significant resources" to "counteract" the defendants' practices. *Id.* (record citation omitted).  The Supreme Court held that under these facts, there was "no question" that the organization had sustained a "concrete and demonstrable injury," with an attendant "drain on [its] resources," that went well beyond a "simpl[e] . . . setback to [its] abstract social interests." *Id.*

We have "read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary*, 993 F.3d at 663 (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).

Although organizations cannot "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all," they can establish standing by showing that they "would have suffered some other injury" had they "not diverted resources to counteracting the problem." *Id.* (citation omitted).

Here, the district court concluded that CAIR-AZ "ha[d] not effectively shown that it would have suffered an injury if it had not diverted resources to counteract Dr. Damask's allegedly 'Islamophobic' teachings." The allegedly offending course material, the court said, was more "akin to a mere social setback for CAIR-AZ's abstract social interest[s]," and the organization had not demonstrated "a diversion of resources that [was] not a normal part of [its] activities." Thus, CAIR-AZ could not establish a cognizable Article III injury.

Under our court's precedents, we disagree. CAIR-AZ is a non-profit organization "committed to advocacy and protecting the civil rights of American Muslims." The Complaint alleges that CAIR-AZ "had to divert [its] resources to create a campaign correcting the Islamophobic information" in Damask's course materials, contracting with a religious scholar to develop materials for this campaign. Under similar facts, we have recognized that such an injury is sufficient to confer Article III standing on an organizational plaintiff.

In *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216 (9th Cir. 2012), for example, the organizational plaintiffs stated that they had spent resources investigating the defendant's alleged discriminatory actions and developing "new education and outreach campaigns" to combat those actions, *id.* at 1219.

The resources spent on those efforts were unrelated to litigation. *Id.* We concluded that because the defendant's actions caused the plaintiffs "to divert resources independent of litigation costs and frustrated their central mission," the plaintiffs had established organizational standing. *Id.*

So it is here. CAIR-AZ alleges that in response to Damask's allegedly harmful depiction of Islam, it went out of its way to develop a public-awareness campaign rebutting the information in Damask's course, "divert[ing] [its] resources" by contracting with a religious scholar who assisted in creating materials for the campaign. As in *Fair Housing Council*, then, Damask's actions "frustrated" CAIR-AZ's mission and caused it to divert resources unrelated to litigation costs. *See id.* Although CAIR-AZ's diversion-of-resources injury is "broadly alleged," such allegations are still "sufficient to establish organizational standing at the pleading stage." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015).

Defendants argue that the "*Havens* framework" should not govern claims arising under the Establishment Clause or Free Exercise Clause, but we are not persuaded. There is nothing in *Havens*' discussion of organizational standing that would limit its application in the First Amendment context. *See* 455 U.S. at 378–79. The fact that Plaintiffs have not located a case in which a court extended *Havens*' rationale to First Amendment claims does not persuade us otherwise. Indeed, we have regularly applied *Havens*' organizational standing principles outside the fair-housing context presented in *Havens*. *See, e.g.*, *E. Bay Sanctuary*, 993 F.3d at 662–64 (applying *Havens* and upholding plaintiffs' organizational standing in the context of immigration law); *Nat'l Council of La Raza*, 800 F.3d at 1039–41 (same result in the context of voting rights law).

Because CAIR-AZ has alleged that Damask's actions frustrated its organizational mission and caused it to divert resources to counteract these actions, we conclude that CAIR-AZ stated sufficient facts to establish Article III standing at the motion-to-dismiss stage of the litigation.

### B.  *Plaintiffs Failed to State a Municipal Liability Claim Against the College District and Abandoned Their Claim on Appeal*

We now turn to Plaintiffs' municipal liability claim against the College District.[2]  Plaintiffs allege that Damask has taught his World Politics course for 24 years, and that he was required to submit a copy of his course syllabus to his "division/department office" no later than the end of the first week of class, under a college regulation.  Because Damask served as the "Social and Behavioral Sciences Evening / Summer Department Chair" at the College, Plaintiffs allege that he acted as a "final policymaker" for the College District, which "knew or had constructive knowledge" that Damask "was teaching the disapproval of Islam."

---

[2] The College District does not dispute that, under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), it is a municipal entity subject to suit under 42 U.S.C. § 1983.  *See also, e.g.*, *Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cnty. Sch. Dist. No. 9*, 880 F.3d 1097, 1108 (9th Cir. 2018); *see generally Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2010).  Thus, although the College District is not a municipality *per se*, we still refer to Plaintiffs' claim against the College District as one for "municipal liability."  *Cf. Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1148 (9th Cir. 2011) (referring to a § 1983 claim against a county hospital as one for "municipal liability").

1. Plaintiffs Abandoned Their Municipal Liability
   Claim on Appeal

In the proceedings before the district court, Defendants argued that Plaintiffs cannot sustain a claim for municipal liability against the College District because they do not allege an "official action or policy" giving rise to their injuries, as is required under *Monell*.[3]  The district court did not reach this argument in dismissing the Complaint, instead concluding that Plaintiffs had not stated a violation of the Establishment Clause or Free Exercise Clause.  However, we "may affirm a 12(b)(6) dismissal on any basis fairly supported by the record." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

As a threshold matter, Plaintiffs have abandoned their municipal liability claim on appeal.  Although Plaintiffs advanced a claim for municipal liability in their Complaint and then defended that claim in their opposition to Defendants' motion to dismiss before the district court, they failed to address or even mention this claim in their Reply Brief even after the College District raised its municipal liability argument in its Answering Brief on appeal, starting on page one of that brief.  That failure amounts to abandonment of Plaintiffs' claim against the College District for municipal liability and of whatever argument they might

---

[3] Although Defendants characterize this failure as an infirmity that impacts Article III standing, we treat it as a ground for dismissal under Rule 12(b)(6), based on a plaintiff's failure to state a claim.  *See, e.g.*, *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 635–37 (9th Cir. 2012).

have offered to us to support that claim.  *See, e.g.*, *Maciel v. Cate*, 731 F.3d 928, 932 n.4 (9th Cir. 2013).[4]

The dissent emphasizes that Plaintiffs were not required to address in their Opening Brief an alternative ground for affirmance not addressed by the district court.  *See* Dissenting Op. 71–72.[5]  That is true, but also beside the point.  It is Plaintiffs' failure to address the municipal liability claim in their Reply Brief, after it was squarely raised by the College District in its Answering Brief, that constitutes abandonment of the claim.  Though the dissent suggests otherwise, this conclusion is based on a straightforward application of our case law on abandonment.

_____

[4] This failure cannot be attributed to any lack of opportunity.  The Reply Brief reported that it contained 5,400 words.  Under our court's rules, a reply brief can extend to 7,000 words.  Ninth Circuit Rule 32-1(b).  We can only infer that Plaintiffs had nothing to say.

[5] The dissent also argues that a single, isolated allusion to the legal standard for municipal liability in the Opening Brief indicates that Plaintiffs did not intend to abandon this claim on appeal.  Dissenting Op. 72.  But we have explained "that we will not 'consider matters on appeal that are not *specifically* and *distinctly* argued in appellant's opening brief,'" *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 335 (9th Cir. 2017) (emphasis added) (quoting *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010)).  "Applying this standard, [we have] refused to address claims that were only 'argue[d] in passing,' or that were 'bare assertion[s] . . . with no supporting argument,'" *Christian Legal Soc'y*, 626 F.3d at 487 (citations omitted) (first alteration added).  Though the dissent suggests otherwise, Plaintiffs' passing reference to the standard for municipal liability does not specifically or distinctly address their municipal liability claim.  *Cf., e.g.*, *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1135 n.12 (9th Cir. 2021) (concluding that although a party had "gestured" at a possible constitutional argument, it "ha[d] forfeited [that] argument by failing to raise the issue specifically and distinctly in its brief" (citation and internal quotation marks omitted)).

In *Maciel*, for example, a defendant belatedly tried to preserve a claim that his challenge to a term of parole was not moot by filing a Federal Rule of Appellate Procedure 28(j) letter shortly before oral argument.  731 F.3d at 932 n.4.  But as we explained, the defendant "ha[d] forfeited this argument by failing to address it in his reply brief even though the state raised [the issue of] mootness in its answering brief." *Id.*  We reaffirmed this principle two years later in *International Brotherhood of Teamsters v. Allegiant Air, LLC*, 788 F.3d 1080 (9th Cir. 2015).  There, we held that the appellant had waived a claim regarding the preclusive effect of an agency decision by failing to "cite relevant authority or otherwise press the point" in its reply brief, despite the fact that the appellee had raised the issue in its answering brief. *See id.* at 1090.

Although the dissent attempts to portray our conclusion as a "novel abandonment theory," Dissenting Op. 77, this characterization is grounded in arguments that are unpersuasive and inconsistent with our case law.  For example, the dissent argues that because reply briefs are optional, an appellant's failure to address an issue in its reply brief cannot provide the basis for an abandonment determination, even if the appellee has raised the issue in its answering brief. *See id.* at 74–75.  Of course, Plaintiffs did file a reply brief in this appeal.  More to the point, the conclusion of the dissent's argument does not follow from its premise.  Though our rules do not require appellants to file reply briefs, nothing about that fact suggests that appellants can avoid the effect of disregarding an argument presented by the appellee.  That is true whether an appellant fails to file any reply brief or in filing a reply brief fails to address an issue squarely raised in the appellee's answering brief.  Indeed, the dissent's theory is flatly inconsistent with

our conclusions in *Maciel* and *Allegiant Air*.[6]  It is, of course, an appellant's prerogative not to file a reply brief, or to stay silent on an issue raised by the appellee in its answering brief.  But it risks abandoning its claim in the process, as our case law shows.  Though the dissent suggests that we are "creat[ing] potential traps for the unwary," *id.* at 29, monitoring the arguments raised by one's opponent and responding as necessary in the reply brief is a basic part of vigilantly prosecuting an appeal.

The dissent also notes that we have discretion to overlook a party's abandonment of an issue and faults us for not exercising that discretion here.  *See id.* at 79.  We are aware of no case, however, in which our court has gone to such lengths to rescue a counseled party's claim under these circumstances, and the dissent cites none.  It is one thing to overlook a party's failure to address a claim in its opening brief, as we did in the cases cited by the dissent.  *See id.* at 79. It is quite another to overlook a party's failure to contest an argument in its reply brief even after it had been squarely presented in the answering brief.  That Plaintiffs wanted to maintain their claim for municipal liability does not, as the dissent suggests, merit a favorable exercise of discretion. *See id.* at 80.[7]  If that were the case, no claim would ever be subject to dismissal.

---

[6] Relatedly, the dissent cites the fact that we do not have "legions of cases finding abandonment of claims on appeal through 'incomplete' reply briefs" as evidence that our abandonment determination is wrong. Dissenting Op. 75.  But we do not require "legions" of cases to establish precedent.  *Maciel* and *Allegiant Air* are sufficient.

[7] As the dissent acknowledges, at 80, a party cannot resuscitate at oral argument an abandoned claim that "was not presented in the briefs[.]"  *United States v. Juvenile Male*, 670 F.3d 999, 1014–15 (9th

We are similarly unpersuaded by the dissent's argument that Plaintiffs did not abandon their municipal liability claim because they did not "choose[] a position that removes the [municipal liability] issue from the case.'" *Id.* at 70 (citation omitted). Even assuming this standard applies under the posture of this case,[8] remaining silent on an issue in the reply brief after an appellee has raised the issue in its answering

---

Cir. 2012); *see also, e.g.*, *Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017) (noting that arguments raised for the first time during oral argument will not be considered).

[8] The dissent's argument relies on inapposite law that has never been applied under the posture before us. In *BankAmerica Pension Plan v. McMath*, 206 F.3d 821 (9th Cir. 2000), we stated that "[a] party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case." *Id.* at 826. But the test articulated in *BankAmerica* applies to scenarios in which a party has abandoned a claim in the proceedings below and then tries to revive that claim on appeal. *See id.* ("[I]t is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment." (citation omitted)). That was the posture in *BankAmerica*, *see id.*, and the case on which it relied for the cited proposition, *see USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1283–84 (9th Cir. 1994).

We have invoked *BankAmerica* for the proposition cited in eight published opinions. Every one of those cases involved a situation in which a party had arguably abandoned a claim in the proceedings below and then sought to revive it on appeal. *See Manikan v. Peters & Freedman, L.L.P.*, 981 F.3d 712, 718 (9th Cir. 2020); *Echlin v. PeaceHealth*, 887 F.3d 967, 979 (9th Cir. 2018); *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1261 n.4 (9th Cir. 2016); *Walker v. Beard*, 789 F.3d 1125, 1132–34 (9th Cir. 2015); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1058–59 (9th Cir. 2007); *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 848 n.4 (9th Cir. 2004); *Montero-Martinez v. Ashcroft*, 277 F.3d 1137, 1145 n.9 (9th Cir. 2002). That is not the case here, where Plaintiffs did litigate the argument below but then failed to discuss it on appeal before us.

brief is in our view "choos[ing] a position that removes the issue from the case." *Id.* For the reasons discussed above, Plaintiffs' failure to respond to the College District's municipal liability argument in their Reply Brief is a textbook case of abandonment.

### 2. Plaintiffs Failed to State a Claim for Municipal Liability

Even if Plaintiffs had not abandoned their municipal liability claim, however, this claim could not survive dismissal under Rule 12(b)(6). Under *Monell*, plaintiffs suing a municipal entity for damages under 42 U.S.C. § 1983 "must show that their injury was caused by a municipal policy or custom." *Los Angeles County v. Humphries*, 562 U.S. 29, 30–31 (2010). To state a claim against the College District, then, Plaintiffs must allege "a deliberate choice to follow a course of action . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Plaintiffs could satisfy *Monell*'s policy requirement in one of three ways. First, the College District may be held liable if it acted "pursuant to an expressly adopted official policy." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (citation omitted). Second, the College District may be held liable based on a "longstanding practice or custom." *Id.* (citation omitted). Third, the College District may be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 974 (citation and internal quotation marks omitted).

28     SABRA V. MARICOPA CNTY. CMTY. COLL. DIST.

A plausible reading of the Complaint suggests that Plaintiffs attempt to invoke the latter two grounds for *Monell* liability.  That is, the assertion that Damask taught his World Politics course for 24 years appears to be an allegation that the College District had a "longstanding practice and custom" of teaching the disapproval of Islam.  Plaintiffs also allege, more explicitly, that Damask acted as a "final policymaker" for the College District and/or that his actions were ratified by such a policymaker.  Neither allegation, however, is sufficient to state a *Monell* claim.

Establishing municipal liability through the existence of a longstanding practice or custom is predicated "on the theory that the relevant practice is so widespread as to have the force of law."  *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (noting that the practice must be so "persistent and widespread" that it amounts to "permanent and well settled" municipal policy (citation omitted)).  Thus, an entity may be held liable under this theory, for example, where it "fails to implement procedural safeguards to prevent constitutional violations" or "fails to train its employees adequately."  *Gordon*, 6 F.4th at 973 (citations and alteration omitted).  By contrast, Plaintiffs cannot allege a widespread practice or custom based on "isolated or sporadic incidents; [liability] must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918; *see also Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom.").

Here, although Plaintiffs allege that Damask has taught his World Politics class for 24 years, they do not allege that

the course in other years contained the same content that offended Sabra, or that Damask's views or teaching methods are so persistent and widespread as to constitute part of the College District's "standard operating procedure." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002). They do not allege, for example, that Damask's Islamic Terrorism module has been incorporated as a standard part of the political science curriculum at the College, or that other professors throughout the College District subject students to similar views or teaching methods. Without an allegation that Damask's allegedly unconstitutional acts constitute a "permanent and well settled policy" embraced by the municipal entity, Plaintiffs have alleged little more than "isolated or sporadic incidents" that are insufficient to establish *Monell* liability. *Trevino*, 99 F.3d at 918.[9]

Plaintiffs' other theories of municipal liability fail for the same or similar reasons. For example, the Complaint also alleged that because Damask served as the "Social and Behavioral Sciences Evening / Summer Department Chair" at the College, he engaged in the allegedly unconstitutional

---

[9] The dissent admonishes us for "expect[ing] Sabra to have pleaded the details that [we] claim[] are missing." Dissenting Op. 82. But we do not suggest that the hypothetical allegations above are the only ones that could suffice to state a plausible municipal liability claim. We offer these merely as examples of the type of allegation that might have "nudged [Plaintiffs'] claims across the line from conceivable to plausible," *Bell At. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And though the dissent maintains that we are being "improperly stringent at the motion to dismiss stage[,]" Dissenting Op. 81, the standard for pleading municipal liability is not a low bar, *see, e.g.*, *Mansfield v. Williamson County*, 30 F.4th 276, 279 (5th Cir. 2022) ("The causal connection required for *Monell* liability is demanding."); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (noting *Monell*'s "rigorous causation standard" (citation omitted)).

conduct as the College District's "final policymaker," and thus, his actions were attributable to the District.

It is true that "a municipality can be liable for an isolated constitutional violation when the person causing the violation has final policymaking authority." *Christie*, 176 F.3d at 1235 (citation and internal quotation marks omitted). "To determine whether a [municipal] employee is a final policymaker, we look first to state law." *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Although "[a] municipal employee may act as a *de facto* policymaker under § 1983 without explicit authority under state law, . . . we are ordinarily not justified in assuming that municipal policymaking authority lies somewhere else than where the applicable law purports to put it." *Id.* at 982–83 (citation and internal quotation marks omitted).

In this case, Arizona law designates a community college district's board as the body responsible for "[a]dopt[ing] policies . . . to offer programs that meet the educational needs of the population served by the community college[,]" Ariz. Rev. Stat. Ann. § 15-1444, and "[e]stablish[ing] curricula and designat[ing] courses that in its judgment will best serve the interests of th[e] state," *id.* § 15-1445. While a final policymaker can delegate its authority to other officials, *see, e.g.*, *Lytle*, 382 F.3d at 984; *Christie*, 176 F.3d at 1236, Plaintiffs do not allege that such a delegation took place here. Indeed, even in their district court briefing, Plaintiffs produced no authority to suggest that a professor becomes a "final policymaker" for an entire community college district simply by assuming administrative responsibilities within his department, *cf. Lytle*, 382 F.3d at 983 ("For a person to be a final policymaker, he or she must be in a position of authority such that a final decision by that person may appropriately be attributed to the

[municipal entity]."), nor have we located any such authority ourselves.

Finally, Plaintiffs allege that the College District "knew or had constructive knowledge" that Damask was teaching the disapproval of Islam, and "not only condoned the material but approved of its use in the classroom." This theory of municipal liability is predicated on the allegation that under a College District regulation, professors must submit a copy of their course syllabus to the relevant "division/department office at the college no later than the end of the first week of class." But while "[a] municipality . . . can be liable for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions, . . . [t]o show ratification, a plaintiff must prove that the 'authorized policymakers approve[d] a subordinate's decision and the basis for it.'" *Christie*, 176 F.3d at 1238–39 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Ratification requires, "among other things, knowledge of the alleged constitutional violation." *Id.* at 1239.

Here, the Complaint does not plausibly allege that a final policymaker had knowledge (actual or constructive) of the offending course material and then sanctioned its use in the classroom. Although the cited regulation indicates that the academic department was to receive a copy of the syllabus no later than a week after class had begun, Plaintiffs do not allege that a final policymaker for the College District was charged with reviewing the syllabus for this course or any other, let alone approving or disapproving of their content.

We therefore conclude that Plaintiffs failed to state a municipal liability claim against the College District. Although in other circumstances Plaintiffs might be given another opportunity to present a pleading that contained more substantial allegations, that is not necessary in this

instance because, as described above, Plaintiffs abandoned their municipal liability claim by failing to present arguments in support of it on appeal.

> ### C. Qualified Immunity Shields Damask From Liability for Plaintiffs' Establishment Clause and Free Exercise Claims

The district court concluded that Damask was shielded from liability under the doctrine of qualified immunity, as there was no case law clearly establishing that his conduct was unconstitutional at the time of the alleged offense. While conceding that there is no case law clearly establishing the unconstitutionality of Damask's conduct, Plaintiffs argue that this case presents the rare circumstance in which "the constitutional violation is so 'obvious' that prior case law is not needed."

The doctrine of qualified immunity "shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Saved Mag. v. Spokane Police Dep't*, 19 F.4th 1193, 1198 (9th Cir. 2021) (citation and internal quotation marks omitted). A federal or state official is entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Following the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), we are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," *id.* at 236. "Addressing the second prong before the first is

especially appropriate where 'a court will rather quickly and easily decide that there was no violation of clearly established law.'" *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019) (quoting *Pearson*, 555 U.S. at 239); *see also C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 978 (9th Cir. 2011).

A right is "clearly established" for purposes of the second prong of the qualified immunity analysis if, "at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (citation, internal quotation marks, and alterations omitted); *see also Ballou v. McElvain*, 14 F.4th 1042, 1049 (9th Cir. 2021) (explaining that "[c]onduct violates a 'clearly established' right if the unlawfulness of the action in question is apparent in light of some pre-existing law" (citation, alteration, and some internal quotation marks omitted)).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Jessop*, 936 F.3d at 940 (quoting *al-Kidd*, 563 U.S. at 741).  "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Evans v. Skolnik*, 997 F.3d 1060, 1066 (9th Cir. 2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  To determine whether rights are clearly established, "we look to then-existing cases of controlling authority or, absent such cases, to a consensus of persuasive authorities." *J.K.J. v. City of San Diego*, 17 F.4th 1247, 1259 (9th Cir. 2021) (citation and internal quotation marks omitted).

Because we conclude that the "clearly established" prong is dispositive in this case, we need not address whether, under the facts alleged in the Complaint, Damask

violated Sabra's constitutional rights.  *See Jessop*, 936 F.3d
at 940.  As we explain below, we have never held that actions
like the ones challenged in this case constitute a violation of
the Establishment Clause or Free Exercise clause.  Nor is this
the exceptional case where the alleged constitutional
violation is so obvious as to obviate the need for a case on
point.  The context of this case weighs heavily against any
argument that the violation is obvious.  In support of their
defense, Defendants present arguments based on "long-held
protections of academic freedom," again starting on page
one of their Answering Brief.  There are powerful forces on
both sides of this debate.  Finally, while courts sometimes
hesitate to dismiss a plaintiff's claims based on qualified
immunity at the motion-to-dismiss stage, the concerns that
might ordinarily justify such hesitancy are absent in this
case.

### 1.  Plaintiffs' Establishment Clause Claim

When the events giving rise to this action occurred, the
touchstone of our Establishment Clause jurisprudence was
the framework set forth in *Lemon v. Kurtzman*, 403 U.S. 602
(1971).  Under the so-called *Lemon* test, a government
practice could satisfy the Establishment Clause only if, in
part, "its principal or primary effect [was] one that neither
advance[d] nor inhibit[ed] religion."  *Freedom From
Religion Found. v. Chino Valley Unified Sch. Dist. Bd. of
Educ.*, 896 F.3d 1132, 1149 (9th Cir. 2018) (quoting *Lemon*,
403 U.S. at 612–13).  During the half century in which we
applied this test, we never held that a teacher or curriculum's
perceived criticism of a religion has the primary effect of
inhibiting religion in violation of the Establishment Clause.
In *Farnan*, for example, a high school history teacher had
made several pointed remarks disparaging religion during
class lectures.  *See* 654 F.3d at 979–81.  Affirming the

district court's conclusion that the instructor was entitled to qualified immunity, we observed that "there has never been any reported case holding that a teacher violated the Establishment Clause by making statements in the classroom that were allegedly hostile to religion." *Id.* at 986. "Because it [was] readily apparent that the law was not clearly established at the time of" the alleged constitutional violation, and "because we [could] resolve the appeal on that basis alone," we declined to decide whether the teacher's actions violated the Establishment Clause. *Id.* at 978. Since *Farnan* was decided, none of our cases has found an Establishment Clause violation under comparable circumstances, and Plaintiffs concede that there is no "pre-existing case-law which establishes the unlawfulness of [Damask's] action beyond reasonable debate."

We recognize that the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 597 U.S. ___ (2022), has called into doubt much of our Establishment Clause case law, at least to the extent that law relies on *Lemon*. In *Kennedy*, which came down several months after this case was argued and submitted, the Court recognized that *Lemon* had been overruled and abandoned what it described as *Lemon*'s "'ambitious,' abstract, and ahistorical approach to the Establishment Clause." Slip Op. at 22 (alteration adopted) (citation omitted). Instead of relying on the *Lemon* test, lower courts must now interpret the Establishment Clause by "reference to historical practices and understandings." *Id.* at 23 (citation and internal quotation marks omitted). Going forward, "the line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* (citation, alterations, and internal quotation marks omitted). But while the analysis prescribed by

*Kennedy* marks a shift in the Court's Establishment Clause jurisprudence, it does not alter the conclusion of our qualified immunity analysis in this case, which is concerned with "the state of the law at the time of [the alleged constitutional violation]." *Jessop*, 936 F.3d at 940 (citation and internal quotation marks omitted). Here, for reasons already discussed, the law did not clearly establish that Damask's actions violated the Establishment Clause at the time Sabra was enrolled in his course.

Although Plaintiffs concede that there are no cases clearly establishing the alleged violation in this case, they argue that Damask is not entitled to qualified immunity for two different reasons. First, they argue that this is one of the exceptional cases in which a prior case (or body of case law) is not needed to clearly establish the right in question. We have recognized that there are "rare cases in which the constitutional right at issue is defined by a standard that is so 'obvious' that we must conclude . . . that qualified immunity is inapplicable, even without a case directly on point." *Jessop*, 936 F.3d at 942 (citation omitted) (alteration in original); *see also Wesby*, 138 S. Ct. at 590 ("Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."). But we have repeatedly emphasized that such cases are few and far between, *see, e.g.*, *Sharp v. County of Orange*, 871 F.3d 901, 911–12 (9th Cir. 2017), and thus, we are hesitant to find a right clearly established without a body of relevant case law.

Contrary to Plaintiffs' assertion, this is not the exceptional case in which the alleged constitutional violation is "obvious" despite the absence of relevant case law. As an initial matter, Plaintiffs' argument frames the relevant

constitutional right at too high a level of generality.  In their briefing below and on appeal, Plaintiffs have described the constitutional right in question as Sabra's right to be free from messages that are "disapproving" of his religion.  The Supreme Court has "repeatedly stressed," however, "that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590 (citation and internal quotation marks omitted).  Here, Plaintiffs' "overbroad proposition, 'cast at a high level of generality,' is just the sort of sweeping statement of the law that is inappropriate for assessing whether qualified immunity applies." *Farnan*, 654 F.3d at 987 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

Plaintiffs' argument also overlooks several contextual factors that make the alleged violation less than obvious.  For example, the challenged content was not only taught in a college course, but also made up a fragment of a single module that was itself just one-sixth of the course.  Moreover, the offending content did not arise in a vacuum.  It was part of a module that sought to explain the phenomenon of *Islamic* terrorism.  Thus, Plaintiffs' allegation that Damask devoted insufficient attention to *other* terror movements is largely beside the point and does not explain why his alleged constitutional violation was obvious.  Finally, although Plaintiffs allege that Damask made a number of inflammatory and false statements about Islam in his PowerPoint slides, it is plausible that Damask was attempting to describe the views and interpretations of Islamic extremists, as opposed to his own, subjective opinions.  Though the offending slides could have benefitted from more precise language, clearer attribution, and better

use of citations, the ambiguity here undercuts the notion that Damask's alleged constitutional violation was obvious.  To be clear, in concluding that Damask is entitled to the benefit of qualified immunity, we do not express agreement with or endorse the substance of his teaching, but he is protected by qualified immunity against the Establishment Clause allegations stated in Plaintiffs' Complaint.

Plaintiffs' second argument is that, even if the constitutional right violated by Damask was not clearly established by a relevant case or body of case law, it was clearly established by a "fact sheet" prepared by the U.S. Department of Education and U.S. Department of Justice. Relying on our decision in *Hardwick v. County of Orange*, 844 F.3d 1112 (9th Cir. 2017), Plaintiffs argue that we may look to agency guidance and statements when deciding whether a right is clearly established for purposes of qualified immunity.

In *Hardwick*, however, we consulted non-decisional authority (a state statute) only as a form of *supplementary support* for a predicate finding that a particular right was clearly established.  *See* 844 F.3d at 1118–20.  The predicate finding itself was based on case law.  *See id.*  Likewise, in *Hope v. Pelzer*, 536 U.S. 730 (2002), the case on which *Hardwick* relied, the Supreme Court concluded that a constitutional right was clearly established based in part on a regulation issued by the defendants' employer, as well as a report, prepared by the Department of Justice, specifically advising the employer that the conduct in question was unconstitutional, *id.* at 743–45.  But again, this non-decisional authority was used to "buttress[]" a predicate finding, based on case law, that the constitutional right in question was clearly established.  *See id.* at 741–43.  Neither *Hardwick* nor *Hope* stands for the proposition that an agency

"fact sheet," without more, is sufficient to clearly establish a constitutional right.

In any event, the fact sheet cited by Plaintiffs would not have put Damask on notice that his conduct was unconstitutional. Damask did not single out Sabra and demand that he explain "why Muslims have not denounced the terrorist attacks of 9/11," as was true in the example of unconstitutional conduct cited by the fact sheet. Thus, even if we could rely solely on non-decisional authority to conclude that a constitutional right was clearly established, the fact sheet does not "'squarely govern[]' the specific facts at issue" in this case. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citation omitted).

"Mindful that there has never been any prior reported case holding that a teacher violated the Constitution under comparable circumstances," *Farnan*, 654 F.3d at 978, we affirm the district court's conclusion that qualified immunity shields Damask from liability on Plaintiffs' Establishment Clause claim.

2.   Plaintiffs' Free Exercise Claim

Plaintiffs' Free Exercise claim fares no better under the "clearly established" prong of our qualified immunity analysis.

To state a claim under the Free Exercise Clause, a plaintiff must show that a government practice "substantially burdens a religious practice and either is not justified by a substantial state interest or is not narrowly tailored to achieve that interest." *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1123 (9th Cir. 2002). Again, though, we have never held under comparable circumstances that a test requiring students to select answers

in conflict with their personal religious convictions (or risk losing points) imposes a substantial burden on religious practice.   Indeed, the most instructive authority we have identified goes the other way.  *See Wood v. Arnold*, 915 F.3d 308, 318–19 (4th Cir. 2019) (concluding that an assignment which required the student to fill in two missing words of the *shahada*, an Islamic declaration—which states, "[t]here is no god but <u>Allah</u> and Muhammad is the <u>messenger</u> of Allah"— did not compel the student, a Christian, "to profess or accept the tenets of Islam," but was merely "an academic exercise [requiring the student] to demonstrate her understanding of the world history curriculum").[10]   As with their Establishment Clause claim, Plaintiffs concede that there is no case, or body of case law, that clearly establishes Sabra's right not to be subjected to a quiz like the one in this case.

The absence of such authority is an inescapable feature of this case, and one that dooms Plaintiffs' Free Exercise

---

[10] Although *Wood* involved a Free Speech claim rather than a Free Exercise claim, its factual similarity and reasoning are instructive in this case.  In *Wood*, the plaintiff argued that "the curriculum implemented and supervised by [d]efendants compelled [her] to confess by written word and deed her faith in Allah," 915 F.3d at 318–19 (first alteration in original), much as Sabra contends that Damask's multiple-choice quiz forced him to adopt views at variance with his religious convictions. Although the claim in *Wood* was predicated on a theory of compelled speech, i.e., that the plaintiff was being forced "to utter . . . speech bearing a particular message," *id.* at 319 (citation omitted), the claim is analogous (albeit not identical) to the claim Sabra has brought under the Free Exercise Clause.  Given these patent factual parallels, we do not agree with the dissent's view that "[t]he facts of *Wood* . . . bear no material resemblance to Damask's quiz questions[,]" Dissenting Op. 91. More to the point, however, even if the dissent finds *Wood* less instructive than we do, it has failed to identify any case that is more apposite than this, let alone one that would "'squarely govern[]' the specific facts at issue" in this case.  *Kisela*, 138 S. Ct. at 1153 (citation omitted).

claim under the second prong of the qualified immunity analysis. Although the dissent tries to find a way around this problem, the solution it lands upon is to frame the clearly established law at a high level of generality, an error against which the Supreme Court has cautioned repeatedly. *See al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (citation omitted)).

In the dissent's view, the clearly established constitutional principle is "that the state cannot condition a benefit or impose a penalty based on a person's adherence or non-adherence to a religious belief." Dissenting Op. 90. Framing the constitutional principle in such general terms, however, "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Instead, our inquiry into whether a particular right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (citation omitted). Recently, for example, we concluded that although the right "to be free from sexual harassment by public officials in the workplace and school contexts" was clearly established under our prior case law, we had "never held that the Equal Protection Clause protects private individuals who suffer sexual harassment at the hands of public officials providing them with social services." *Sampson v. County of Los Angeles ex rel. L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1024 (9th Cir. 2020). Because our law had not "placed the constitutional question beyond debate . . . *in the particular context*" of the case before us, we held that the constitutional right in question was not clearly established at the time of the alleged violation. *Id.* at 1024 & n.10 (emphasis added).

By contrast, the dissent's framing of the relevant constitutional right in this case omits any consideration of "the specific context of the case," *Brosseau*, 543 U.S. at 198, and would vitiate the protections of qualified immunity by allowing plaintiffs to allege violations of an "extremely abstract right[,]" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation omitted).

Perhaps anticipating this critique, the dissent makes two additional points that merit a response.  In response to our conclusion that there are no cases putting Damask on notice that his conduct might be unconstitutional under the circumstances here, the dissent observes that "no specific case on point is required."  Dissenting Op. 90 (citing *Sharp*, 871 F.3d at 911 n.7).  To the extent the dissent means to suggest that this is "one of those rare cases in which the constitutional right at issue is defined by a standard that is so 'obvious' that we must conclude that qualified immunity is inapplicable," even without a relevant case or body of case law, *see Jessop*, 936 F.3d at 942 (citation and ellipsis omitted); *see also Sharp*, 871 F.3d at 911–12, that argument is unpersuasive for reasons we discuss below.  To the extent the dissent suggests we are impermissibly demanding a case "directly on point," *al-Kidd*, 563 U.S. at 741, that is not true either.  Although no such case is required, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  Thus, the Supreme Court has chided lower courts for "fail[ing] to identify a case where an officer acting under similar circumstances . . . was held to have violated" the relevant constitutional provision.  *White*, 137 S. Ct. at 552.  For all its spirited criticism of our conclusion, the dissent has not furnished a single case recognizing a Free Exercise violation under facts remotely similar to this case, let alone one that "squarely governs the case here[.]"  *Brosseau*, 543 U.S. at 201.

The dissent also theorizes that the "level of generality" problem is less of an issue here than it is in cases involving "more open-ended constitutional rights" such as the right not to be arrested without probable cause. Dissenting Op. 86.  It is unclear where this proposed distinction comes from or what its doctrinal basis might be.   The dissent cites no authority for this theory, and we have not located a Supreme Court or Ninth Circuit decision that would support that proposition.  As far as we can discern, the Supreme Court's admonition to avoid framing clearly established rights at a high level of generality is not limited to "open-ended" rights, whatever those may be.  That such a limitation has not been recognized comes as no surprise, for what makes a right more or less open-ended is unclear.[11]    The standard described by the dissent is so vague and indeterminate as to justify any result, making principled, consistent application hopeless.

Without a case or body of case law clearly establishing the constitutional right in question, Plaintiffs resort to arguing that the violation was so obvious as to eliminate the need for such authority.  But this is not one of those "rare cases."  *Sharp*, 871 F.3d at 912.  Even accepting as true the allegations in Plaintiffs' Complaint, the purpose and effect of the quiz are susceptible to interpretation.   Although Plaintiffs argue that it "forced Sabra to disavow his faith and adopt" views "antithetical" to his religious convictions, it is

---

[11] It is not at all clear that the Free Exercise Clause's "anti-penalty and anti-hostility principles" are "more precisely defined at the outset" than, say, the right not to be arrested without "probable cause," as the dissent argues.  *See* Dissenting Op. 86 & n.5.  As with probable cause, the concepts of "hostility" and a "penalty" can be defined at widely varying levels of generality.  There is no basis to suggest that we need less case law to define the contours of the Free Exercise principles at issue in this case than we do in the context of other constitutional rights.

also plausible to interpret the quiz as the district court did.[12] The district court concluded that Sabra "was not required to adopt the views expressed by Dr. Damask or the authors Dr. Damask cited to in his course, but only to demonstrate an understanding of the material taught." Regardless of whether the quiz violated the Free Exercise clause—a question we need not decide to resolve this claim under prong two of the qualified immunity analysis—any such violation was far from "obvious."

Accordingly, we conclude that Damask is also entitled to qualified immunity with respect to Plaintiffs' Free Exercise claim.[13]

### 3.    Qualified Immunity at the Motion to Dismiss Stage

The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (alteration in original) (quoting *Hunter*

---

[12] By offering this observation, we are not, as the dissent suggests, "drawing inferences in favor of the [D]efendants." Dissenting Op. 84. We are merely noting that, even taking all of Plaintiffs' allegations as true, the alleged violation is not so obvious as to make this the "rare case[]" in which a constitutional right is clearly established even without a body of relevant case law. *Jessop*, 936 F.3d at 942.

[13] The dissent observes that we have not "openly dispute[d]" its conclusion that Plaintiffs have stated a Free Exercise claim. Dissenting Op. 83. But we have no reason to dispute such a conclusion where, as here, we can dispose of a claim based on the second prong of our qualified immunity analysis. *See Jessop*, 936 F.3d at 940. In light of our conclusion that Damask is entitled to qualified immunity, we need not, and do not, take any position as to the merits of Plaintiffs' Free Exercise claim.

*v. Bryant*, 502 U.S. 224, 227 (1991)).    That is because qualified immunity gives government officials "a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Id.* (internal quotation marks omitted) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996)).

It is true that resolving claims of qualified immunity at the motion-to-dismiss stage can sometimes present "special problems for legal decision making," *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018), particularly when we are "aided only by the skeletal . . . factual picture sketched out in the complaint," *Wong v. United States*, 373 F.3d 952, 956 (9th Cir. 2004).   Thus, it is understandable that district courts sometimes delay a decision on qualified immunity until the parties have had the opportunity to develop a more comprehensive factual record.    *See O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (observing that a Rule 12(b)(6) dismissal based on qualified immunity "is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies" (citation omitted)).

In this case, though, there are two unique features that obviate the concern over resolving qualified immunity claims prior to discovery.

First, Plaintiffs attached substantial documentary evidence to their Complaint, including the allegedly offending slides; the assigned reading excerpt from *Future Jihad*; screenshots of the full end-of-module quiz; the World Politics course syllabus; screenshots of Sabra's correspondence with Damask following his completion of the quiz; and screenshots of the College's statement posted to Instagram.   We therefore have access to the allegedly offending course material that forms the sum and substance of Plaintiffs' claims, as well as other materials that serve to

contextualize Plaintiffs' factual allegations.   These are precisely the materials that ordinarily would have been produced in discovery.

Second, Damask's World Politics course was a self-guided course administered entirely online.  The PowerPoint slides, assigned readings, and end-of-module quizzes made up the entirety of the course.   There were no lectures, discussion groups, or other pedagogical components beyond the materials described in the Complaint.  In other words, we have before us the universe of evidence we might wish to consider in resolving Damask's claim of qualified immunity. Discovery would not serve to sharpen our understanding of the factual picture in this case.

Even if discovery somehow were to produce additional relevant evidence, it is difficult to conceive of evidence that would alter the result in this case.  As discussed, we have found no cases that would have put Damask on notice that his conduct might be unconstitutional under the circumstances here.   No matter what we might learn in discovery, then, Damask would still be shielded by qualified immunity.[14]   Postponing our qualified immunity decision until the summary judgment stage would only consume

---

[14] The dissent takes a more optimistic view as to the fruitfulness of discovery in this case.  *See* Dissenting Op. 88.  But even if that is correct, the dissent has not explained what we might learn in discovery that would deprive Damask of qualified immunity.  There is good reason to sidestep that question, for such an outcome would require a case (or body of case law) that clearly establishes the unlawfulness of Damask's actions under the "particular circumstances" in this case.  *Plumhoff*, 572 U.S. at 779.  The dissent has not identified a single case that would serve this function.

additional time, expense, and judicial resources, without any realistic possibility that the outcome would change.

Accordingly, although we conclude that CAIR-AZ has organizational standing, we affirm the district court's dismissal of this action.

**AFFIRMED**.

VANDYKE, Circuit Judge, concurring:

I agree with the majority opinion and join it. I write to respond to Judge Bress's position that qualified immunity is inappropriate here because Sabra's Free Exercise claim is clearly established. In reality, Sabra's Free Exercise claim—whether it might ultimately succeed or not—is fraught with difficulties, which is why no claim like it has ever, to my knowledge, been squarely addressed by any court. The only thing clearly established about that claim is that nothing about it is clearly established.

I also write separately to briefly note our court's misguided approach to organizational standing.

## I.   Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012)

(cleaned up). The Supreme Court "ha[s] repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (cleaned up), as doing so would "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights," *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Notwithstanding this "demanding standard," *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018), our dissenting colleague defines a constitutional violation at a level so abstract that it becomes difficult to identify any clear limit to its application. The dissent would make it a constitutional violation for instructors such as Professor Damask to teach and test about their controversial opinions, but presumably only where those opinions are "crude," "wayward," "gross misconceptions," "offensive," or "denigrating" or "hostile" to a religion. Whatever one thinks of Professor Damask's course content, there are serious concerns with relying on a judge's *subjective* views of the Professor's possible motives as authorizing the judiciary to use one part of the First Amendment to cannibalize another. How we would proceed on the merits, if we needed to, in this challenging area is a *very* hard question; the only thing clear to me is that it would not be appropriate for our analysis to turn on our own personal views about whether what Professor Damask taught was too "offensive" or "hostile."

According to the dissent, "the two offending [multiple-choice] questions put Sabra to a facially invalid choice between disaffirming his religious beliefs or receiving a lower grade." And so Sabra was "forced to ratify [Professor Damask's] views or face a tangible detriment." For this reason, the dissent "would have held that Sabra stated a Free

Exercise Clause claim and remanded for the parties to engage in discovery." To drive this point home, the dissent encourages everyone to "imagine multiple-choice questions such as these being posed to us based on what we would regard as gross misconceptions of our own religions."

This is always good advice, especially for judges. It never hurts to ask ourselves whether we could live with the rule we are applying in a case if it was *our* ox being gored. I'm a Christian, so I'll craft the hypothetical accordingly: The Bible instructs followers of Christ to "hate [their] father and mother, wife and children, [and] brothers and sisters." *Luke* 14:26 (NIV). Obviously, many people—including most (if not all) Christians, myself included—would not interpret this passage in isolation to represent an accurate statement of Christian doctrine about loving your family. But a "wayward" professor could certainly rely on it to support an "offensive" view that the Bible directly teaches that all Christians must hate their families—full stop. That same professor, having taught that controversial view, might require his students to answer the following multiple-choice question on a graded quiz:

Where does the Bible instruct Christians to hate their families?

A. The Gospel of Luke

B. The Epistle to the Hebrews

C. The Book of Deuteronomy

D. Hating one's family is not taught in the Bible.

Christian students (myself included) may strongly believe the correct answer is D, but according to the professor, the correct answer would be A.

This hypothetical demonstrates several salient points. Among them, just as most people view terrorism as very bad, the same could be said of hating one's family.[1]  And a religion that teaches its followers to hate one's family would most certainly be viewed with near universal disdain.  But would an offended Christian student similarly situated to Sabra have a Free Exercise claim just because his professor taught this controversial position taken directly from the Bible, and then tested on it?  Should the availability of that claim turn on the professor's personal motives for teaching the material?  I suppose jurists could disagree about *those* questions.  But it would be much harder for them to dispute whether anything in our caselaw *clearly* establishes such a claim.

We have repeatedly affirmed the idea that academic freedom protects a professor's right to teach controversial subjects.  *See, e.g.*, *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 988 (9th Cir. 2011); *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010).  This principle plainly extends to testing students on what they were taught, even if it only concerns the professor's opinions and not demonstrable facts.  Were this not the case, judges and juries would be given the power to decide which opinions are too "hostile" or "denigrating" to

---

[1] Teaching that the Bible instructs all Christians to hate their families is much closer to teaching that Islam supports terrorism than it may appear at first blush because the Bible elsewhere equates hating with being a murderer.  *See I John* 3:15 (NIV) ("Anyone who hates a brother or sister is a murderer.").

a religion, to use some of the dissent's terms.    That is troubling.

So ultimately, if we remanded this case, and everything the dissent imagines might favor Sabra turned out to be true, Sabra still would not have a clearly established Free Exercise claim.  Only by ignoring the utter paucity of similar cases *in this context* can the dissent conclude otherwise.  If we *had* to decide whether Professor Damask's views cross the "dimly perceived line of demarcation" such that teaching his controversial opinions was unconstitutional, *Farnan*, 654 F.3d at 988 (cleaned up), we obviously would.  But we would be the first to address that issue, and it would be very difficult.  And because we would be the first to do so, this is obviously a case in which qualified immunity applies.  *See Mullenix*, 577 U.S. at 11.

## II. Organizational Standing

While I agree with the majority opinion that our circuit's precedent compels the conclusion that CAIR-AZ has organizational standing, this case presents yet another example where our court's jurisprudence is at "loggerheads" with Supreme Court precedent.  *See Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) (Ikuta, J., concurring and dissenting).    The Supreme Court has determined that organizational standing arises upon a showing of an injury in fact, similar to the test for individual standing.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).  This means that an organization must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).  To satisfy this standard, the challenged conduct should "perceptibly impair[]" the organization's interest in carrying

out its core mission. *See Havens*, 455 U.S. at 378–79. Consistent with *Havens*, our court has determined that an organization can establish standing if it can show "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the [challenged actions]." *Smith v. Pac. Prop. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).

But as in other areas of our court's jurisprudence, we have paid lip service to these rules while faltering in our application. In multiple cases, we have watered down the requisite injury to the point where "we have held that an organization with a social interest in advancing enforcement of a law was injured when the organization spent money enforcing that law." *Fair Hous. Council of San Fernando Valley*, 666 F.3d at 1226 (Ikuta, J., dissenting) (discussing *Smith*, 358 F.3d at 1105). As Judge Ikuta has astutely noted, "[t]his looks suspiciously like a harm that is simply 'a setback to the organization's abstract social interests,' the very thing *Havens* indicated was not a 'concrete and demonstrable injury to the organization's activities . . . .'" *Id.* (quoting *Havens*, 455 U.S. at 379).

We can add this case to the pile. CAIR-AZ pled that it is a "non-profit organization committed to advocacy and protecting the civil rights of American Muslims while promoting justice." It also pled that "[i]n an attempt to remedy the damage done by [Professor] Damask, CAIR-AZ has had to divert their resources to create a campaign correcting the Islamophobic information." And it further pled that "it has contracted with a religious scholar to create materials for this campaign." While this suffices under our precedent, it merely establishes that CAIR-AZ simply "spent money . . . addressing the exact problem [it was] established to address." *Fair Hous. Council of San Fernando Valley*,

666 F.3d at 1226 (Ikuta, J., dissenting). In other words, the only resources CAIR-AZ diverted are those to further its stated purpose of "protecting the civil rights of American Muslims." An activity that falls exactly in line with an organization's stated purpose seriously undermines any sense of injury, and therefore runs afoul of the Supreme Court's threshold requirement that injury be "concrete and particularized" and "actual or imminent." *See Lujan*, 504 U.S. at 560. Given our warping of clear Supreme Court instruction, I agree with Judge Ikuta that we should revisit our circuit's organizational standing test en banc. *See Fair Hous. Council of San Fernando Valley*, 666 F.3d at 1227 (Ikuta, J., dissenting).

BRESS, Circuit Judge, dissenting.

Mohamed Sabra, a Muslim student at a public community college, was literally put to the test. In a class presentation reasonably viewed as denigrating to Islam, Professor Nicholas Damask taught that Islamic terrorism was rooted in the Koran's religious mandates and that the Prophet Muhammad had himself committed acts of terrorism. Asserting that "[t]he legitimacy of terrorism is supported by nearly every Islamic legal authority of any significance" and that "[c]ontentions that Islam does not promote warfare or violence cannot be supported on either theological or historical grounds," Damask littered his presentation with photos of Muslim children with captions such as "A future Hamas terrorist?" and "Yet another?" Damask then had students take a crude multiple-choice quiz in which to receive credit, Sabra was forced to answer—contrary to his religious beliefs—that terrorism is "encouraged in Islamic doctrine and law" and "justified

within the context of Jihad." Faced with formal questions of Islamic religious doctrine and constrained by the format, Sabra chose his religious beliefs and got the questions wrong, earning a lower grade.

Being put to the stark choice between adhering to one's sincerely held religious beliefs or facing a penalty falls within the heartland of the Free Exercise Clause's protections. The question here, however, is not whether Sabra should prevail but merely whether he has stated a claim for relief at the motion to dismiss stage. He has. Although Sabra suffered no First Amendment injury through his mere exposure to inflammatory course materials, he may have suffered such an injury when, in connection with those disturbing materials, he was forced to answer black and white multiple-choice questions that he plausibly alleges required him to violate his religious beliefs on pain of receiving a lower grade. Discovery is therefore needed to assess Damask's explanations for his facially problematic quiz questions.

The majority opinion unfortunately never gets there by relying on alternative grounds for dismissal that result in the majority avoiding the question of whether Sabra's Free Exercise claim is legally valid. But the majority's grounds for decision are not correct. The majority bestows qualified immunity on Professor Damask based on a minimal record that raises more questions than it answers, even though we have repeatedly held that granting qualified immunity at the motion to dismiss stage and without discovery is disfavored.

The majority also affirms the dismissal of the Maricopa County Community College District because Sabra supposedly has not pleaded a custom or practice for purposes of municipal liability, even though the district court never reached this issue, the College devoted minimal briefing to

it, and Sabra has never been given an opportunity to amend his complaint.  The majority then prevents Sabra from even having that standard opportunity to replead by holding that Sabra has abandoned this claim on appeal—an abandonment holding that is unsound, unprecedented, and unfair.  The majority has effectively imposed a case-ending sanction on Sabra in circumstances that do not remotely warrant it.

 I would have met Sabra's Free Exercise claim on the merits rather than rely on legally infirm alternative grounds for affirmance.  Sabra's allegations are troubling, concern matters of sincerely held religious conviction, and warrant further judicial inquiry.  I respectfully dissent.

<p style="text-align:center">I</p>

The plaintiff, Mohamed Sabra, enrolled in Professor Nicholas Damask's World Politics course at Scottsdale Community College in the 2020 spring semester.  The College is part of the Maricopa County Community College District ("MCCCD"), and a state actor for purposes of 42 U.S.C. § 1983.  Damask's course, which he has been teaching at the College for 24 years, is self-guided and administered online.  When students have questions, they can message Damask on the College's internal communication software platform.

This appeal centers on a unit of Damask's course entitled "Islamic Terrorism."  During that unit, Damask assigned an excerpt from the book *Future Jihad: Terrorist Strategies Against America* by Walid Phares, had students review a PowerPoint presentation that Damask created, and administered a 25-question, multiple-choice quiz.  The heart of Sabra's Free Exercise Clause claim turns on two questions in this quiz for which Sabra lost points, but which he claims he could not answer "correctly" because the questions as

written required him to affirm a view of Islam that is contrary
to his religious beliefs.

The district court dismissed Sabra's complaint under
Rule 12(b)(6), finding that Sabra failed to state a Free
Exercise Clause violation because the quiz only required
Sabra "to demonstrate an understanding of the material
taught." The majority decides this case in a way that allows
it to avoid the merits of this claim. In a subsequent section,
I will explain why the majority is wrong to do so. In this
section, I explain why, in my view, Sabra has stated a claim
for relief under the Free Exercise Clause. There are
unanswered questions here, but those require discovery; we
cannot simply accept the defendants' view of the facts.[1]

<p style="text-align:center">A</p>

The question in the current posture is only whether Sabra
has pleaded enough factual allegations to survive dismissal
of his Free Exercise claim. To do so, Sabra's complaint must
contain a "short and plain statement of the claim showing
that [he] is entitled to relief." Fed. R. Civ. P. 8(a). This
requires Sabra to plead a claim that is "plausible on its face,"
meaning that his complaint must contain sufficient "factual
content that allows the court to draw the reasonable
inference that the defendant[s] [are] liable for the

---

[1] I agree with the majority that under our precedents, plaintiff
Council on American-Islamic Relations of Arizona, Inc. ("CAIR-AZ")
has organizational standing under Article III. (For ease of reference,
however, I will refer to Sabra as the plaintiff.) I also agree with
defendants that Sabra's Establishment Clause claim lacks merit. The
Establishment Clause does not provide the right doctrinal "box" for the
problem before us. *See Cal. Parents for Equalization of Educ. Materials
v. Torlakson*, 973 F.3d 1010, 1022 (9th Cir. 2020) (*CAPEEM*) (Bress, J.,
concurring).

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Sabra has met this threshold burden.

Although Damask's quiz questions form the basis for the claimed Free Exercise Clause violation—because it is through them that Sabra suffered a formal penalty— Damask's PowerPoint presentation provides the primary context for the quiz.  The PowerPoint slides were made available prior to the quiz and are attached as an exhibit to Sabra's complaint.  The slides would understandably cause considerable offense to a Muslim student (among others) because they portray Islam as a religion that not only supports terrorism but requires it.  I offer only a few of Damask's slides here for consideration.  I have added red boxes around some of the more striking portions of the slides:



58   Sabra v. Maricopa Cnty. Cmty. Coll. Dist.







Case 2:20-cv-01080-SMB Document 25-1 Filed 06/26/20 Page 37 of 76
II. Islamic Terrorism: Definition (cont.)
As with terrorism and jihad generally, contemporary Islamic legal authorities are unanimous in their approval of suicide attacks: "The glory of the Islamic nation appeared when our prophet taught us the industry of death – when he taught us how to create death. Then life became cheap in our eyes. When one of the sons of our nation is killed, he says 'I won' and the Master of the Ka'aba [Allah] swears that he won. .. Our bombs are the *jihad* fighters, whom America has called 'suicide attackers' and we call martyrs."
Sheikh Moshin al-Awaji, imam of the Grand Mosque at King Saud University, Riyadh, Saudi Arabia
POS120 -- Islamic Terrorism
33

Case 2:20-cv-01080-SMB Document 25-1 Filed 06/26/20 Page 44 of 76
III. Islamic Terrorism: Analysis (cont.)
➢ Islamic states have a decided preference to employ force over diplomacy, relative to other countries: Islamic countries faced 142 crises in last 50 years – use of force in 76 (=55%), including high-intensity violence/full scale war in 31. Compared to: Great Britain (11%), U.S. (17%), USSR (28%)
➢ Muslim popular opinion has some sympathy for terrorism generally, and the ultimate goals of terror group (sharia) particularly.
Huntington notes a marked difference in foreign policies between Islamic and non-Islamic states
POS120 -- Islamic Terrorism
40

The only other relevant course material was an excerpt from a book by Walid Phares, who Sabra alleges promotes anti-Muslim ideologies.

At the conclusion of the unit on Islamic terrorism, Damask had students take a multiple-choice quiz. Two questions form the core of Sabra's Free Exercise Claim. In Question 9, Sabra was asked to answer: "Where is terrorism *encouraged* in Islamic doctrine and law?" Consistent with his religious beliefs, Sabra chose the fourth answer: "terrorism is not encouraged in Islamic doctrine and law." The "correct" answer was "the Medina verses." This screenshot of the web-based quiz shows the question and Sabra's incorrect answer:



(The reader will notice that there is a box in the bottom labeled "Additional Comments," but there is no suggestion that it was Sabra who could add such comments when taking the quiz. Instead, it appears this box was to be used by the

62    Sabra v. Maricopa Cnty. Cmty. Coll. Dist.

instructor, in the event the instructor wanted to comment on the student's answer.)

In Question 20, Sabra was asked to fill in the blank: "Terrorism is _____ in Islam."  Consistent with and constrained by his religious beliefs, he chose the second answer: "always forbidden."  That too was wrong:



After taking the quiz, Sabra messaged Professor Damask to express his "disgust" at having to answer questions that were "absolutely in distaste of Islam."  Sabra explained that he "usually do[es] not feel offended when my religion is talked about" and "underst[ood] the school has a curriculum," but nevertheless, "I feel I should not let these types of questions just stand."  In response, Damask wrote that the questions were designed to illuminate "what beliefs motivate [terrorists] no matter how wrong they may be."

Damask did not give Sabra credit for his answers to these two questions, and Sabra received a 64% on the quiz. Sabra posted the quiz questions on social media, where the story quickly went viral. The College at first condemned Damask's actions, but then later retracted its disapproval and called for an "immediate independent investigation of the facts related to this situation." It appears that the College initially indicated that it would give Sabra credit for three questions he missed, but Sabra alleges that the points have not been credited.

B

With this background in place, I turn to the merits of Sabra's Free Exercise challenge. A student does not state a Free Exercise violation merely because he was exposed to offensive content in class. *See Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1016 (9th Cir. 2020). But when a school "penalize[s], interfere[s] with, or otherwise burden[s] religious exercise," *id.* at 1020, or when the challenged action has "a coercive effect that operates against the litigant's practice of his or her religion," *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985), the student has a viable claim.

To determine if a Free Exercise violation has occurred, we ask whether the state has put the plaintiff to a choice between exercising religion or "recei[ving] an important benefit upon conduct proscribed by a religious faith, . . . thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981). In other words, a plaintiff states a Free Exercise claim when state action forces a conditional choice between exercising one's religious beliefs and avoiding a penalty or gaining a benefit. *See Fulton v. City of Philadelphia*, 141

S. Ct. 1868, 1876 (2021) ("[I]t is plain that the City's actions have burdened [plaintiff's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs."); *Trinity Lutheran v. Comer*, 137 S. Ct. 2012, 2021–22 (2017) ("[T]he Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution .... [W]hen the State conditions a benefit in this way . . . the State has punished the free exercise of religion.").

We have upheld schools' curricular decisions against Free Exercise challenge when such an unconstitutional choice has not been imposed. In *CAPEEM*, a group of parents of Hindu children in the California public schools challenged the state's curricular standards, alleging that they "carr[ied] a hostile and denigrating message about the origins of Hinduism when compared with similar provisions relating to other religions of the world." 973 F.3d at 1013–15. The district court dismissed the parents' Free Exercise claims and we affirmed. We held that because the standards "at most . . . contain material Appellants find offensive to their religious beliefs," the defendants did not violate the Free Exercise Clause. *Id.* at 1020. In *Grove*, we similarly held that a school board's refusal to remove from the curriculum a book that offended plaintiff's "religious sensibilities" did not create a Free Exercise Clause issue. *See* 753 F.2d at 1533–34.

Given this precedent, Damask's PowerPoint presentation, standing alone, did not violate Sabra's Free Exercise rights, however repugnant Sabra may have found the course materials. But the quiz is a different matter because of its penalty component. On its face, the quiz— which based on the record before us provided no context

except the bare questions asked—put students to a black-and-white choice on direct questions of Islamic religious doctrine.  To gain points on Question 9, Sabra had to affirm that terrorism is "encouraged in Islamic doctrine and law," and lost points when he answered: "terrorism is not encouraged in Islamic doctrine and law."  Similarly, in Question 20, Sabra had to ratify that terrorism was "justified" in Islam, when he believed, consistent with the second answer, that it was "always forbidden."

A "severe" and "inescapable" impact on religious exercise exists when state action "affirmatively compels" a student to "perform acts undeniably at odds with fundamental tenets of their religious beliefs."  *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972).  That is the core principle that Sabra plausibly invokes here.  We can all imagine multiple-choice questions such as these being posed to us based on what we would regard as gross misconceptions of our own religions.  It is one thing to be exposed to such material in a public-school setting.  It is quite another to be forced to ratify those views or face a tangible detriment.  And while Sabra's claim ultimately turns on just two questions on a quiz, I know of no "peppercorn" exception to the Free Exercise Clause, by which religious liberties could apparently be whittled away on the theory that they matter not enough.  To regard Sabra's challenge as de minimis is to ignore the constitutional injury of which he reasonably and rightly complains.

There is of course a fine line between unlawfully penalizing a student for his religious beliefs and teaching a student a point of view that may offend those beliefs.  College professors should have wide latitude in choosing how they will teach a course.  And the temptation to turn every uncomfortable moment into a constitutional violation

should be resisted.  But what I believe is doing the work here for Sabra at the motion to dismiss stage is the intensely formal nature of the multiple-choice format; the specific way in which the questions were drafted; their orientation around Islamic religious beliefs; and the fact that when Sabra answered the questions "incorrectly," he lost points on the quiz.

Sabra was not merely made to endure offensive course materials.  He was instead placed into a caged pedagogical exercise in which he was forced to affirm a wayward view of his religion or else receive a lower grade.  There was no way out for Sabra on this one.  The issue here is thus not Sabra's discomfort, but his being docked points—receiving a penalty—for his failure formally to answer "correctly" a question of Islamic religious doctrine.  On its face, the two offending questions put Sabra to a facially invalid choice between disaffirming his religious beliefs or receiving a lower grade.

C

But is there some other explanation for this?  Was this just a poorly drafted quiz or were the quiz questions reflective of Professor Damask's possible hostility toward Islam?  Or is there some other reason we can be less concerned about what happened here?  The problem is that at this stage of the proceedings, we do not know.  And we need discovery to get to the bottom of this, including on Damask's request for qualified immunity.

The quiz questions themselves came with no introduction, explanation, or disclaimer.  They lack any context as presented.  And the most salient context we have is Damask's PowerPoint presentation.  Suffice to say, however, if a professor was hoping to explain away facially

problematic quiz questions such as these, the PowerPoint Damask created is a very poor choice for putting those concerns to rest. One can easily read into that PowerPoint a denigrating view of Islam. Sabra thus plausibly alleges not only that the quiz questions put him to an unconstitutional Catch-22, but that they required him to endorse the disapproving view of Islam that he could reasonably perceive in the PowerPoint slides. Damask's PowerPoint presentation thus underscores the need for discovery into Sabra's allegations.

The defendants offer two main responses to the quiz, but neither can carry the day at the motion to dismiss stage. First, when Sabra complained to Professor Damask using the College's messaging system, Damask suggested in response that the quiz questions were written from the perspective of what an Islamic terrorist would argue, with the implication that students were supposed to answer the questions from that standpoint. Damask urged Sabra "not to think about whether the terrorists' beliefs are 'right' or 'wrong' or 'true,'" but to "approach the discussion" by "thinking simply" about "what beliefs motivate [the terrorists] no matter how wrong they may be."

It is possible that this was Damask's thinking when he prepared the quiz. But there is no basis to credit that explanation without discovery. Damask's response to Sabra is hard to square with the fact that the quiz questions are drafted as though they are calling for purely factual, objective answers—as one might expect for a multiple-choice quiz. And when the quiz asked students to think from a certain perspective, the questions so indicated. For example, Question 19 was framed around what Walid Phares believes. Questions 9 and 20 were not written in that way. And Damask's PowerPoint was not written in that way,

either.  While Damask attributes some of the statements in his slides to others, many of the most troubling statements were offered without attribution.

Second, the defendants argue that Sabra has not stated a claim because he was merely "being tested to demonstrate understanding of the course material."  The district court similarly believed there was no Free Exercise Clause violation because Sabra was only being asked "to demonstrate an understanding of the material taught."  It is possible that this may turn out to be the best view of what happened.  But we cannot treat the defendants' position as true in the present posture.

The implication of the defendants' argument is that a public school could teach a curriculum hostile to a religion, penalize students who answer formal questions of religious doctrine "wrong," and then absolve itself of liability by arguing that students were merely being asked to rehash what they learned in the course.  That is an unsettling proposition with no apparent limiting principle.  And it would mean that even outright animus toward religion in a public-school setting could be immunized from constitutional challenge by the circular response that students were merely being tested on the course materials. *Cf. Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (state actors may not act with "hostility to a religion or religious viewpoint").  The defendants' argument therefore sweeps too broadly.  I cannot credit the evident suggestion that no public-school

class can ever produce a Free Exercise violation, regardless of how the course is taught or the material tested.[2]

To say that Sabra was being tested on the course materials, as defendants do, thus requires further analysis into the nature of those materials and the context for the disputed quiz questions. And on that issue, we do not have complete information. I would have held that Sabra stated a Free Exercise Clause claim and remanded for the parties to engage in discovery.

## II

The majority bypasses the merits of Sabra's Free Exercise claim altogether. It affirms the district court's judgment for the College District on alternative grounds that the district court did not reach. The majority further holds that Professor Damask is entitled to qualified immunity. These holdings are mistaken.

## A

The majority affirms the district court's dismissal of the College District by concluding that (1) Sabra on appeal abandoned his municipal liability claim against the College District; and (2) his complaint fails to allege a custom or practice for purposes of municipal liability. In my view, the majority errs in resolving this claim on grounds that the district court did not reach, and on a pleading issue for which

---

[2] This is not a matter of bringing to bear one's subjective or personal views, as the separate concurrence incorrectly asserts. It is instead part of our obligation to ensure that government actors do not act in ways that "are hostile to the religious beliefs of affected citizens" or "in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

Sabra was entitled to leave to amend his complaint. The majority compounds that error by improperly holding that Sabra has abandoned his claims against the College District.

1

The district court did not reach the question of whether Sabra sufficiently alleged an official custom or practice for purposes of the College District's "municipal" liability. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978). Although the College District advanced this argument in its motion to dismiss, the district court instead found that Sabra had not pleaded a First Amendment violation. The district court therefore did not address whether Sabra sufficiently pleaded an official custom or practice for purposes of the College District's alleged municipal liability.

Somewhat remarkably, the majority holds that Sabra "abandoned [his] municipal liability claim on appeal." Maj Op. 22. That is not correct. "A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case." *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000). That is not what happened here.[3]

---

[3] Although the majority tries to suggest otherwise, *BankAmerica* sets the standard for when "a party abandons an issue." 206 F.3d at 826. We have set forth that standard in general terms in many cases, without suggesting that it is limited only to abandonment of a claim at the district court as opposed to the court of appeals. Nor is it apparent why any different standard would apply in those two contexts. The majority thus itself evaluates abandonment under *BankAmerica*'s test and does not suggest any alternative standard that we should apply instead. Maj. Op. 26.

We can begin with Sabra's opening brief.  To the extent the majority is faulting Sabra for not specifically addressing in his opening brief whether he had pleaded a custom or practice for purposes of the College District's municipal liability, Sabra had no obligation to raise this issue on his own.  The district court did not rule against him on this basis.  There is no requirement that an appellant seeking reversal of the judgment below engage in shadowboxing by preemptively discussing other alternative grounds for *affirmance* in his opening brief.

Our cases are clear on this point.  As we reiterated last year:

> We have previously held that the failure of a party in its opening brief to challenge an alternate ground for a district court's ruling *given by the district court* waives that challenge. . . .  [An appellant] does *not* waive a challenge to any ground for the district court's ruling in its opening brief that was not relied on in the district court's order.

*Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 729 (9th Cir. 2021) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010)) (alterations omitted; second emphasis added); *see also Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 n.10 (9th Cir. 2018) (rejecting the argument that appellants waived an issue by not addressing it in their opening brief because the district court did not rule on that basis).  Indeed, we have described it as "'groundless'" "to suggest that an appellant must address all *possible* alternate grounds for affirmance—even those not ruled upon by the district court—in an opening brief." *Warmenhoven*, 13 F.4th at 729 (quoting *Rodriguez*, 591 F.3d at 1118 n.6).  To the

extent the majority premises its abandonment holding on what Sabra allegedly failed to include in his opening brief, the majority clearly errs.

While our clear case law on this issue is sufficient to show that Sabra had no obligation to raise municipal liability in his opening brief, I note that Sabra certainly *did* maintain in his opening brief that he was seeking relief against the College District and that he had a basis to do so.  Sabra argued, among other things, that "MCCCD had actual and constructive knowledge that the Islamic Terrorism module was going to be taught at [the College] because MCCCD's own Regulation 3.6 requires that 'a copy of the course syllabus [] be submitted to [MCCCD] no later than the end of the first week of class.'"  He further argued in his opening brief that "MCCCD not only had notice of the class material, but it condoned the same and approved its use in the classroom."

These statements each directly address the legal standard for municipal liability, which in the majority's words requires that the College District had "knowledge (actual or constructive) of the offending course material and then sanctioned its use in the classroom."  Maj. Op. 31.  And more broadly, throughout his opening brief, Sabra made clear that he was seeking reversal of the judgment as to both Damask and the College District.  This was more than sufficient to show that Sabra was still pressing this claim, even as nothing required Sabra to address the sufficiency of his custom and practice allegations when the district court did not rule on that basis.[4]

_____

[4] In a footnote, the majority maintains that these statements in Sabra's opening brief were not sufficient to show that Sabra "specifically

We can turn next to the remainder of the briefing.  In approximately two and a half pages of its 53-page answering brief—on pages 43 to 46—the College District argued that we could affirm on the alternative ground that Sabra had failed to plead an official custom or policy for purposes of municipal liability.  Much of this abbreviated discussion in the College District's answering brief consisted of background legal citations.  As the majority notes, Sabra in his reply brief did not specifically address this claimed alternative ground for affirmance.

The majority seizes on this to hold that Sabra has thereby abandoned his *Monell* theory on appeal.  According to the majority, even though the district court never ruled on this basis, once the College District in its answering brief raised this supposed alternative ground for affirmance—on a pleading issue for which Sabra otherwise would have received leave to amend—Sabra's failure to respond to the argument in his reply brief means he has now forfeited his entire municipal liability claim for all time.  According to the majority, this abandonment rule "is true whether an appellant fails to file any reply brief or in filing a reply brief fails to address an issue squarely raised in the appellee's answering brief."  Maj. Op. 24.  The majority thus holds that once the appellant in a reply brief "disregard[s] an argument presented by the appellee" in its answering brief, the appellant has thereby conceded the argument through abandonment.  Maj. Op. 24–25.  The majority claims this

and distinctly" argued his municipal liability claim there.  Maj. Op. 23 n.5.  But as I have explained, Sabra had no obligation at all to address in his opening brief possible grounds for affirmance on which the district court did not rely.  *Warmenhoven*, 13 F.4th at 729.  I point out what Sabra said in his opening brief to show that even notwithstanding his lack of obligation, Sabra did not somehow walk away from his claim against the College District.

rule of law "is based on a straightforward application of our case law on abandonment," and indeed reflects "a textbook case of abandonment."  Maj. Op. 23, 27.

It is hard to overstate the unprecedented nature of this holding as a matter of appellate procedure.  Under the Federal Rules of Appellate Procedure, appellants are not required to file reply briefs *at all*; they are optional.  *See* Fed. R. App. P. 28(c), 31(a).  Many litigants in our Court do not file them.  *United States v. Dharni*, 757 F.3d 1002, 1004 (9th Cir. 2014) ("It is not at all unusual for appellants to fail to file reply briefs, which are optional.").  The order docketing this case thus used our standard language stating that Sabra's "optional reply brief is due 21 days after service of the answering brief."  To the extent the majority is suggesting that an appellant's failure to file a reply brief is tantamount to abandonment, the majority contradicts both the Federal Rules and the explicit guidance we gave the parties in this case through our usual case-opening order.  The rules governing reply briefs explain why we do not have loads of cases finding issues abandoned for failure to file reply briefs, which would be the case if the majority's rule were actually the law.

To the extent the majority's abandonment holding turns on the fact that Sabra chose to file a reply brief but did not address every issue raised in the answering brief—here, a pleading issue that the district court did not even reach—the majority's abandonment rule is equally invalid.  With a background rule that reply briefs are optional, we have never told appellants that if they elect to file a reply brief, failure to respond to a particular argument made in the answering brief means appellants will be treated as forfeiting that claim. As I explain below, a failure to address an issue in a reply brief can contribute to an appellant *losing on the merits* of

that issue.  But we have never held that in and of itself, such a failure is a *procedural default*.    Once again, it is commonplace that litigants in optional reply briefs do not always address every single argument raised in an answering brief, especially ones that were not grounds for the decision below.  If the majority's rule were the law, we would again have legions of cases finding abandonment of claims on appeal through "incomplete" reply briefs.

Instead, for all its representation that its abandonment holding is a "straightforward application of our case law on abandonment," Maj. Op. 23, the majority identifies only two cases supporting its broad abandonment theory.  But the majority quotes isolated lines from those cases without revealing their full picture.  Those two cases do not support what the majority is doing here.  And they confirm that today's decision is anything but a "straightforward application" of existing law.

In the first case, *Maciel v. Cate*, 731 F.3d 928 (9th Cir. 2013), the appellee argued for the first time in its answering brief that the defendant's completion of parole mooted the appeal, based on events post-dating the filing of the appeal.  *Id.* at 931–32.  The appellant responded to the mootness issue in his reply brief.  *See Maciel v. Cate*, No. 11-56620, Dkt. 33 at 2–4.  Then, the appellant attempted to raise a new argument against mootness in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j).  In a footnote, we stated that the appellant had "forfeited this argument" by "failing to address it in his reply brief" and by instead raising it in an "improper[]" Rule 28(j) letter "filed shortly prior to oral argument."  *Maciel*, 731 F.3d at 932 n.4.

We have never at any point in *Maciel*'s nearly 10-year existence cited this two-line snippet in a footnote as setting forth    some    watershed    principle    of    abandonment

jurisprudence (indeed, it appears we have never cited this aspect of *Maciel* at all). *Maciel* does not support, much less require, the majority's abandonment holding. The appellant in *Maciel* of course forfeited his right to make *any further argument on appeal* on the mootness issue; that is what made his Rule 28(j) letter improper. And that explains why in the one sentence the majority relies upon, *Maciel* cited only *United States v. McHenry*, 659 F.3d 893, 902 (9th Cir. 2011), a case that also rejected an argument because it was made for the first time in a Rule 28(j) letter. *See Maciel*, 731 F.3d at 932 n.4. But to say that an appellant cannot make additional arguments in a Rule 28(j) letter filed on the eve of argument—a longstanding point we make all the time—is a far cry from saying the appellant in a reply brief has totally abandoned an entire claim forever, especially one based on a pleading issue that the district court never addressed. And for all the majority's reliance on *Maciel*'s footnote, *Maciel* ultimately went on to address the argument on the merits as a matter of discretion. *Id.* If the majority had followed the rest of *Maciel*'s footnote, it would have had to remand to allow Sabra to replead, as I explain below.

The second case the majority cites is *International Brotherhood of Teamsters v. Allegiant Air, LLC*, 788 F.3d 1080 (9th Cir. 2015). That case also does not support the majority's broad abandonment rule. In *Allegiant Air*, the appellant failed to argue in its *opening brief* that an agency decision should have preclusive effect. *Id.* at 1090. Out of an apparent abundance of caution, the appellee argued in its answering brief that collateral estoppel did not prevent us from revisiting the issue. *Id.* In its reply brief, the appellant then tried to argue that the agency determination did have preclusive effect, but it offered only a conclusory assertion on this point. *Id.* We stated that although "[w]e have discretion to consider an issue raised in a reply brief where,

as here, an appellee raised an issue in its brief . . . [b]ecause [appellant's] Reply does not cite relevant authority or otherwise press the point, we find the argument waived." *Id.*

Properly considered, the central problem in *Allegiant Air* was that the appellant failed to raise an argument in its *opening brief*. The question then became whether to exercise our discretion to address the argument because the appellee had raised it in its answering brief. *Allegiant Air* thus speaks to the question of what an appellant must do to revive an argument it neglected to include in its opening brief, but which is potentially back in play based on the appellee discussing it in the answering brief.

This case is completely different because as I discussed above, Sabra had no obligation to address the municipal liability pleading issue in his opening brief. *Allegiant Air* did not purport to set forth a general rule of irrecoverable abandonment of a claim anytime a reply brief does not address an argument made in the answering brief. The majority's assertion that my views here are "flatly inconsistent with our conclusions in *Maciel* and *Allegiant Air*," Maj. Op. 24–25, is thus simply wrong, ignoring the critical differences between this case and those ones. This is not a "textbook case of abandonment," as the majority somehow asserts, Maj. Op. 27, but the deployment of an entirely novel abandonment theory.

To be sure, and as I referenced above, an appellant's failure to respond to an argument raised in an answering brief can result in the appellant losing *on the merits* of the ground raised in the answering brief and not addressed in a reply brief. That is because (as the majority notes) we "may affirm a 12(b)(6) dismissal on any basis fairly supported by the record," *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004), just as we may affirm the judgment on alternative

grounds more generally, *see, e.g.*, *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1136 (9th Cir. 2003).

But losing on the merits is entirely different than losing on grounds of abandonment. The problem here is that the majority cannot just affirm on the merits. The *Monell* issue is, at best, a failure to plead sufficient facts. Until today, Sabra had never received a ruling identifying insufficiencies in his "custom and practice" factual allegations. And as I explain further below, Sabra would have been given leave to amend his allegations as a matter of course—as the majority expressly concedes. Maj. Op. 31–32. The *Monell* pleading issue is thus not on its own an alternative ground *for affirmance*: we could at best vacate the district court's decision on this basis as to the College District and instruct that Sabra be given leave to replead with additional facts. Yet the only reason the majority is disallowing Sabra from having that standard opportunity to amend his complaint is by bootstrapping its improper theory that Sabra abandoned this issue in his reply brief.

As a procedural ruling, the implications of today's abandonment holding will likely extend far beyond Sabra and his claims. Parties often spar in the district court over various claimed pleading deficiencies as to which the court does not rule but which, if it had dismissed on those bases, would have been the proper subject of leave to amend. Now every one of these fact pleading defects is in play on appeal as an alternative ground for affirmance on abandonment grounds if the appellant fails to address them preemptively in his opening brief and/or in his reply brief. With no basis in the federal rules or our precedents, the majority has created potential traps for the unwary while inviting

extensive and unnecessary protective briefing on pleading issues that district courts did not address.

Of course, even if the majority's abandonment-by-reply-brief theory were plausible, nothing *requires* the majority to find Sabra's claim against the College District abandoned and thereby block Sabra from pursuing any further relief against this defendant. "We have discretion . . . to overlook any waiver." *Phillips v. E.I. DuPont de Nemours & Co. (In re Hanford Nuclear Rsrv. Litig.)*, 534 F.3d 986, 1007 (9th Cir. 2008). Indeed, we often exercise that discretion even when an appellant fails specifically and distinctly to argue an issue in his opening brief—unlike here, the violation of an actual, well-established procedural requirement. *See, e.g.*, *Etamedi v. Garland*, 12 F.4th 1013, 1027 (9th Cir. 2021); *Wooten v. Kirkland*, 540 F.3d 1019, 1025 n.4 (9th Cir. 2008); *Koerner v. Grigas*, 328 F.3d 1039, 1048–49 (9th Cir. 2003).

Why not exercise that discretion here, when Sabra is being blindsided with a novel theory of abandonment and when he has advanced troubling allegations related to his religious beliefs? A favorable exercise of discretion would further be warranted considering that nothing in Sabra's reply brief indicates that he was "choos[ing] a position that removes the [*Monell*] issue from the case," as is required to find Sabra's claim against the College District abandoned. *BankAmerica Pension Plan*, 206 F.3d at 826. Sabra's reply brief consistently indicated that he was seeking reversal of the district court's judgment as to both appellees. From Sabra's reply brief, the majority "infer[s] that [Sabra] had nothing to say" about his *Monell* claim. Maj. Op. 23 n.4. Why not infer instead that Sabra believed, correctly, that he had no obligation to say anything on this issue?

When we asked Sabra's counsel at oral argument about this, he made clear that Sabra was not abandoning any claim against the College District, explaining at length Sabra's theories of municipal liability.  I agree with the majority that an abandoned claim cannot be resuscitated at oral argument.  But the oral argument colloquy with Sabra's counsel confirms that the *Monell* issue was never abandoned in the first place.  And it underscores the severity of the majority's abandonment ruling.

The majority claims it is "aware of no case . . . in which our court has gone to such lengths to rescue a counseled party's claim under these circumstances." Maj. Op. 25.  But surely other parties have done worse and fared better.  I do not understand why, even on the majority's misguided view of abandonment, that the majority is insisting that Sabra face case-ending consequences as an exercise of our discretion.

I am aware of no case in which we have found a claim abandoned in circumstances such as this, and the majority cites none.  Nothing in our cases required this.  And I see no judicial interest in applying the doctrine of abandonment in the unforgiving fashion that the majority does here.  The majority has turned what is at best a minor omission in an optional reply brief into a death knell.

2

Equally severe is the majority's conclusion that Sabra's complaint fails to allege a custom or policy, and that Sabra is not even allowed an opportunity to amend.

To demonstrate an official custom or policy under *Monell*, Sabra was required to allege that the College District made "a deliberate choice to follow a course of action . . . by the official or officials responsible for establishing final

policy with respect to the subject matter in question."
*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). To
state such a claim, Sabra could have alleged a "longstanding
practice or custom." *Gordon v. Cnty. of Orange*, 6 F.4th
961, 973 (9th Cir. 2021) (quotations omitted). In addition,
even if the incident is isolated, municipal liability remains
proper "if [a] final policymaker ratified a subordinate's
actions," meaning that the policymaker "approve[d] a
subordinate's decision and the basis for it." *Christie v. Iopa*,
176 F.3d 1231, 1238–39 (9th Cir. 1999) (quotations
omitted).

Sabra plainly endeavored to plead these elements in his
complaint. He alleged that the College District had
constructive knowledge of the class syllabus; that Damask
had been teaching this class for 24 years; that the College
District "publicly defended" Damask after Sabra's
allegations came to light; and that because "Damask, as the
division/department chair, engaged in [the challenged]
actions[,] and thus as the final policymaker[,] Damask's
actions are attributable to" the College District. Sabra thus
specifically alleged that the College District "not only
condoned the material but approved of its use in the
classroom."

The majority spends pages explaining why these
allegations are insufficient—far more than the College
District itself spent on this issue in its answering brief. On
the merits, I find much of the majority's analysis improperly
stringent at the motion to dismiss stage. For example, the
majority faults Sabra for "not alleg[ing] that the course in
other years contained the same content that offended Sabra,"
and notes that Sabra did not allege that "other professors
throughout the College District subject students to similar
views or teaching methods." Maj. Op. 28–29. I doubt Sabra

had to make allegations so far-reaching to state a claim for municipal liability. But at the same time, Sabra did allege that Damask had been teaching the course for nearly a quarter century, and that he was the department chair who in that capacity approved his own course. On this front, it is not reasonable to expect Sabra to have pleaded the details that the majority claims are missing.

The larger point, however, is that even if one were inclined to agree with the majority that Sabra's existing complaint could use some beefing up, Sabra has never been given the opportunity to cure the deficiencies that the majority identifies. Under Rule 15, leave to amend should be "freely give[n]." Fed. R. Civ. P. 15(a)(2). "[T]his policy," we have held, "is to be applied with extreme liberality." *Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). Thus, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quotations omitted).

If the district court had ruled against Sabra on the bases that the majority does, Sabra clearly would have been entitled to leave to amend. Indeed, if the district court had refused to grant Sabra leave to amend, we would have held that the court abused its discretion. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (holding that the district court abused its discretion because "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment"). There is strong reason to believe that Sabra could address the alleged

shortcomings that the majority identifies considering Damask's lengthy history of teaching this class, his prominent decision-making role in the College, and the fact that Sabra can plausibly allege that the College approved or was aware of Damask's course materials. The majority effectively agrees, recognizing that "in other circumstances Plaintiffs might be given another opportunity to present a pleading that contained more substantial allegations." Maj. Op. 31–32.

But the majority then remarkably shuts this down too because "Plaintiffs abandoned their municipal liability claim by failing to present arguments in support of it on appeal." Maj. Op. 31–32. This is excessive and wrong for the reasons I have given above. What was at best Sabra's minor omission in his reply brief on appeal has become the supposed justification for a case-dispositive sanction preventing him from even re-pleading a legitimate claim.

B

The majority further errs in granting qualified immunity to Professor Damask at this preliminary stage of the proceedings. To determine if Damask is entitled to qualified immunity we consider "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of [his] alleged misconduct." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019) (quotations omitted). Here, plaintiffs have stated a Free Exercise claim, which the majority does not openly dispute. So, to receive qualified immunity, Damask must show that he did not violate a clearly established right.

It may be that Damask will be able to make that showing. But we are not in a position to form that judgment now, at this early juncture. A state actor cannot condition a benefit

or impose a penalty on the plaintiff's exercise, or willingness not to exercise, a religious belief. *See, e.g.*, *Fulton*, 141 S. Ct. at 1876; *Trinity Lutheran*, 137 S. Ct. at 2022; *Thomas*, 450 U.S. at 716; *Yoder*, 406 U.S. at 218; *Grove*, 753 F.2d at 1533–34. The issue is not whether that principle is clearly established—it obviously is—but instead whether that is what happened here, and whether Damask acted with hostility towards Islam in the process. *See Masterpiece Cakeshop*, 138 S. Ct. at 1731. That is why discovery is also needed to evaluate the qualified immunity question.

The majority sees things differently, but its reasoning is not persuasive. The majority concludes that "[t]he purpose and effect of the quiz are susceptible to interpretation." Maj. Op. 43. But this only shows that the majority is drawing inferences in favor of the defendants, which is impermissible at this stage. *See Ass'n for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011) (on a motion to dismiss "[t]he court draws all reasonable inferences in favor of the plaintiff"). In any event, the two disputed quiz questions do not require much interpretation to see they are problematic. And if they are not, it is only because the context of the rest of the course demonstrates that the quiz questions are not as they might seem. But we need discovery to figure that out.

The majority's conclusion otherwise reflects error. The majority "stress[es] the importance of resolving immunity questions at the earliest possible stage in litigation." Maj. Op. 44 (quoting *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010)). Although I agree with the sentiment, it does not govern here. In *Dunn*, the case the majority cites on this point, the plaintiff prisoner filed a § 1983 claim rooted in substantive due process, claiming that the prison had violated his "fundamental liberty interest in his relationship

with his children" after the prison prohibited minors from visiting him after he had phone sex with his wife from the prison with one of his children on the line. 621 F.3d at 1198, 1204. We were quite right to reject that near-frivolous claim on qualified immunity grounds at the motion to dismiss stage. But that case bears no resemblance to this one, where the baseline constitutional right is clearly established, and the key question is instead how the disputed quiz questions should be properly understood.

The more relevant cases for our purposes are the ones emphasizing that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making" because we must accept the well-pleaded allegations in the complaint as true. *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (reversing district court's grant of qualified immunity at the Rule 12(b)(6) stage); *see also O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (reversing district court's grant of qualified immunity at the Rule 12(b)(6) stage because "dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies") (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)); *Morley v. Walker*, 175 F.3d 756, 761 (9th Cir. 1999) (affirming denial of qualified immunity at the Rule 12(b)(6) stage); *Pelletier v. Federal Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992) (same). We have therefore cautioned that the "skeletal—at best—factual picture sketched out in [a] complaint" can preclude the resolution of qualified immunity at the motion to dismiss stage. *Wong v. United States*, 373 F.3d 952, 956 (9th Cir. 2004).

It is of course true, as the majority notes, that "courts must not define clearly established law at a high level of

generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quotations omitted). But not every qualified immunity case presents a dispositive, first-order level of generality problem at every stage of litigation.   And setting aside that *Wesby* was a summary judgment case, the "level of generality" problem in qualified immunity cases is more pronounced in cases like *Wesby* itself, which involve more open-ended constitutional rights—there the right not to be arrested without "probable cause." *Id.* at 582, 584.   Here, the Free Exercise Clause's anti-penalty and anti-hostility principles are fairly defined.[5] And I do not believe we need an exhaustive body of case law to conclude that it is improper to impose a penalty based on hostility or animus toward a particular religion, assuming that is what happened here.

Although it is possible that after discovery Damask may have a "level of generality" argument, the questions we need to consider first are simply what the quiz questions meant and what Damask was teaching, which require factual development.   The majority thus proves my point in repeatedly emphasizing that qualified immunity turns on the specific context of the case.   Maj. Op. 41.   It is that context that I believe necessitates further factual inquiry before the qualified immunity question can be confidently answered.

---

[5] A constitutional right that is more precisely defined at the outset requires less case-by-case development to illuminate its meaning. Therefore, the level of generality problem is less acute.   This reasoning should hardly be considered controversial, as the majority incorrectly asserts.

That is why our case law recognizes the difficulties associated with making qualified immunity determinations at the motion-to-dismiss stage, difficulties that I believe are present here.  *Keates v. Koile*, 883 F.3d at 1234; *O'Brien*, 818 F.3d at 936; *Wong*, 373 F.3d at 956.  As we explained in *Keates* in reversing the grant of qualified immunity on a Rule 12(b)(6) motion, "our decision at the motion-to-dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity 'were the case permitted to proceed, at least to the summary judgment stage' and the court is presented *with facts providing context for the challenged actions*."  883 F.3d at 1235 (quoting *Wong*, 373 F.3d at 957) (emphasis added); *see also O'Brien*, 818 F.3d at 936 ("Once an evidentiary record has been developed through discovery, defendants will be free to move for summary judgment based on qualified immunity.").

The majority concedes that "district courts sometimes delay a decision on qualified immunity until the parties have had the opportunity to develop a more comprehensive factual record."  Maj. Op. 45–45.  But it concludes that "two unique features" of this case make qualified immunity appropriate at the pleadings stage.  Maj. Op. 45.  I disagree with that assessment.

The first "unique" feature that the majority identifies is the fact that the plaintiffs "attached substantial documentary evidence to their Complaint," including the quiz questions and offending slides.  Maj. Op. 45.  The majority thus believes it has "precisely the materials that ordinarily would have been produced in discovery."  Maj. Op. 46.  This is not persuasive.

Plaintiffs often attach exhibits to their complaints.  But that standard practice does not invariably, or on its own,

justify granting a motion to dismiss, including on qualified immunity grounds. Equally unfounded is the majority's suggestion that there are no further documents out there that could bear on this case. There is no basis for that assumption.

One can easily imagine the many document requests that Sabra could legitimately serve on the defendants that would shed further light on Damask's facially problematic quiz questions and how he taught his class. These include but are not limited to documents on which Damask relied in preparing the quiz; documents on which Damask relied in preparing the PowerPoint; Damask's communications with the College and others about Sabra's complaints or Damask's controversial teaching materials; Damask's class notes; Damask's earlier versions and drafts of these course materials; any past complaints made to Damask or the College about Damask's course; documents bearing on the College's initial decision to condemn Damask's actions, and its about-face on that issue; documents related to the College's own investigation into the events giving rise to this case; and so on.

The majority tells us that "[t]he context of this case weighs heavily against any argument that the violation is obvious." Maj. Op. 34. But it then in the name of qualified immunity prevents Sabra from conducting even basic document discovery into the surrounding context. That has it backwards. There is no basis to conclude that the relevant documents in this case are only the ones Sabra himself had on hand and attached to his complaint (something Sabra was not even required to do in the first place).

A second "unique feature" of this case, the majority tells us, is that because Damask's class "was a self-guided course administered entirely online," "we have before us the

universe of evidence we might wish to consider in resolving Damask's claim of qualified immunity." Maj. Op. 46. Indeed, the majority goes so far as to conclude, "[d]iscovery would not serve to sharpen our understanding of the factual picture in this case." Maj. Op. 46. These suggestions are unfounded.

I have explained above why it is folly to assume that there are no other relevant documents besides the ones Sabra attached to his complaint. But the majority's secondary suggestion that this case could be decided purely on a paper record is entirely at odds with the basic discovery practices authorized in federal court, most notably oral testimony. *See* Fed. R. Civ. P. 30. Our system places a premium on putting witnesses under oath and requiring them to explain their actions. Damask's under-oath explanation for his quiz questions is at present among the most critical information we are lacking. There is thus nothing "unique" about the fact that Sabra's claims are based in documentary evidence. Many legal claims can be so described. What is unique, however, is the majority's insistence that we can make factual judgments at the pleading stage, without any of the basic discovery that the Federal Rules allow.

The majority nonetheless concludes that "[e]ven if discovery somehow were to produce additional relevant evidence"—which it of course would—we can still cut off this lawsuit at the pleading stage because "[n]o matter what we might learn in discovery . . . Damask would still be shielded by qualified immunity." Maj. Op. 46. It is not apparent to me how the majority can say this. The majority does not dispute that Sabra has pleaded a Free Exercise Clause violation. The majority asserts that it has "found no cases that would have put Damask on notice that his conduct might be unconstitutional under the circumstances here."

Maj. Op. 46–46.  But no specific case on point is required.  *See, e.g.*, *Sharp v. City of Orange*, 871 F.3d 901, 911 n.7 (9th Cir. 2017); *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.).  And, in any event, there are legions of cases establishing the basic Free Exercise clause principle that the state cannot condition a benefit or impose a penalty based on a person's adherence or non-adherence to a religious belief.

The majority replies that "we have never held under comparable circumstances that a test requiring students to select answers in conflict with their personal religious convictions (or risk losing points) imposes a substantial burden on religious practice."  Maj. Op. 39–40.  But that understates Sabra's allegations substantially.  What we have here is a student who, on the face of a highly constrained multiple-choice exercise, was seemingly required to affirm a particular view of his religion or else receive a lower grade, with a problematic PowerPoint presentation as our primary context and, as of yet, no evidence of the instructor's objectives.

The majority's reliance on *Wood v. Arnold*, 915 F.3d 318 (4th Cir. 2019), which the majority describes as "the most instructive authority" it has identified, only underscores how the majority errs in affirming the denial of qualified immunity at the motion to dismiss stage.  Maj. Op. 40.  In *Wood*, a public high school taught a unit on the "Muslim World" in a world history course, during which students were asked to complete a worksheet covering the "beliefs and practices" of Islam.  915 F.3d at 312–13.  This assignment specifically appeared under the heading "Beliefs and practices: The Five Pillars."  *Id.* at 317.  One fill-in-the-blank question asked students to fill in the underlined words:

"There is no god but <u>Allah</u> and Muhammad is the <u>messenger</u> of Allah." *Id.* at 312–13.

*Wood* does not remotely support awarding Damask qualified immunity at the motion to dismiss stage. As the majority concedes in a footnote, *Wood* did not even involve a Free Exercise claim. Maj. Op. 40 n.10. The core theory Sabra advances was thus not even discussed in *Wood*. The facts of *Wood* also bear no material resemblance to Damask's quiz questions and pejorative PowerPoint slides because, among many other reasons, the disputed assignment in *Wood* contained clear context ("Beliefs and Practices: The Five Pillars") confirming that students were merely being asked to "identify the tenets of Islam." 915 F.3d at 317. The context here is hardly so conclusive, and instead raises even more questions.

Finally, and perhaps most critically, *Wood* was resolved at the summary judgment stage. *Id.* at 313. Although the plaintiff's allegations in *Wood* pale in comparison to Sabra's, the plaintiff in *Wood* had the opportunity to conduct discovery—which the majority improperly denies Sabra. *Wood* thus if anything confirms that the majority acts prematurely in letting Damask out of this case at the pleading stage. Unfortunately, this is only of a piece with the majority's improper determination to prevent the further exploration of highly problematic allegations involving important matters of religious faith.

I respectfully dissent.